## UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA

---

MARK CHAMBERLAIN,

        **Plaintiff,**

   **V.**

POLICE OFFICER BOGAN, ET AL.,

        **Defendants**

**CIVIL ACTION**

**NO. 20-cv-6572**

REC'D SEP - 0 2024

---

### NOTICE OF DISCOVERY

I, Mark Chamberlain, now file Discovery in the above caption case. Any documents within this package are documentation previously filed by, The United States Attorney's Office, the Common Pleas Courts Of Philadelphia, and or myself with the latter institutions. Within this discovery package please find the following:

- Pro-se amended omnibus motion (filed August 18, 2020)
- Pro-se motion to compel information (filed February 21, 2020)
- Pro- se Omnibus hearing Transcripts (held August 26, & September 14, 2020)
- Search warrant 212248
- Affidavit of Probable Cause
- Biographical Report
- Philadelphia Police Dept. Misconduct Disclosure (P/O Tyra Deveaux #3212)
- Notice from U.S. Department of Justice revealing IAD investigation of P/O Jeffery Galazka #7481
- Correspondence from Adina Greenfield (Private investigator) to Atty. Mark Wilson (Plaintiff's U.S. Atty.)

- Misc. Documents from The Common Pleas Court Of Philadelphia showing the authentic signature of (The late) Kevin Devlin

- Evidence Control Data form of Rashon Cater #19-06643

- Property receipt #3393678

- Property receipt (of Rashon Carter) #3393768 matching Evidence Control Data form #19-06643

- Criminal Docket Sheet of Rashon Carter (MC-51-CR-0010379-2019)

- Philadelphia Municipal Court Arraignment Court Magistrate Schedule

- Memorandum from Police City of Philadelphia

- Blank search warrant signed and approved by Kate Lewis

UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA

---

**MARK CHAMBERLAIN,**

               **Plaintiff,**

**V.**

**POLICE OFFICER BOGAN, ET AL.,**

            **Defendants**

**CIVIL ACTION**

**No. 20-cv-6572**

---

### PROOF OF SERVICE

I, MARK CHAMBERLAIN, certify that I am this 9th day of September, 2024, Hand delivered a copy of this discovery, to the United States District Court For The Eastern District Of Pennsylvania, 601 Market st. Philadelphia, Pa. 19106 James Byrne rm 1206

Date: 09-09-24

                                  MR. MARK CHAMBERLAIN

Name: MARK CHAMBERS
PP#859335
Detention Center
8201 State Road
Philadelphia, Pennsylvania 19136

Hon. CHARLES EHRLICH
Courtrooms:   608
PRO-SE DEFENDANT
NCD:  AUGUST 26, 2020

---

Commonwealth of Pennsylvania

v.

MARK CHAMBERS

:
:
:
:
:
:
:
:
:
:
:

IN THE COURT OF COMMON PLEAS
FOR THE FIRST JUDICIAL DISTRICT
OF PENNSYLVANIA
CITY OF PHILADELPHIA

CP-51-CR-0004488-2019

CHARGES:  PWID AND VUFA

**Received**

AUG 1 8 2020

Office of Judicial Records
Prison Liaison Unit

### AMENDED OMNIBUS MOTION

**TO THE HONORABLE JUDGE CHARLES EHRLICH OF THE COURT OF COMMON PLEAS; PHILADELPHIA COUNTY:**

Defendant, **MARK CHAMBERS**, in his **PRO-SE capacity**, moves this Honorable Court, pursuant to the United States and Pennsylvania Constitution's 4TH Amendment and Article I section 8 to suppress, 5th amendment (due process) and, 14th amendment (equal rights clause) PA Constitution's, Due process. This motion filed Pursuant to Pa. R. Crim. P. 578 and 581 **FOR JUST CAUSE, MOTIONS THE COURT TO SUPPRESS AND MOTION TO QUASH THE INFORMATION**

**AND NOW**, comes the PRO-SE Defendant **MARK CHAMBERS**, Respectfully Requesting the Suppressing of Physical Evidence, statement allegedly made during illegal intrusion, search warrant, initial (49) used for a affidavit of probable cause, criminal complaint, and to Quash the information and brings forth the following:

   **(A) Identification of his person,** *due to the unduly highly suggestiveness of a unconstitutional preliminary hearing procedure,*

   **(B)** *(Alleged) physical evidence illegally seized from the Defendant's home without warrant or a detached magistrate's determination of probable cause* **and**

   **(C)** (Alleged) *contraband found in the Defendants vehicle without warrant or a detached magistrate's determination of probable cause,*

1

**(D)** *(Alleged) statement made by the Defendant, obtained during the illegal intrusion of the Defendant's privacy, illegal detainment, and subsequently illegal arrest*

by **THE Philadelphia Police Department's Narcotics Field Unit Officials** on or about the APRIL 22, 2019.

**(E) THE ARREST MADE WITHOUT WARRANT, WITHOUT PROBABLE CAUSE, AND INSUFFICIENT CRIMINAL COMPLAINT FILED APRIL 23, 2019** signed by Jason Morgan **(A REPRESENTATIVE FOR THE DISTRICT ATTORNEY OFFICE AS AFFIANT CAUSING A CONFLICT OF INTEREST IN THE PROSECUTION)**

**(F) SUPPRESS THE FRAUDULENT APPLICATION FOR SEARCH WARRANT**

**(G) SUPPRESS THE FRAUDULENT AFFIDAVIT OF PROBABLE CAUSE**

**(H) <u>MOTION TO QUASH THE INFORMATION FILED BY THE DISTRICT ATTORNEY'S OFFICE PURSUANT TO PA. R. CRIM. P. 578 OF THE PRE-TRIAL OMNIBUS MOTION AND DEFENDANT AVERS THE FOLLOWING REASONS:</u>**

- *Subject Matter Jurisdiction,*
- *Lack Of Evidence, and*
- *For The District Attorney's Office Propagating a Falsehood and A Fraud Upon The Court*
- *Violations of the Pa. R. Crim. P. 560 and 504*

*As* grounds for this Motion, Defendant states: **<u>CASE HISTORY</u>**

1) That MARK CHAMBERS is the defendant in the above captioned case.

2) That on or about April 22, 2019 at approximately 4:30 p.m., Defendant was acting in a lawful and orderly manner in his home and there no warrants issued for his arrest, and were no exigent circumstances, that police officers can point to, justifying the entry of his residence without a warrant to search and seize, or a affidavit of probable cause.

3) At this time Defendant was arrested and was charged with possession with the intent to deliver, knowingly and intentionally possession w/intent to deliver, possession of drug paraphernalia, possession of a firearm prohibited, and possession of instrument of a crime.

4) The police unlawfully seized and searched Defendant and his home, without a warrant, without probable cause, without reasonable suspicion, or without Defendants consent.

5) Officers did not possess a arrest warrant for the defendant and did not have a valet description of a suspect to be seized. (ex. Application for warrant states, "B/M TARGET WEARING ALL BLACK")

6) That during this unlawful search and seizure, the police did not identify the Defendant as their suspect from prior unlawful acts *(4-16-2019, 4-18-2019 and 4-22-19)* on the days leading to the illegal intrusion.

7) These officers also illegally searched a parked vehicle on a public street. (Separate from his home) This vehicle was and still is registered to the Defendant and the police had no search warrant or consent to search the vehicle.

8) During the illegal intrusion the officers seized the following items (unconstitutionally):

   (a) One amber (color) bottle of 10 oz. promethazime (from Defendant's vehicle)

   (b) One revolver pistol (.38 caliber)

   (c) One sawed off shotgun

   (d) 2 pieces of mail with Defendant's name

   (e) One galaxy note 8 cell phone

   (f) One packet of heroin

   (g) 26 (or 25, possible 27) suboxone strips

   (h) 7 packets of crack cocaine (from clear baggie)

   (i) Four pills (from clear container) alleged oxycodone

   (j) One scale

   (k) Unused clear packets

(9) At preliminary Hearing the Defendant was subjected to a illegal identification procedure that has no independent bases.

3

(10) Through the production of Discovery by the Commonwealth and after inspection, it has been brought to the Defenses attention, that there is several fraudulent documentation. (ex. Lab reports, search warrants, affidavits, and property receipts)

(11)   Furthermore, by comparision of the highly exaggerated hand writing of P/O Tyra Deveaux # 3212, on a 229 form, it has been revealed she also forged information onto the application for search warrant, while also forging a non existant judge's name.

12) Defendant further explain (in court 7-22-2020)  what made the discovery incomplete as follows: "I do not have any;(1) Any 75-48 Incident Reports or Investigation reports (2) 75-483 Statements from police officers, witnesses or Defendant (3) Photocopies of  buy money (4) Pictures of any physical evidence and or (5) Inventory Receipts of alleged evidence taken from property.

13) When asked about these forms and if they were a part of the discovery (by the court), the A.D.A responded, "no your honor, not in this case".


It is the Questions and Answers from this hearing on 7-22-2020, the fraudulent documents produced through discovery and documents from Internal affairs about the credibility of police officer Tyra Deveaux #3212, that has now cause this amended Omnibus motion to Quash, inter alia, the information filed by district attorney office. Defendant encourages the District Attorney's Office to remember, it's their burden to prove every element of the crimes alleged and to prove the evidence was not obtain in violation to the Defendants rights and to beware of the special obligation, to not prosecute cases, not based on probable cause (rule 3.8).

4

## PART ONE: UNCONSTITUTIONAL IDENTIFICATION PROCEDURE

Defendant, MARK CHAMBER, IN HIS PRO-SE CAPACITY, motions the courts to **SUPPRESS IDENTIFICATION**, made by police officer Timothy Bogan #3358 at the Preliminary hearing held on June 24, 2019 in front of the **Honorable Rosario Jimenez**. This identification was unduly and highly suggestive, that being unconstitutional violating the Defendant's rights to due process. (5th amendment and 14th amendment)

This identification has no independency that could have arrive from the actual criminal act and presents the following proof:

(1) The police report redacts alleged accounts of the days leading to the Defendant's arrest. Nowhere in this report does the report give information that the Defendant was the suspect investigated.

(2) Throughout the entire report, the suspect is only identified as, a "black male", a "target", and or a "black male wearing all black with his hood up". Which one can clearly see is an indication of no current identity on the alleged "target".

(3) The report continues by stating a B.M.V check revealed the Defendant's name and an address of a residence in the Southwest Philadelphia area of the city. This being given a single picture of the Defendant at that time. *(violating further the Defendant's due process rights)*

(4) The arrest report was only after the arrest and refers to no evidence to refer, making the decision; the Defendant was involved in a crime and or wanted for investigation, prior to his arrest. *(ex. Vehicle and Pedestrian investigation report (75-48A))*

(5) The seizure of the Defendant was subsequent to the illegal breach of privacy, kicking down the Defendant's front door, while looking for a unknown "black male wearing all black" that was allegedly seen 4 days prior, entering into the residence with a key that was never recovered from the Defendant.

(6) There is no interview sheets (75-483) done by any witnesses (police officers) or the alleged C/I that could have shown a positive identification made by a CI or police officers.

(7) There was no line-up or photo array done by any police officer, witness, or C/I to consider a identification prior to the preliminary hearing.

5

(8) P/o Bogan only identifies the defendant due to the illegal intrusion. Violating not only the 4th amendment but also the 5th amendment rights to due process. Showing not only a abuse of power but a great disregard for the constitution.

(9) Even the alleged search warrant on its face proves to not only not identify the suspect but its statement, in section titled, "name of owner, occupant or possessor" it states a vague description of a "target b/m wearing all black med to dark complexion Med to dark build. Proving no identity on the target and telling a different story than p/o Bogan (during preliminary hearing).

(10)      Even the personally typed version of the 75-48 (incident report) does not name the Defendant as the suspect, fails to give a description of a suspect and does not bare the license plate # of the vehicle allegedly obtain at the scene of the crime and the document is further proof of fraud.

   The Commonwealth/Police Department cannot point to any proof indicating the Defendant was in no way a part of any drug transactions and have based their entire illegal intrusion, upon the Defendant, his family and home on fabricated events barring nothing of truth to survive suppression. (Pa. r. c. p 581)


## PART TWO: AFFIDAVIT OF PROBABLE CAUSE

1) THE AFFIDAVIT (cut and pasted from redacted arrest report and 75-49 as shown by blacking out the names and numbers of police officers) refers to information allegedly given to Narcotics Field Unit Officers, pertaining to a b/m name "RON" selling drugs using cell phone number 215-609-7495 around the area of Anchor st. and Torresdale ave.

2) This information was give to these officers (NFU) by Patrick Mangold #767 of the Gun Violence Task Force (Affidavit states he is from the intelligences unit badge 4477) and P/o Winscom #7625 (no other info found on Winscom)

3) There is no information given to show when these officers obtained this info (time) or how they obtain this info (source).

4) No mention of a reliable source used to obtain this info (credibility) and

5) Patrick Mangold #767 (G.V.T.F) himself is a unreliable source for info, due to the finding of guilt, that he falsified information, forged confessions, perjury under oath,

threatened suspect to sign statements, and fraudulently identified defendants, that were never seen committing a crime.

6) "RON" has no connection to the Defendant, has no identity, no connection to the Defendants home and could possibly be the unknown black male/target wearing all black.

7) P/o Bogan claims to dial this cell phone number (215-609-7495) on 4-16-19 at approx. 2pm and hears a males voice answering and a one-sided conversation ensued.

8) The location of 5400 Torresdale was chosen to be a meeting place and approx. 5 mins later a Nissan Quest arrives on the scene, barring the license plate # KYZ-0624, C/I enters for approx. 1 min and exit while back up officers follow the Quest.

9) While following the vehicle it pulls over at the corner of Hegerman st and Tulip st *(2 ½ blocks away from the Defendants home but closer to the location of Sanger st where the criminal complaint states this contraband was seized from 6 days before (on 4-16-19)).* These officers tried to set up surveillance, but by the time they circled the block the vehicle was unoccupied. (showing no identity on the driver/suspect)

10) Meanwhile p/o Galazka #7481 did a B.M.V check on the vehicle obtaining the name MARK CHAMBERLAIN and a address of 1235 S. 58th street *(not 2139 Anchor st. that warrant seeks to search)*

11) P/o Bogan (#3358) claims this set up was repeated on 4-18-19 but this time a unknown "b/m target wearing all black with his hood up" shows up to the 5400 block of Torresdale *(near Sanger st.)* and completes transaction with the alleged C/I. Then allegedly followed back to the Defendant's home and seen using a key to enter. (no key recovered)

12) The one transaction that (allegedly) occurred on 4-18-19, with an unknown b/m followed back to the home of the Defendant, is the only thing could have been used to determine probable cause.

13) This unknown black male, has no connection to the Defendant's home for police officer Bogan to point out to a magistrate's determination of probable cause. (on 4-22-2019)

14) There was no observation of unknown b/m having a continuation of movements to and from the Defendants Home in between 4-18 and 4-22-19 for a determination of probable cause.

15) P/o Patrick Mangold #767, nor the C/I ever made any showing of a connection between drugs and the residence.

16) There was no drug transactions committed at 2139 Anchor st. for that matter and no info was ever given about the Defendant's home.

17) P/o Bogan #3358 only makes a assumption without knowledge or investigation or reasonable suspicion but only fabricated thoughts acquired after the illegal intrusion *(not sworn to a magistrate).*

18) P/o Bogan #3358 allegedly gave a description of the property a unknown black male entered using a key without address. P/o Galazka and Eleazer went back to the area and using the description obtain the address of 2139 Anchor st.

19) This shows to be unsure and only able to give a description and the Officers given the description never double-checked behind the others.

20) Proven by the fact that P/o Bogan and Deavux went by the location of 2100 Sanger st.

21) There is a showing of two *(2)* different properties observed by officers and only on one occasion, an unknown black male was suppose to be followed to the Defendant's home, being the only thing to determine Probable cause.

22) Again, no information received to connect unknown b/m, the cell phone or the original target "RON", to the Defendant's home involving any transactions.

23) The vehicle was registered to a different address *(1235 S. 58ᵗʰ st)* and the vehicle was not seen anywhere near 2139 Anchor st., making no showing of a connection to the "b/m

target" or to the vehicle. The "b/m target" did not even enter the Defendant's home because a description of a home (on a block similar to others) is not a accurate address and officers given description *(p/o's Bogan and Deavux)* never confirmed.

24) ***IMPORTANT NOTE:*** Subsequent to the Defendants arrest, discovery produced from the commonwealth and evidence control data form *(laboratory #19-06643)* barring information of another suspect District control # and property receipt # and could possibly be "RON".

25) The information fails way to short of the "four corners" needed to show probable cause and all evidence is in order for suppression.

## PART THREE: THE FACE OF THE APPLICATION FOR SEARCH WARRANT AND AFFIDAVIT IS DEFECTIVE IN ITS ENTIRETY

(1) As previously mention defendant was arrested April 22' 2019 allegedly pursuant to search warrant #212248 and was arrested on multiple drug and firearm violations.

(2) Defendant anticipates the Commonwealth attempt to introduce evidence allegedly found in the Defendant's home without a valid search warrant.

(3) The invalid search warrant allegedly issued to Narcotics Fields Unit Is dated 4-21-2019 but allegedly signed on 4-22-19 approx. 9:49 am (on Easter Sunday), that was suppose to authorize a search at 2139 Anchor st. in the Frankford section of Philadelphia's 15th District.

(4) Defendant submits to the application not only being fraudulent, forged, and strategically orchestrated but also not based on any accurate facts (affidavit).

(5) The fraudulent (75-51) Affidavit of Probable Cause is titled "initial (49)" was allegedly sworn to by p/o Timothy Bogan #3358.

(6) P/o Bogan identifies "crack cocaine and any substance under 1972, for items that were to be search for and seized pursuant to the search warrant.

(7) Nowhere does it authorize the seizure of a cell phone or the vehicle to be search and this was allegedly everything connecting the defendant to the investigation. This omission is crucial to the credibility of the officer's investigation.

(8) The application indicates 2139 Anchor st as the property to be search even though the reading of the Defendant's vehicle tag # gave a completely different address. This further proving the defendant was not the alleged target.

(9) The owner: Jean Paul Gulle, voter: James Rose, the target: b/m wearing all black, med. To dark compl., Med. Build. *(Further confirming no identification on a suspect)*

(10)    Affidavit *(as previously)* only mentioned a drug deal of a alleged dealer (unknown identity) was seen entering 2139 Anchor st. allegedly using a key (which was never recovered) after a transaction some three blocks away.

(11)    The Application carries many mishaps and reasons of doubt to authenticity (ex. 3 different versions of the document).

(12)    P/o Bogan uses his alleged 29 years of experience in Narcotics as to being a professional and playing a important role in the alleged probable cause decision.

(13)    Due to p/o Bogan's alleged 29 years of professionalism and experience, he should have known a lot better of a investigation was needed and was very lacking, which is very detrimental to his investigation. (AFFIDAVIT)

## BRINGING ATTENTION TO:

(a) Any information about the C/I's background or prior dealings with P/o Bogan (himself) or any other member of the Narcotics Field Unit and or whether or not this C/I has led to arrest which led to actual convictions.

(b) Any information from the CI that he/she was aware of or observed illegal activity taking place in or around 2139 Anchor st.

(c) How the conclusion of the b/m (suspect) had any connection to 2139 Anchor st. instead of someone who just possibly stop by after he committed a (alleged) crime some 3 blocks away.

(d) A nexus between the cell phone, 5400 Torresdale, the unknown "b/m target wearing all black with his hood up" and the property other than a alleged following and key that was never recovered.

    1. On 4-22-19 upon execution of this alleged warrant #212248, officers immediately seized the defendant w/o cause or prior I.D or arrest warrant.

    2. All items allegedly seized placed on property receipts #'s 3393678, 3393679, and 3393680 but there was no property receipt for any alleged firearms.

3. A mention of and claim to the seizing of firearms, has no prior evidence (ex.property receipt) for the showing of (before arrest report or preliminary hearing or any of the evidence for that matter) the firearms ever being seized from 2139 Anchor st, but there is the criminal complaint, showing it was seized 6 days before, somewhere on Sanger st.

4. The Commonwealth did not move any evidence into exhibits (in reference to the firearms), as they did for narcotics, so that evidence should be waived.

5. On the face of the warrant in section "items seized" it does not specify the items allegedly seized but only categorize the items as:

6. Drugs

7. Para

8. U.S.C

9. Weapons

10. There was no filing of affidavit of probable cause, a search warrant, or the inventory receipt return to the magistrate or the clerk of courts in accordance to Pa. r. c. p. 210.

11. Thus being no proof a search warrant was every issued and no proof these items were every taking from 2139 Anchor st but the criminal complaint tells a better story. (Sanger st as previously mentioned)

12. Mr. Chambers seeks an order from the courts suppressing all evidence seized listed on property receipts (#3393678, 3393679, and 3393680 for cash, mail and phone from evidence and returned Pa. r. c. p. 588). Due to not only there being no probable cause presented to a magistrate but there is no authentication of a affidavit, a arrest warrant, a search warrant application or even a inventory of the seized items and without properly following the procedure by making these documents public, there can be no self authentication (pa. r. c. p. 902).

**AMENDED SECTION**

**PART FOUR**

**(D) (ALLEGED) STATEMENT MADE BY THE DEFENDANT DURING THE ILLEGAL INTRUSION, SEARCH, SEIZURE AND ARREST.**

The Commonwealth has made a showing of an attempt to use a statement (allegedly) made, during the illegal intrusion, against the Defendant in a court of law. Furthermore, the Commonwealth has admitted in the same sitting, that there was no 75-483's and nowhere in the discovery does it show a Miranda was given, and or that a Miranda was waived.

This statement has no proof of existence and there are no documents to show, that it was not just added, into a report in order to sustain a belief of guilt. A 75-49 was received on January 21, 2020 and was the first attempt to introduce a statement. (9 months or so after arrest)

The statement has no ground to survive a suppression, due to a lack of evidence to prove it even was made during a legal advantage point.

**HISTORY**

1) On 4-22-2019 police officers illegally entered the defendants home, by kicking down the front door without warrant or any other legal authority. Upon entry the Defendant was **immediately detained without just cause (evidence).**

2) Among other things P/O's Galazka and Sgt. Love have claimed, the Defendant stated, **"He got the guns after the shootings occurred up on Benner and Torresdale and Anchor and Torresdale and he was carrying around the revolver for his own protection, while on the street".**

3) As previously stated, A.D.A Mazmanian, admits there is no 75-483 (statement), but also through 75-49 (investigation report), there is no indication of a Miranda warning being given or a waiver thereof.

4) Furthermore, the statement was not entered into evidence and Defendant wasn't made notice of, until approx. 9 months after arrest and not mentioned through any previous reports.

5) The alleged statement given during the time of the illegal intrusion, illegal detainment, and or during the process of an illegal arrest must be suppress.

12

## PART FIVE: ARREST MADE WITHOUT WARRANT, WITHOUT PROBABLE CAUSE AND BY CRIMINAL COMPLAINT WITHOUT AFFIDAVIT AND OR SUFFICIENT SUMMARY OF CHARGES

1. Through discovery defense has discovered there is no warrant authorizing his arrest and lacks proper documentation (75-48(A)) needed to articulate reasons for searching the Defendant during illegal intrusion. (According to PPDD 12. 11 Appendix B section (B)(c)(3))

2. The Commonwealth has no documentation needed to prove the Defendant was an actual suspect, committed any crimes, and or that the Defendant was arrested in order to prove jurisdiction. (PPDD 12.11 section (8)(A) of the investigation division/unit, 12.11 APPENDIX B (4)(B) and 12.11 section APPENDIX B section (F))

3. Technically the Defendant is literally "KIDNAPPED" and the Commonwealth has no proof for justification showing why the Defendant has been arrested and or Detained, due to the police officer's ever reporting a investigation (75-48(A)) or an arrest for that matter.

4. No report, of a crime submitted, or even an arrest, to the district allegedly, having the jurisdiction over location, brings suspicion to how the Commonwealth received a District Control number in the first place. (proof of fraud)

5. The Criminal Complaint does not articulate the crimes charged and falsely reported by days and time. Basically does not follow Pa. R. Crim. P 504(2)(a) (b),(5), or (6)(a) and in violation of.

6. Defendant was arrested without warrant and there was no summons or warrant issued for arrest, after the initiation of the complaint. (violation rule 509 (2)(a))

7. The above reason, inter alia, the criminal complaint needs to be suppressed along with the arrest itself, because the complaint was insufficient, lacked an affidavit of probable cause for the arrest and no arrest warrant was every issued (according to supreme court rulings).

8. Furthermore, there's a conflict of interest, by charges being initiated by a representative for the District Attorney Office, having no personal knowledge of events, who is a part of the same entity attempting to prosecute and both seek the same benefit and or gain.

## PART SIX: MOTION TO QUASH THE INFORMATION FILED BY DISTRICT ATTORNEY ON JUNE 27, 2019AFTER PRELIMINARY HEARING

1. On June 27, 2019, the District Attorney's Office filed a the Information against the Defendant pursuant to Pa. R. Crim P. 560.

2. This filing based on a prima facie case (allegedly) established by the Commonwealth on June 24, 2019, but the Defendant was prejudiced against, by the **UNDULY HIGHLY SUGGESTIVE IDENTIFICATION PROCEDURE,** and by false testimony allowed making the essential elements of the preliminary hearing defective.

3. Through the production of the "DISCOVERY" it has been revealed that, the Commonwealth lacks in evidence to prove a crime was committed (75-48(A)) and that the Defendant is the person (possibly) that committed a crime (no verification of identification).

4. Making the other half of the essential elements needed to establish a prima facie case during preliminary hearing defective as well. .

5. Without proper documentation of a crime being committed and or in what district it was reported, the Commonwealth has **NO PROOF OF JURISDICTION** and has failed (before beginning) to prove beyond a reasonable doubt the Defendant's guilt of any offense, that was never reported.

6. Furthermore, the Information is failing, according to **Pa. R. Crim. P. 560 (B)(3)**and**(5).** For where the complaint has no mention of any other control substance except "crack cocaine" and the date claimed charges stem from investigation on the 16th of April ( a Tuesday), which is a crime never reported, and property receipt states completely different D.C # from a completely different district and a location outside of Defendant home.

7. Wherefore, the Commonwealth continues the use of an arrest report (created after arrest) on the 22, of April (which was a Monday) at the Defendants home pursuant to a search warrant.

8. Rule 560 (B)(3) plainly states, " the date when the offense is alleged to have been committed **if the precise date is known, and the day of the week if it is an essential element of the offense charged,** provided that if the precise date is not known or if the offense is continuing one, an allegation that it was committed on or about any date within the period fixed by the statue of limitations shall be sufficient,

9. Part (B)(5) of rule 560 plainly states, " a plain and concise statement of the essential elements of the offense **substantially the same as or cognate to the offense alleged in the complaint,**

10. Clearly, there are some violations to the rule when the criminal complaint is read along with many contradictions into the comparison of the information filed by the District Attorney's Office.

11. Furthermore, the charges of the criminal complaint (showing of charges), goes outside the essential elements described in summary and there is no affidavit of probable cause attached (violating 4[th and 14th] amendment) to explain or verify, causing the Information document to become defective and making the information **LACK IN SUBJECT-MATTER-JURISDICTION.**

12. Due to Supreme Court's rulings, it states in part, "....observing we have clearly set forth the requirements for subject-matter-jurisdiction, which includes, 1. **COMPETENCY** AND 2. **NOTICE.**

13. Through Discovery, we now see the Commonwealth has no evidence needed, in order to prove the Information stands on solid proof of Jurisdiction and or to show a prima facie case (was properly established), or proven without falsehood.

14. Even though, an alleged prima facie was shown during preliminary hearing, the honorable Rosario Jeminez, did not have the opportunity to see the fabrications of testimony and or fraudulent documents of discovery and or that lacks of documents (75-48 or 75-48(A)) to prove this events occurred.

15. Clearly contradicting a crime actually happen and the defendant is possibly the suspect (because they are allegedly pre-trial issues) inside the covered jurisdiction area.

16. Supreme court states in part, ".....Jeopardy does not attach until the prosecution has established a prima facie case....."

17. Due to these recent discoveries, the Commonwealth **LACKS EVIDENCE**, to prove a prima facie case (on 6-24-2019), and to prove the elements of the charges or even to show (for just cause) that the Defendant could even be a possible suspect.

18. By allowing these fraudulent documents to stand uncorrected, while still proceeding to prosecute on such fraudulent documentation, is not only a showing of **MALICIOUS PROSECUTION** but also, **AN AFFIRMED FALSEHOOD AND A FRAUD UPON THE COURT.**

## IN CONCLUSION

The Defendant has been extremely prejudiced against by not only a showing of bias judgments (continuous talk of criminal history) but by the Honorable Charles Ehrlich revoking Defendant's bail due to such. Continued use of the unauthenticated events of the case, intentional delays (by Hon. Robert P. Coleman), ineffective assistance (by Joseph L. Coleman), the non-investigation (from the D.A. Office), denial of access to the courts (which continues) by the misuse of COVID-19, unjustified delay (in allowing the Defendant to proceed pro-se), while still holding court proceeding without the Defendant. Refusing the Defendant discovery, illegally detaining the Defendant (With the intent to maliciously prosecute), even after fraudulent documentation was revealed, Defendant made the Commonwealth aware but also, by the showing of a conflict of interest within the Commonwealth/prosecution.

There is a showing of favoritism towards corrupt police officers and attempts to cover up the corruption. Not only due to the presumption of guilt (continuous use of criminal record), but leaving the Defendant **"GUILTY UNTIL PROVEN INNOCENT"**. Thus causing those who are in control of up-holding the Defendants rights, **TO IGNORE THE VIOLATIONS OF THE DEFENDANT'S UNITED STATES CONSTITUTIONAL RIGHTS AND FORCING THE DEFENDANT TO GO AGAINST ALL ODDS OF THE JUDICIAL SYSTEM.**

**WHEREFORE**, Defendant respectfully requests that this Court suppress the above-described evidence, the unduly highly suggestive identification, alleged statement made, search warrant, affidavit, the unreported arrest, Quash the Information and release the unconstitutional detained detainee.

This case is eligible for dismissal with prejudice, due to the extreme amount of **"BAD FAITH" AND THE UNEXPLAINABLE OMISSIONS OF PENNSYLVANIA PROCEDURES, WHILE IGNORING THE UNITED STATES CONSTITUTION, AS WELL AS OUR PENNSYLVANIA CONSTITUTION.**

Respectfully submitted,

_MARK CHAMBERS_
___# 859335___ , Petitioner

_AUGUST 4, 2020_
Date

Commonwealth of Pennsylvania

v.

MARK CHAMBERS

:
:
:
:
:
:
:
:
:

**IN THE COURT OF COMMON PLEAS
FOR THE FIRST JUDICIAL DISTRICT
OF PENNSYLVANIA
CITY OF PHILADELPHIA**

CP-51-CR-0004488-2019

**CHARGES: PWID AND VUFA**

**VERIFICATION**

I, MARK CHAMBERS, verify that I am the petitioner in the foregoing Petition, and that
the facts set forth therein are true and correct to the best of my knowledge, information and
belief; and that this verification is subject to the penalties of 18 Pa. Cons. Stat. Ann. §4904
relative to unsworn falsification to authorities.

_778.59.335_ , Petitioner

_August 4, 2020_
Date

Commonwealth of Pennsylvania                :       **IN THE COURT OF COMMON PLEAS**
                                            :       **FOR THE FIRST JUDICIAL DISTRICT**
v.                                          :       **OF PENNSYLVANIA**
                                            :       **CITY OF PHILADELPHIA**
MARK CHAMBERS                               :
                                            :       CP-51-CR-0004488-2019
                                            :
                                            :       **CHARGES:  PWID AND VUFA**

<u>**PROOF OF SERVICE**</u>

I, MARK CHAMBERS, hereby certify that I am this day serving copies of the foregoing

**AMENDED OMNIBUS MOTION** and this proof of service on the following persons in the

manner indicated below:

Service by first class mail addressed as follows:

**One (1) original to:**

Juanita Kidd Stout Center for Criminal Justice
**Motions Counter, 2nd Floor**
1301 Filbert Street
Philadelphia, Pennsylvania 19107

**One (1) copy to each of the following:**

District Attorney's Office of Philadelphia          Juanita Kidd Stout Center for Criminal Justice
**Larry Krasner, District Attorney**                **Hon. CHARLES EHRLICH**
3 Penn Square                                       1301 Filbert Street, Suite 1419 RM.608
Philadelphia, Pennsylvania 19102                    Philadelphia, Pennsylvania 19107

I understand that any false statements herein are made subject to the penalties of 18 Pa. Cons.
Stat. Ann. §4904 (relating to unsworn falsification to authorities).

_____
# 859335 , Petitioner

_AUGUST 4, 2020_
Date

MARK CHAMBERS
PP # 859335
C.F.C.F.
7901 STATE ROAD
PHILA, PA. 19136

Received

FEB 2 1 2020

Office of Judicial Records
Prison Liaison Unit

HON. JUDGE CHARLES EHRLICH
CORT ROOM: 608
PRO-SE DEFENDANT
NCD: FEB. 24, 2020

---

COMMONWEALTH

V.

MARK CHAMBERS

IN THE COURT OF COMMON PLEAS
FOR THE FIRST JUDICIAL DISTRICT
OF PENNSYLVANIA
CITY OF PHILADELPHIA

CP- 51- CR- 0004488-2019

CHARGES: P.W.I.D AND V.U.F.A.

## MOTION TO COMPEL INFORMATION
### PERTAINING TO WITNESSES, CONFIDENTIAL INFORMANT REGISTRY AND NARCOTIC FIELD UNIT POLICE OFFICERS DIRECTLY INVOLVED IN THE ABOVE CAPTION

**TO THE HONORABLE JUDGE CHARLES EHRLICH OF THE COURT OF COMMON PLEAS; PHILADELPHIA COUNTY:**

Petitioner, MARK CHAMBERS, in his PRO-SE MANNER, moves for the courts to compel the Commonwealth, to turn over any of the information, herein requested, according to the rule of disclosure of discovery, as to do so is in the interest of justice.

This motion is in accordance with Pa. R. Crim. P. 573 (2) (a) (iv) (in part)....any other evidence specifically identified by the defendant, provided the defendant can additionally establish that its disclosure would be in the interest of justice.

In this particular case holds the exact type of interest of justice pertaining to the rule, which the pro-se Defendant will show a brief description as to why; to proceed

**PART ONE:   BRIEF OF CASE**

(1) On 4-22-2019 the Defendant's front door of his home was violently kicked in and his home was breached by the narcotic field unit officers.

(2) At the time of the breach, these police officers from the N.F.U did not possess authorization to commit the home invasion. There was no affidavit of probable cause signed by a detached magistrate (or Judge) and there was no search warrant or arrest warrant, in order to search the premises (or seize any property) and or arrest the defendant.

(3)  After the search and arrest, p/o Timothy Bogan #3358, went back to the residence of the Defendant's home and gave his spouse a unsigned carbon copy of a application for a search warrant and affidavit w/o a attach (75-51) affidavit of probable cause. (P/o Bogan name is present as affiant)

(4) Defendant has never been shown the alleged items taken from his residence, the police officers (N.F.U) have never properly inventoried these items (Pa. R. Crim. P 210) and even after request of discovery, Defendant still has not been shown any proof these items exist. (Alleged contraband)

(5) There were firearms that were allegedly found but not placed on a property receipt (the way the other alleged items were) and during preliminary hearing, the firearms were not moved into evidence as other items were. (See preliminary transcripts pg. 23 lines 3-5) After the production of discovery, property receipts were introduced and lack proper procedure or chain of custody and have no way of informing the courts or the defendant where the firearms were seized from and or who actually possessed them prior to introductory. (Especially because no D.N.A or fingerprint analysis was done on the firearm)

(6) What little pre-trial discovery the defendant was given, consist of recently dated lab reports (1-6-2020 and 1-13-2020), although according to docket sheet (7-31-2019) the discovery was

"passed at the bar of the court" and during the defendant's Grazer hearing A.D.A. Christina Giardina and Defendant's prior attorney (Joseph L. Coleman) both claimed to have completed copies of discovery. Showing not only deception but also the lack of required evidence in order to hold the Defendant for trial and or approve an arrest. (For The District Attorney's Charging Unit)

(7) There is scanned over documents, falsified signatures (forged) pasted on top of other documents to make attempts of authenticity, typed documents (that should be printed), as well as search warrants that are produced two separate ways. (Three including the one left at the Defendants residence)

(8) The Defendant believes these police officers are regularly participating in this illegal conduct and have been accused of doing such in the past. By their way of producing these fraudulent documents, it shows confidence that one should take as a sign, that these officers believe they will not get caught.

(9) The Defendant has been intentionally delayed (since 7-31-2019 to 1-3-2020) in his court proceedings and believes he has not been given no other excuses why (he's been delayed), other than because of the lack of discovery and evidence.

(10) Due to such misconduct and malicious prosecution that has already been shown, there can be no way this court should allow this case to proceed any further, until the authenticity of documents are established and the back ground of the following officers are produced in order to assure not only the trustworthiness of these officers but to also establish, (for the record), that none of them have been previously accused of, found guilty of, are not currently under investigation, (of or have been) reported to a supervisor, internal affairs, or through any computer assisted dispatch reports, complaining against these officers (for any type of misconduct) and if so, what was the ending results if any, for the following officers:

(from the Philadelphia police department's narcotic's field unit or any officer mentioned that is not from the N.F.U.)

1. Timothy Bogan #3358
2. Jeffery Galazka #7481
3. Tyra Deavux #3212
4. Brien Werner #1731
5. Rodney Eleazer # (May be a badge number below)
6. Bryan Sumter # 4819
7. Ernest brown #1926
8. Thomas Rola #4053
9. Richard Woertz # 7328
10. Sgt. Patrick Love # 8554
11. Lt. Robert Muldoon # 193
12. P/o Mcintyre # 686
13. Patrick Mangold (G.V.T.F.) #4477
14. P/o Ruddy # 959
15. P/o Winscom # 7625 (C.I.U or G.V.T.F)

Some of these officers are currently under investigation and may or may not be currently on a list, which does not allow them to testify or conduct investigations without supervision approval or district attorney's approval. Furthermore, continued use of any of these officers found to be responsible of any misconduct (in their official or individual capacity), especially one identified in this motion, is a showing of the city of Phila. failure to remove the bad seeds of our city's judicial system. (ex. Patrick Mangold #4477 of G.V.T.F)

The Defendant is also asking the courts to compel the Commonwealth for the information pertaining to three (3) other badge numbers that are not identified by officer's names but are listed as participants in the search of the Defendant's home. (According to the fraudulent search warrant)

The following badge numbers are listed but without identification (name) and as far as the Defendant can see from the arrest reports and 75-49 (investigation report) are not mentioned as being participants in the investigation. The following are the badge numbers that information is being sought after;

(1) 9416

(2) 4855 and

(3) 1802

This is a request of information in accordance to Pa. R. Crim. P 573 (2) (a) (iv) in attempt to not only enforce proper procedures but to also allow justice to run its coarse properly, under the 5th amendment and the 14th amendment. (Right to due process and equal protection clause) As well as the 6th Amendment (rights to a fair speedy trial)


## PART TWO : PROOF OF REGISTRY FOR CONFIDENTIAL INFORMANT (# 1417)

PLEASE BE ADVISED: THIS IS NOT TO BE MISTAKEN AS A REQUEST FOR THE IDENITY OF THE INFORMANT BUT ONLY PROOF OF REGISTRATION AS ALLEGED IN THE POLICE REPORT.


### BRIEF HISTORY ON THE ALLEGED INFORMANT (#1417)

(1)  Based on police reports and 75-49, a confidential informant was used to purchase crack cocaine on April 16, 2019 and April 18, 2019 as well as April 22, 2019. (The alleged days of events leading to arrest)

(2) The reports identifies the C/I as #1417, who's information is confined in the 16th (on one property receipt and then, on another property receipt it states confined in the 15th) and who is mention as a participant in the illegal sales of crack cocaine. (Also to have been used in previous investigations, resulting in arrest and seizures DC#'s upon request) There are no mentions of arrest resulting in convictions.

(3) This alleged C/I #1417, gave no information (according to reports) that has led to any convictions and (according to reports) gave no information alleged or accusing Defendant of any transactions or involving the Defendant's home into any transactions or any belief that would cause a Magistrate or Judge to believe any reliable information was present to issue a search warrant for the Defendant's residence or to believe probable cause existed to do so.

(4) Furthermore, the Defendant has reasons to believe this "C/I" is not registered and or properly not being used accurately as instructed by police directives commands. (Due to other misconducts as previously mentioned)

(5) There is also the possibility this C/I, does not exist. For verification the Commonwealth should also be forced to provide the DC#'s that the reports, claim can be provided upon request.

(6) Proving or not having the ability to prove or produce documentation showing the registry forms for the use of this confidential informant (#1417), further shows these Narcotic Field Unit Officers are just following the "unwritten directive" directions of a policy under which they could "flip suspects into off- the books confidential informants", directed by police inspector Raymond Evers, in a meeting held in May 2017. (Also placing blame on Evers's supervisor Chief Inspector Anthony Boyle. According to I.A.D reports)

(7) This is only proving further corruption and misconduct adding doubt to the credibility of these officers and showing the present case, before us, is tainted with intentional misconducts, malicious intent and bad faith. (As proven by documents of discovery)

(8) Due to all the information presented to the courts in this motion as well as others, there is a show of the importance, to produce the requested information (asked for in this motion) as well as the authenticity of all other documentation presently before the courts and or to soon be produced in the future by the Commonwealth or Philadelphia's Police Narcotic Field Unit.

**WHEREFORE,** Petitioner request the court to **COMPEL THE COMMONWEALTH** to release any information herein requested or in the alternative schedule a hearing for such. (Pa. R. Crim.P. 577)

RESPECTFULLY REQUESTED,

DATE: 2-13-20

PRO-SE DEFENDANT

Commonwealth of Pennsylvania

v.

MARK CHAMBERS

       :
       :
       :
       :
       :
       :
       :
       :
       :

**IN THE COURT OF COMMON PLEAS
FOR THE FIRST JUDICIAL DISTRICT
OF PENNSYLVANIA
CITY OF PHILADELPHIA**

CP-51-CR- 0004488 -20 20

CHARGES: PWID AND V.U.F.A

---

## ORDER FOR HEARING

**AND NOW,** this _____ day of _____ (*month and year*),

upon consideration of the attached petition and upon motion of _____,

Esquire, attorney for the petitioner, it is ordered and decreed that a hearing on the petition be

held on the _____ day of _____ (*month and year*), at

_____ _____ in Room _____, _____

Courthouse, and that a copy of the petition and of this order shall be served upon the District

Attorney and upon the prosecutor in this case.

By the Court:

_____
                                      J.

Commonwealth of Pennsylvania         :    **IN THE COURT OF COMMON PLEAS**

                                       :    **FOR THE FIRST JUDICIAL DISTRICT**

v.                                   :    **OF PENNSYLVANIA**

                                         :    **CITY OF PHILADELPHIA**

MARK CHAMBERS              :

                                         :    CP-51-CR- _0004488_ -20 _20_

                                         :    **CHARGES:** PWID AND VUFA

                                         :

                                         :

## <u>VERIFICATION</u>

I, MARK CHAMBERS , verify that I am the petitioner in the foregoing Petition,

and that the facts set forth therein are true and correct to the best of my knowledge, information

and belief; and that this verification is subject to the penalties of 18 Pa. Cons. Stat. Ann. §4904

relative to unsworn falsification to authorities.

_859335_ , Petitioner                               _2-13-20_

                                                                                Date

Commonwealth of Pennsylvania    :    **IN THE COURT OF COMMON PLEAS**
                           :    **FOR THE FIRST JUDICIAL DISTRICT**

v.                          :    **OF PENNSYLVANIA**
                           :    **CITY OF PHILADELPHIA**

MARK CHAMBERS         :

                           :    CP-51-CR-_0004488_ -20 _20_

                           :    CHARGES: _PWID AND VUFA_

                           :

                           :

## PROOF OF SERVICE

I, _MARK CHAMBERS_ , hereby certify that I am this day serving copies of the foregoing

motion to quash and this proof of service on the following persons in the manner indicated

below:

Service by first class mail addressed as follows:

**One (1) original to:**

Juanita Kidd Stout Center for Criminal Justice
**Motions Counter, 2ⁿᵈ Floor**
1301 Filbert Street
Philadelphia, Pennsylvania 19107

**One (1) copy to each of the following:**

District Attorney's Office of Philadelphia    Juanita Kidd Stout Center for Criminal Justice
**Larry Krasner, District Attorney**    **Honorable Judge** _CHARLES EHRLICH_
3 Penn Square    1301 Filbert Street, Suite _1419 RM. #608_
Philadelphia, Pennsylvania 19102    Philadelphia, Pennsylvania 19107

I understand that any false statements herein are made subject to the penalties of 18 Pa. Cons.
Stat. Ann. §4904 (relating to unsworn falsification to authorities).

_____           _2-13-20_

_859335_ , Petitioner           Date

082620-CHAMBERS_FINAL

IN THE COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY

FIRST JUDICIAL DISTRICT OF PENNSYLVANIA

CRIMINAL TRIAL DIVISION

— — —

| | |
|---|---|
| COMMONWEALTH | : NO.  CP-51-CR-0004488-2019 |
| | : |
| | : |
| | : |
| vs. | : |
| | : |
| | : |
| | : |
| MARK CHAMBERS | : |

— — —

August 26, 2020

Courtroom 608 — Stout Center for Criminal Justice

Philadelphia, Pennsylvania

— — —

B E F O R E:   THE HONORABLE CHARLES EHRLICH, J.

— — —

MOTION

— — —

082620-CHAMBERS_FINAL

APPEARANCES:

GREGORY MAZMANIAN, ESQUIRE

Assistant District Attorney

For the Commonwealth

MARK CHAMBERS, Pro se

LEON DOMINIC GOODMAN, Esquire

Back-up counsel

082620-CHAMBERS_FINAL

INDEX

– – –

COMMONWEALTH'S WITNESSES

| WITNESS | DR | CR | RD | RC |
|---|---|---|---|---|
| OFFICER TIMOTHY BOGAN | 10 | 40 | | |

– – –

COMMONWEALTH'S EXHIBITS

| NUMBER | DESCRIPTION |
|---|---|
| C-1 | Search warrant No. 212248 |
| C-2 | Search warrant No. 212248 |

– – –

DEFENSE EXHIBITS

| NUMBER | DESCRIPTION |
|---|---|
| D-1 | PR # 3393659 |
| D-2 | PR # 3393664 |
| D-3 | 48, 48A computer generated |
| D-4 | PARS |
| D-5 | 75-49 |
| D-6 | Forfeiture PARS |

082620-CHAMBERS_FINAL

004:01                          PROCEEDINGS

02          COURT CRIER:  Your Honor, Mark Chambers.

03          THE COURT:  Okay.  Can you swear the

04     defendant in since he's representing himself.

05          COURT CRIER:  Your name, for the record, sir,

06     in a loud, clear voice, please.

07          THE DEFENDANT:  Mark Chambers.

08          (MARK CHAMBERS is duly sworn/affirmed at this

09     time.)

10          COURT CRIER:  This is No. 2 on your list

11     today.

12          THE COURT:  Good afternoon, Mr. Chambers.

13     We're here today for motions that you filed, and I

14     have the amended omnibus motion that you filed, I

15     think it was, August 18th of this year.  And I

16     believe the Commonwealth has a copy; is that

17     correct?

18          MR. MAZMANIAN:  It is, Your Honor.

19          I apologize to interrupt.  Can I do some

20     housekeeping issues very quickly?

21          THE COURT:  Sure.

22          MR. MAZMANIAN:  I do have an amendment to the

23     complaint.  I did let Mr. Goodman know.  I did

24     just verbally tell -- I did let Mr. Goodman know

25     in May.  I did just verbally tell Mr. Chambers the

082620-CHAMBERS_FINAL

005:01    dates.  It is currently listed at 4/16.  I'd like

02    it to read 4/16/2019 through April 22, 2019.

03    These dates were mentioned at the preliminary

04    hearing as well as the police paperwork and

05    Mr. Chambers own filings.

06         THE COURT:  So right now it says just 4/16;

07    is that correct?

08         MR. MAZMANIAN:  That is correct.

09         THE COURT:  4/16/19.

10         MR. MAZMANIAN:  Yes.  And it should be

11    through April 22, 2019.

12         THE COURT:  Okay.  Anything you want to say

13    about that, Mr. Chambers?

14         MR. CHAMBERS:  There is an objection to it

15    due to the summary of the events in the complaint.

16    They do label -- in the complaint it does say 4/16

17    through 4/22.  Criminal complaint first page

18    actually charges me for, I'm assuming, the first

19    transaction, which is supposed to be the day of

20    identification, but the summary does not elaborate

21    on that in there at all.  There is no affidavit

22    for me to...

23         THE COURT:  I am going to allow the

24    amendment, and, of course, your objection is

25    noted.  I also wanted to tell you that whatever

082620-CHAMBERS_FINAL

006:01    rulings I make on your motions there will be a

02    full record, and you can certainly, should you be

03    convicted, appeal to the Superior Court as to any

04    errors that I may have made in my rulings or in

05    testimony taken.

06        All right.  That amendment is granted.

07        Now, let's take a look at the motion itself.

08    From reading through the motion, I think you have

09    various issues.  I'm summarizing.  We can go

10    through so everything is covered, but one is your

11    identification at the preliminary hearing.

12        MR. CHAMBERS:  Yes.

13        THE COURT:  Another is physical evidence that

14    was taken from your house; a third is evidence

15    that was taken from your car; and a fourth is just

16    your arrest and coming into your house with the

17    claim that the arrest was made without a warrant,

18    without probable cause; and then it goes on to a

19    few other things such as suppressing the

20    fraudulent application for search warrant;

21    suppress the fraudulent affidavit of probable

22    cause.

23        So I think the best way to do this since it's

24    your motion --

25        MR. CHAMBERS:  There are other issues as

082620-CHAMBERS_FINAL

007:01    well.

02         THE COURT:  What other issues?  Those are the

03    first two pages then you go into your case

04    history.

05         MR. CHAMBERS:  Yes.  On the second page, it's

06    also criminal complaint being signed by Jason

07    Morgan, who is a representative of the District

08    Attorney's Office, which is causing a conflict of

09    interest.

10         THE COURT:  Okay.

11         MR. CHAMBERS:  It is not signed by an

12    investigation officer.

13         THE COURT:  I also notice you have a motion

14    to quash the information --

15         MR. CHAMBERS:  Yes.

16         THE COURT:  -- as part of your omnibus

17    motion, and the basis is subject matter

18    jurisdiction, lack of evidence, District

19    Attorney's Office propagating a falsehood, and

20    fraud and violation of Pennsylvania Rule of

21    Criminal Procedure 560 and 564.

22         MR. CHAMBERS:  504.

23         THE COURT:  504.  Excuse me.

24         I think that covers it then.

25         MR. CHAMBERS:  For the most part, yes.

082620-CHAMBERS_FINAL

008:01          THE COURT:  With that summary, I am going to
02      turn to the Commonwealth and you can call your
03      first witness as to the motion and we'll proceed
04      from there.  If we're not able to finish the
05      motion today, because we can take testimony until
06      about 2:00, 2:30 today, I will continue it to
07      another date when we have absolutely nothing
08      listed so we can complete any testimony that's
09      necessary and hear argument from both you and the
10      district attorney.
11          All right.  Mr. Mazmanian, you may call your
12      first witness.
13          MR. MAZMANIAN:  Thank you, Your Honor.  Just
14      one quick clarification just because this is now
15      combining motion to quash with a motion to
16      suppress; the motion to quash I would just need
17      the notes of testimony.
18          THE COURT:  I don't think we're going to get
19      to the motion to quash today.  Let's deal with the
20      other issues that are on page one and two.  Motion
21      to quash we will need the notes and let's get them
22      and Mr. Chambers should have them and I should
23      review them.  And then we'll deal with that, which
24      I think we'll have to deal with on another day.
25          MR. MAZMANIAN:  That works, Your Honor.  I do

082620-CHAMBERS_FINAL

009:01    have the documents from when that is relevant.

02        THE COURT:  Okay.

03        MR. MAZMANIAN:  Your Honor, the Commonwealth

04    calls Officer Timothy Bogan.

05        MR. GOODMAN:  If I may, Your Honor, request

06    as we proceed that we can be clear on the record

07    in terms of what portion or what part of the

08    motion is being addressed.

09        THE COURT:  Okay.

10        MR. GOODMAN:  So as the witnesses are being

11    called that can be placed on the record at least

12    for clarity sake for Mr. Chambers what we're

13    dealing with.

14        THE COURT:  Thank you.  That's a good

15    suggestion.

16        MR. MAZMANIAN:  For the record, Your Honor,

17    Officer Bogan was the narcotics eyes officer, the

18    observing officer.  He will be able to testify to

19    the ID issue, the evidence taken, the arrest, the

20    search warrant as he is also the affiant, and the

21    statement.

22        There is a second officer that may provide

23    clarity, if necessary.

24        THE COURT:  Statement of the defendant?

25        MR. MAZMANIAN:  Statement of the defendant,

082620-CHAMBERS_FINAL

010:01    which is in his grounds.

02          THE COURT:  So ID, evidence seized, arrest,

03    search warrant, and statement of the defendant is

04    what Officer Bogan will be testifying to.

05          MR. MAZMANIAN:  Yes, which should be all of

06    the grounds that we are currently looking at at

07    page one and two.

08          THE COURT:  Let's bring him in.

09          COURT CRIER:  Sir, could you please state and

10    spell your first and last name?

11          OFFICER BOGAN:  Officer Timothy Bogan,

12    B-O-G-A-N, Badge No. 3358, Narcotics.

13          (OFFICER TIMOTHY BOGAN is duly sworn/affirmed

14    at this time.)

15          THE COURT:  All right.  Before we begin,

16    Mr. Chambers, I say this to all people in my

17    courtroom, you need to wear your mask and it needs

18    to cover your nose as with everybody else while

19    we're in the courtroom.

20          You may proceed, Commonwealth.

21          Good afternoon, Officer Bogan.

22          MR. MAZMANIAN:  Thank you, Your Honor.

23                DIRECT EXAMINATION

24    BY MR. MAZMANIAN:

25    Q.    **Good afternoon, Officer Bogan.**

082620-CHAMBERS_FINAL

011:01  A.    Good afternoon.

02  Q.    Officer Bogan, how long have you been a

03  Philadelphia police officer?

04  A.    Over 31 years.

05  Q.    And what is your current assignment?

06  A.    My current assignment is Philadelphia Police

07  Department Narcotics Unit.

08  Q.    And how long have you been a member of the

09  Narcotics Unit?

10  A.    I was transferred into the Narcotics Bureau in

11  December of '97, and then I went to the plainclothes

12  unit or the field unit in May of '98.  I then worked at

13  various parts of the city in that capacity.  In July of

14  I believe it was 2011, I transferred to the

15  Philadelphia Police Department Internal Affairs

16  Division, and the following July I was transferred back

17  into the Narcotics Field Unit where I am currently at

18  today.

19            THE COURT:  July of 2012?

20            THE WITNESS:  Yes, 2011 to 2012.

21            THE COURT:  Got it.

22  BY MR. MAZMANIAN:

23  Q.    As part of your responsibilities as a Philadelphia

24  narcotics officer, do you conduct narcotics

25  surveillance, surveillance, specifically, of narcotics

082620-CHAMBERS_FINAL

012:01 sales, and make arrests?

02 A.   Yes.   Whenever we receive information, we will go

03 out and investigate the complaints or information and

04 try to establish if narcotics are actually being sold.

05 Q.   And in your experience, how many times -- how many

06 narcotics observations and investigations have you

07 taken part in?

08 A.   I'll say well over 500.

09 Q.   And how many arrests have you made?

10 A.   I'll stay with the same figure, well over 500.

11 Q.   How many search warrants have you applied for?

12 A.   I'll say the same thing, over 500.

13 Q.   And, Officer Bogan, on April 15th of 2019, did you

14 receive information that directed you to the corner of

15 Anchor and Torresdale Avenue in the city and county of

16 Philadelphia?

17          THE COURT:   What date was that?

18          MR. MAZMANIAN:   That was April 15, 2019.

19          THE COURT:   Thank you.

20          THE WITNESS:   Yes.

21          Your Honor, on that date, I received

22     information from Officer Winscomb and Mangold of a

23     male selling narcotics through a cell phone number

24     of 215-609-7495.

25 BY MR. MAZMANIAN:

082620-CHAMBERS_FINAL

013:01  Q.   And, Officer Bogan, --

02          MR. CHAMBERS:  Who was selling narcotics?

03          THE COURT:  A male.

04          MR. CHAMBERS:  A male.  The arrest report

05   says --

06          THE COURT:  You'll have a chance to

07   cross-examine.  The officer can testify.  Hearsay

08   comes in in a motion, anything that was told to

09   him or anything else that he used as part of his

10   investigation, for purposes of the motion not at

11   the trial.  Once he's done testifying, you will

12   have a complete opportunity to cross-examine him

13   on all relevant matters.

14         You may proceed.

15          MR. MAZMANIAN:  Thank you, Your Honor.

16  BY MR. MAZMANIAN:

17  Q.   Have you ever been to that location before in your

18  capacity as a narcotics officer?

19  A.   Yes.

20  Q.   What's your experience in that location?

21  A.   We've made several arrests in that area.

22  Q.   Can you put a ballpark number on the several?

23  A.   I'll say approximately 10, 10 or more.

24  Q.   How many times have you been out there?

25  A.   I'm sorry?

082620-CHAMBERS_FINAL

014:01  Q.    For the purpose of being a narcotics officer, how

02  many times have you been to that location?

03  A.    In that little pocket there, I'll say I've

04  approximately done maybe four, four or five search

05  warrants, in that area.

06  Q.    And so, Officer, one last question:  This is in

07  the 15th District, correct?

08  A.    Yes.

09  Q.    How many times have you done narcotics

10  surveillance in the 15th District?

11  A.    Hundreds.

12  Q.    So what was the -- did you return to that -- I'm

13  sorry.   Strike that.

14       Did you go to that location on April 16, 2019?

15  A.    Yes.   Yes, I did.

16  Q.    When you were out there on April 16th, did you see

17  anyone that you currently see in the courtroom today?

18  A.    That's correct; defendant sitting next to counsel.

19  Q.    And what occurred on the 16th that brought the

20  defendant into your observation?

21  A.    Your Honor, on that date, myself and Officer

22  Deveaux met with a confidential informant.  I searched

23  the -- or I checked the confidential informant for any

24  narcotics or paraphernalia or United States currency.

25  On that date, Your Honor, I dialed a cell phone number

082620-CHAMBERS_FINAL

015:01  of 215-609-7495.  The phone rang.  It was answered by a

02  male's voice.  I turned the phone over to the

03  informant.  There was a one-sided conversation, Your

04  Honor.  I could hear the informant's conversation.  The

05  phone call was ended.  I then transported the CI to the

06  5400 block of Torresdale Avenue.

07  Q.    I am just going to pause you, because I want to

08  get on the record the one-sided conversation.  What did

09  that involve that you could hear?

10  A.    That was the CI stating that they had $40 and they

11  wanted to meet up.

12  Q.    So once you transported the CI, what happened

13  next?

14  A.    The CI got out of my vehicle, Your Honor.  At that

15  point, I had backup officers come into the area.  I

16  want to say not long after the phone call, Your Honor,

17  a Nissan Quest arrived being operated by the defendant

18  here.

19  Q.    Did you actively see the defendant driving the

20  vehicle?

21  A.    Yes.

22  Q.    How far away from him were you?  Just best

23  estimate.

24  A.    Best guess I can remember approximately 20 feet.

25  Q.    And what were the conditions like?  Was it light

082620-CHAMBERS_FINAL

016:01 out, dark out?

02 A.    It was a sunny day.

03 Q.    Okay.  So once you saw the defendant pull up, what

04 happened next?

05 A.    The CI entered the vehicle on the front passenger

06 door.  CI stayed inside approximately less than 30

07 seconds.  The CI exited the vehicle.  The vehicle

08 pulled off.  At that point, I had my backup officers

09 follow this vehicle.

10       The CI got back into my vehicle.  The CI turned

11 over to me from their hand two clear packets containing

12 crack cocaine.  At that point, I checked the informant

13 for any additional narcotics or money or paraphernalia

14 once again.  There was nothing on the CI's person.

15       Your Honor, the backup officers followed this

16 vehicle.

17 Q.    Who are your backup officers that day?

18 A.    On this day we had Officer Galaska, Officer

19 Sumpter, Officer Brown, Lieutenant Muldoon.

20 Q.    And who followed the Quest?

21 A.    I believe -- I really can't say who actually got

22 behind the vehicle, because it's not like we get right

23 behind the vehicle when we're following it.  We give it

24 a leeway.

25 Q.    But you know it was one of your backup officers?

082620-CHAMBERS_FINAL

017:01  A.    They're communicating to me over police radio of

02  the direction and the area where it's going.

03  Q.    **And what happened after they followed it?**

04  A.    At that point, Your Honor, the vehicle went down I

05  believe it was Hegerman Street and stopped at the

06  corner of Anchor and Hegerman Street.  At that point,

07  Your Honor, the officers continued trying to pass this

08  vehicle to turn, come back around and establish the

09  surveillance on the vehicle.  When the officers

10  returned, which was maybe two to three minutes

11  depending on the traffic, the vehicle was unoccupied.

12       At that point, Officer Galaska conducted a DMV

13  check, and he advised me that the vehicle came back

14  registered to a Mark Chamberlain at 1235 South 58th

15  Street.

16       Your Honor, at that point, we went inside.  I

17  conducted a NIK test G on one of the packets of crack

18  cocaine, and it did test positive for presence of

19  cocaine.  I am certified to conduct these tests.  I

20  then placed those two packets on Property Receipt

21  No. 3393659.

22            THE COURT:  339?

23            THE WITNESS:  3659.

24  BY MR. MAZMANIAN:

25  Q.    **Did that conclude your investigation for the 16th,**

082620-CHAMBERS_FINAL

018:01  Officer?

02  A.    That's correct.

03  Q.    And then on the 17th, did you do anything to

04  further your investigation in this matter?

05  A.    Your Honor, on that date approximately 5:30 a.m.,

06  myself and Officer Deveaux went out to the area of 1235

07  South 58th Street to see if we could locate the Nissan

08  Quest.  We went out to that area.  We did not observe

09  the Nissan Quest out in the area of 58th Street in the

10  1200 block.

11  Q.    And that's the address that the registration came

12  back to; is that correct?

13  A.    That's correct.

14  Q.    Okay.  Did you do anything else on the 17th?

15  A.    No.

16  Q.    Did you go back to the area of Torresdale and

17  Anchor on the 18th?

18  A.    That's correct.

19  Q.    And what occurred on the 18th?

20  A.    Your Honor, on that date, myself and Officer

21  Deveaux went out there to the area of 2100 Anchor

22  Street.  We had met with the confidential informant.  I

23  checked the confidential informant for contraband and

24  U.S. currency and paraphernalia with negative results.

25        At that point, Your Honor, we proceeded to go in

082620-CHAMBERS_FINAL

019:01    the area of Anchor, Sanger, and Hegerman Street looking

02    for the Nissan Quest.  We did not see the vehicle out

03    there that day.  At that point, I dialed that phone

04    number once again of the 215-609-7495.  It was answered

05    by a male's voice.  I turned the phone over to the

06    informant.  Once again, there was a one-sided

07    conversation where the CI stated that they had $40 and

08    they were in the area of 5400 Torresdale.  The phone

09    call was ended.

10        I had backup officers come into the area, Your

11    Honor.  I let the CI out of my vehicle along with

12    Officer Deveaux.  The CI did have the $40 prerecorded

13    buy money.  While I was conducting surveillance on the

14    informant, I observed the defendant come here on the

15    2100 block of East Sanger Street off of, I want to say,

16    Hegerman.  The CI was behind our vehicle.  Officer

17    Deveaux was several houses away on foot.  The

18    defendant, as he was walking westbound on Sanger, made

19    a motion like this.

20    Q.    And, Your Honor, just for the record, taking his

21    right arm, extending it, and making a waving motion

22    towards himself.

23    A.    At that point, the defendant continued walking

24    westbound.  The CI walked eastbound.  Approximately two

25    and a half car lengths away from me is where they met.

082620-CHAMBERS_FINAL

020:01   Officer Deveaux was still on foot.  At that point, I
02   observed the CI hand the defendant the prerecorded buy
03   money, and the defendant had a hand-to-hand exchange
04   with the informant.
05       At this point, he walked, the defendant walked
06   eastbound, and at that point the CI got back into my
07   vehicle and turned over to me from their hand two loose
08   chunks of crack cocaine.  I checked the informant.
09   There was nothing else on their person.
10       I was then in phone contact with Officer Deveaux,
11   and Officer Deveaux relayed to me that the male was
12   walking northbound and walking to the location of
13   Anchor Street.  At that point, Your Honor, I drove down
14   Anchor Street.  I saw the defendant come onto the
15   block.  Officer Deveaux was about maybe five to six
16   seconds behind him.  I observed this male walk up the
17   steps of a property, use keys, and entered a property.
18       Your Honor, that address was -- I believe that
19   address was 2139.  I then had Officer Galaska --
20           THE COURT:  Of what block?
21           THE WITNESS:  Anchor.  Sorry.  2139 Anchor.
22           THE COURT:  Thank you.
23           THE WITNESS:  At that point, I had Officer
24       Galaska and Alazier drive down and they did
25       confirm the address to be 2139 Anchor.  At that

082620-CHAMBERS_FINAL

021:01      point, Your Honor, I return to headquarters.  I

02      conducted an NIK test G on the narcotics.  It was

03      positive for cocaine base.  I then placed those

04      two loose chunks on Property Receipt No. 3393664.

05   BY MR. MAZMANIAN:

06   Q.   And did that terminate your investigation for that

07   day, Officer?

08   A.   On that day, yes.

09   Q.   And I have a question.  I just want to circle back

10   to when you saw the defendant first come on the block.

11   About what was the range of the time that you were

12   observing him?

13   A.   He was actually walking up towards my vehicle.

14   Q.   And could you see his face at that time?

15   A.   Yes.

16   Q.   And about how far, if you can give a range?

17   A.   I believe it was about two, two to three car

18   lengths away.

19   Q.   Okay.  And the lighting conditions at that time?

20   A.   Was daylight.

21   Q.   You said he walked back to 2139 Anchor.  Did you

22   lose sight of him at any point when he was walking

23   there?

24   A.   I did lose sight of him, yes.

25   Q.   And then you circled in your car and caught him,

082620-CHAMBERS_FINAL

022:01   correct?

02   A.    Yes.   When Officer Deveaux stated to me that he

03   was walking northbound and he was still behind him and

04   then he went westbound on Anchor Street, Officer

05   Deveaux was about five seconds behind him and I was

06   coming down Anchor Street.

07   Q.    And when you did catch up in your vehicle, could

08   you still see it was the same person?

09   A.    Yes.

10   Q.    And did you see it was the same person that went

11   into 2139 Anchor?

12   A.    Yes.

13   Q.    Moving onto the 22nd, April 22nd, was that part of

14   your -- was that date part of your investigation?

15   A.    That's correct.

16   Q.    And on April 22nd, before going out to that area,

17   did you apply for search warrant 212248?

18   A.    Yes.

19          MR. MAZMANIAN:  And, Your Honor, may I

20   approach?

21          THE COURT:  You may.

22          THE WITNESS:  Excuse me, Your Honor.  Can I

23   get a sip of water?

24          THE COURT:  Yes.  We can get you some water.

25          THE WITNESS:  I got it here in my bag.  I

082620-CHAMBERS_FINAL

023:01      just wanted to check.

02   BY MR. MAZMANIAN:

03   Q.    Officer, what's your procedure for applying for

04   getting a search warrant?

05   A.    Your Honor, I conduct a property check on the

06   location for a registered owner.  I then type up the

07   probable cause affidavit, which is the facts of this

08   investigation which started on April 15th.  I then have

09   my sergeant review it.  Once it's reviewed by my

10   sergeant, I then send it down to the District

11   Attorney's Office charging unit to get approval from

12   the District Attorney's Office.

13       Once that's approved by the District Attorney's

14   Office, I will bring it down to 1301 Filbert Street to

15   either a judge or a magistrate to give me authorization

16   to execute that search warrant on the property of 2139

17   Anchor.

18   Q.    And did you run the ownership information for this

19   address?

20   A.    Yes.

21   Q.    And did it come back to defendant?

22   A.    I don't believe it did.

23       MR. MAZMANIAN:  And, Your Honor, may I

24   approach with what I've marked as C-1.

25       THE COURT:  Sure.

082620-CHAMBERS_FINAL

024:01  BY MR. MAZMANIAN:

02  Q.   I'm first showing you this.  What is this document

03  that I am holding or giving to you?

04  A.   This is a photocopy of search warrant No. 212248.

05  This is what I sent down to the District Attorney's

06  Office and this is what they e-mailed me back.

07  Q.   Okay.  And that is prior to being signed by a

08  magistrate; is that correct?

09  A.   Yes.  This was submitted on the 21st of April.  It

10  was approved by ADA Kate Lewis on 4/21/19 at 12:32 p.m.

11  Q.   That's a fair and accurate copy of what you

12  received; is that correct?

13  A.   Yes.

14          MR. MAZMANIAN:  And, Your Honor, at this

15      point, I will move that into evidence.

16  BY MR. MAZMANIAN:

17  Q.   And I do see it says in big letters, "approved ADA

18  Kate Lewis."  Who wrote that on there?

19  A.   The district attorney who approves it does that.

20          THE COURT:  This was on April 21st?

21          MR. MAZMANIAN:  Officer Bogan, what date was

22      this sent to the DA's office?

23          THE WITNESS:  April 21st.

24          MR. MAZMANIAN:  And, Your Honor, may I

25      approach with what I've marked as C-2?

082620-CHAMBERS_FINAL

025:01          THE COURT:  Yes.

02 BY MR. MAZMANIAN:

03 Q.    I will take C-1 back.

04       Officer Bogan, what did I just hand you?

05 A.    This is a photocopy of the search warrant

06 No. 212248.

07 Q.    And is that a fair and accurate copy of your

08 search warrant?

09 A.    Yes.

10 Q.    After page one there is a bunch of other pages.

11 What is that specifically?

12 A.    That is the affidavit of probable cause.

13 Q.    And is that what you typed up?

14 A.    Yes.

15 Q.    And, Officer, going back to page one of the search

16 warrant, now, that is after it was signed by a

17 magistrate, correct?

18 A.    Yes, it is.

19 Q.    Which parts of this search warrant did you fill

20 out?

21 A.    I actually typed everything up on the upper half

22 of the search warrant as well as my name.  I signed my

23 name on the signature and affiant.  Officer Deveaux,

24 who is my partner, she filled out the property seized

25 in this property.

082620-CHAMBERS_FINAL

026:01  Q.   And did you see Officer Deveaux fill that out?

02  A.   Yes.

03  Q.   And when is that?  When was that specifically

04  filled out?

05  A.   She actually filled it out at the dining room

06  table of this property.

07  Q.   So after the warrant was served?

08  A.   Yes.

09  Q.   Now, Officer, directing your attention to slightly

10  below where it says property seized, the badge numbers

11  and the other officers, is that Officer Deveaux as

12  well?

13  A.   Yes, it is.

14  Q.   Filled out at the same time?

15  A.   Yes.

16        THE COURT:  Do you have an extra copy of that

17  by any chance?

18        MR. MAZMANIAN:  Yes, Judge.  I apologize.

19        THE COURT:  And I assume, Mr. Chambers, you

20  have a copy of it, right?

21        MR. CHAMBERS:  Yes.

22        THE COURT:  Okay.

23  BY MR. MAZMANIAN:

24  Q.   And the signature line under that, signature of

25  witness to inventory, that was signed by who?

082620-CHAMBERS_FINAL

027:01  A.    That was signed by my sergeant, Pat Love.

02  Q.    **And that was done at the same time that it was**

03  **filled in?**

04  A.    Yes.

05  Q.    **Now, underneath that in the bottom left-hand**

06  **corner, who filled out that portion?**

07  A.    That is filled out by the magistrate down in the

08  basement of the CJC.

09  Q.    **And did you physically take this warrant to the**

10  **basement of the CJC?**

11  A.    Yes.

12  Q.    **Did you present this warrant to that magistrate?**

13  A.    Yes.

14  Q.    **Did he sign it in your presence?**

15  A.    Yes, they did sign it.

16          THE COURT:  Just for the record, that would

17  be -- the official title is Arraignment Court

18  Magistrate in Philadelphia formally known as Bail

19  Commissioners who review and approve warrants 24

20  hours a day.

21          MR. MAZMANIAN:  Thank you, Your Honor.

22          MR. CHAMBERS:  For the record, can he state

23  the name?

24          MR. MAZMANIAN:  I can't read the signature.

25          Can you, Judge?

082620-CHAMBERS_FINAL

028:01          THE COURT:  I can –– it's first initial is K

02      and looks like maybe a D, but I can't read the

03      full name.

04  BY MR. MAZMANIAN:

05  Q.   But this was a magistrate that you presented it to

06  in the basement of the CJC, correct?

07  A.   Yes.

08  Q.   Now, Officer Bogan, in that space there is a

09  deadline for this warrant to be served.  What is that?

10  A.   It can be served no later than 9:49 a.m. on April

11  24th of 2019.

12  Q.   And when was this warrant granted?

13       It's right underneath that.

14  A.   It was approved and signed off on April 22, 2019,

15  at 9:49 a.m.

16          MR. MAZMANIAN:  Your Honor, at this point I

17      will move C-2 into evidence.  You already have a

18      copy, but I'll publish to Your Honor.

19          THE COURT:  All right.  Any objection?

20          MR. CHAMBERS:  The objection is to the

21      authenticity of the warrant.

22          THE COURT:  Okay.  Objection noted.

23      Overruled.  It can be admitted.

24          Go ahead.

25  BY MR. MAZMANIAN:

082620-CHAMBERS_FINAL

029:01 Q.   So, Officer Bogan, after you had this search
02 warrant approved, what did you do next?
03 A.   At that point, Your Honor, when I got in from
04 being down here at the courthouse, we gathered, my
05 backup officers as well as my supervisors, and we
06 formulate a plan to go out and execute the search
07 warrant at 2139 Anchor.
08 Q.   And about what time did you get there giving a
09 date range for security of the CI -- sorry, not date
10 range, a time range.
11 A.   I will say we got out there between 3:30 and 4:30.
12 Q.   And so what occurred once you arrived on that
13 location?
14 A.   Once we arrived on that location, Your Honor, I
15 spoke to Officer Deveaux, observed the Nissan Quest on
16 Hegerman Street at Anchor.  At that point, we left that
17 location.  I had Officer Galaska and Alazier set up
18 the -- establish a surveillance of the front of the
19 property of 2139 Anchor Street.  Your Honor, once that
20 surveillance was established, they notified me over
21 police radio.
22      At that point, myself and Officer Deveaux had a
23 confidential informant.  At that point, I checked the
24 confidential informant, once again, for any United
25 States currency, paraphernalia, illegal contraband with

082620-CHAMBERS_FINAL

030:01  negative results.  I then, once again, dialed that

02  phone number of 215-609-7495.  It rang.  It was

03  answered by a male's voice.  I turned the phone over to

04  the informant.  Once again, it was a one-sided

05  conversation, and the phone call was ended.

06          THE COURT:  What was the conversation?

07          THE WITNESS:  Conversation was I got $40 and

08      I'm over at, like, Sanger and Torresdale.

09  BY MR. MAZMANIAN:

10  Q.    What happened next?

11  A.    At that point, Your Honor, several minutes after

12  the call Officer Galaska notified me that the defendant

13  had exited the property of 2139 Anchor Street and was

14  walking in the direction of Torresdale Avenue.  Less

15  than, I want to say, three to five minutes later, Your

16  Honor, the defendant appeared.  Walking through the

17  driveways he came to Sanger Street.  The CI walked over

18  to the defendant on Sanger Street.  The defendant

19  accepted the prerecorded buy money and had a

20  hand-to-hand exchange with the informant.  I'm

21  approximately 20 feet away looking at the transaction,

22  Your Honor, as well as Officer Deveaux was.

23      When the transaction was over, the defendant

24  walked northbound through the driveway, and the CI got

25  back in my vehicle and turned over to me two loose

082620-CHAMBERS_FINAL

031:01   chunks of crack cocaine.

02         THE COURT:  Can you just explain to me when

03   you talk about hand-to-hand transaction?  Can you

04   describe and show us what you're talking about?

05         THE WITNESS:  Your Honor, I kind of liken it

06   to when you give children Halloween candy when

07   they come knocking on your door.  It's like a

08   pinching motion.  You put the candy in their

09   bucket.  The only difference is they're putting it

10   into the CI's hand.

11         THE COURT:  How many times have you seen such

12   a type of exchange in your work?

13         THE WITNESS:  Your Honor, I want to say I

14   personally have made numerous purchases like that,

15   I want to say, well over a total of 500 times

16   whether I observed it or made purchases myself.

17         THE COURT:  And were narcotics found --

18         THE WITNESS:  Yes.

19         THE COURT:  -- as a result of observing those

20   actions?

21         THE WITNESS:  Yes, sir.

22         THE COURT:  Go ahead.

23   BY MR. MAZMANIAN:

24   Q.   When you say you made purchases, you were

25   purchasing narcotics in an undercover capacity when you

082620-CHAMBERS_FINAL

032:01 were talking about that?

02 A.    Yes, undercover on the job, not off duty.

03 Q.    And, Officer, you saw this hand-to-hand that you

04 just described?

05 A.    Correct.

06 Q.    What happened after that?

07        I'm sorry.  You did say the CI comes to you and

08 turns over two loose chunks of crack cocaine?

09 A.    Yes.

10 Q.    Let me ask you just to skip ahead, because we're

11 going to talk about the warrant next.  But were those

12 two loose chunks placed on a property receipt?

13 A.    Yes.  I don't have the property receipt because

14 the drugs that were purchased were placed on the drug

15 property receipt that was recovered from the property.

16 Q.    Thank you.

17        Were they eventually NIK tested?

18 A.    Yes.

19 Q.    Were they crack cocaine?

20 A.    Yes.

21 Q.    Okay.  So after the CI turned over the chunks to

22 you, what occurred next?

23 A.    At that point, Your Honor, I continued northbound

24 on Torresdale where I saw the defendant exit the

25 driveway on Cheltenham Avenue, and then the defendant

082620-CHAMBERS_FINAL

033:01  walked eastbound on Cheltenham and then southbound on

02  Hegerman.  I saw him get to Anchor Street and I advised

03  Officer Galaska and Alazier that he was coming down

04  Hegerman Street and going west on Anchor.

05      At that point, Officer Galaska informed me that

06  the defendant had just entered the property of 2139

07  Anchor Street.

08  **Q.   Once he enters, how long before you are set up to**

09  **execute the search warrant?**

10  A.   We were already set up so within three to five

11  minutes.

12  **Q.   And where did you go during the search warrant?**

13  A.   The plan was for the main part of the team to go

14  through the front door.  Myself and Officer Deveaux

15  took the rear of the property.

16  **Q.   Who was the first person in the front door?  Who**

17  **was knocking for this warrant?**

18  A.   It was Officer Galaska.

19  **Q.   And what happened once now you're in the back and**

20  **Officer Galaska is at the front door?**

21  A.   After a couple minutes, they told me on radio that

22  it's secured, come around.  So when I got around, the

23  defendant was in the kitchen and Officer Galaska was

24  recovering items off of his person.

25  **Q.   So you saw Officer Galaska recovering the items?**

082620-CHAMBERS_FINAL

034:01  A.   Yes.

02  Q.   **And where in the house was this occurring?**

03  A.   In the kitchen.

04  Q.   **And what items did Officer Galaska recover?**

05  A.   From the defendant's person was one cell phone --

06  Your Honor, I did confirm that cell phone was the same

07  cell phone that I had dialed on the 16th, the 18th, and

08  the 22nd -- $420 United States currency plus the

09  prerecorded buy money which was just used.

10  Q.   **So it was 420 plus the 40?**

11  A.   Yes.  From his -- he had, like, a hooded

12  sweatshirt on, Your Honor, and in the hooded sweatshirt

13  pocket Officer Galaska recovered a revolver, a handgun,

14  a .38-caliber handgun out of that pocket that was

15  loaded with six rounds.  From the defendant's wallet

16  was one packet of heroin, 26 Suboxone strips, seven

17  clear packets of crack cocaine.  That was from his

18  person.

19      The defendant was very cooperative, Your Honor.

20  He did make a statement while we were there with

21  Officer Love and Officer -- I'm sorry -- Sergeant Love

22  and Officer Galaska that he had the gun for protection

23  because of recent shootings up at Torresdale and

24  Benner.  There was a recent homicide at, I believe it

25  was, Anchor and Torresdale.  So he said he just --

082620-CHAMBERS_FINAL

035:01          MR. CHAMBERS:  Objection to hearsay.

02          THE COURT:  It's a motion so hearsay comes in

03     for a motion, and also it's a statement by the

04     defendant, which is a party-opponent statement, so

05     the DA can bring it out both at the motion and at

06     trial.

07          Go ahead.

08  BY MR. MAZMANIAN:

09  Q.   Officer Bogan, did you physically hear the

10  defendant make this statement?

11  A.   I heard him say that he had just got the gun for

12  protection.

13  Q.   Where was he when he gave that?

14  A.   He was in the kitchen.

15  Q.   He was in the kitchen.

16       And had any officer asked him a question?  Was

17  that statement in response to any question?

18  A.   No.

19  Q.   And what questions was the defendant asked while

20  in the house?

21  A.   The only questions that we asked the defendant

22  were his biographical information, his date of birth,

23  his address, his Social Security number.

24  Q.   And the defendant freely answered those?

25  A.   Yes.

082620-CHAMBERS_FINAL

036:01 Q.    At no point was he asked a question about the
02 firearm?

03 A.    No.

04 Q.    After the items are recovered from his person --
05 I'm sorry.  You said you confirmed the cell phone.  How
06 did you confirm that cell phone?

07 A.    I dialed the number personally.

08 Q.    And it rang?

09 A.    It rang, yes.

10 Q.    So after the recoveries are made from his person,
11 what happened next?

12 A.    Defendant also stated that there was a shotgun in
13 the rafters of the basement.  At that point, myself and
14 Officer Galaska went to the basement, and from the
15 rafters in the basement was a sawed-off shotgun which
16 was not loaded.

17 Q.    Which was not loaded?

18 A.    Was not loaded.

19 Q.    Was anything else recovered from the house?

20 A.    Yes.  There was some mail recovered I believe in
21 the living room by Officer Alazier in the defendant's
22 name.  From the basement Officer Roller recovered a
23 clear bag that contained four pills; two blue, two
24 orange, also, one scale, and a packet of new and unused
25 clear packets.

082620-CHAMBERS_FINAL

037:01 Q.    And, Officer, what did you do next?

02 A.    At that point, Your Honor, I made a phone call to

03 the gun violence task force detectives up in Northeast

04 Detectives, advised them that we had just executed a

05 search warrant on a property of 2139 Anchor and we

06 recovered handguns.  At that point, the gun violence

07 task force detectives stated they would take possession

08 of the handgun and conduct further investigation on the

09 handgun and shotgun.

10 Q.    Were those guns turned over to those detectives?

11 A.    They arrived on the scene and they were turned

12 over to the detectives.

13 Q.    And they are the ones that property receipted

14 those firearms, correct?

15 A.    That's correct.

16 Q.    Now, Officer Bogan, after the guns were turned

17 over, did you do anything else involving this

18 investigation?

19 A.    We went back.  I conducted an NIK test on the

20 purchased narcotics, the recovered narcotics, and the

21 test was positive for presence of cocaine.  All the

22 items confiscated were submitted to evidence and the

23 chem lab for further processing.  There was also, I

24 believe, four or five people in the property, Your

25 Honor, including children.  I don't remember their

082620-CHAMBERS_FINAL

038:01  ages, but I do know it's in the 75-49.

02  Q.    Were there any adults in the property?

03  A.    Yes, there was one adult female.

04  Q.    Did you ever see the defendant's car again?

05  A.    Myself and Officer Galaska went down to the

06  vehicle.

07  Q.    Where was the vehicle?

08  A.    It was on Hegerman Street parked at Anchor.

09  Q.    About how far from the house is that?

10  A.    Five, six houses maybe.

11  Q.    It's on a street parking spot, not in the

12  driveway?

13  A.    It's parked legally on the street on Hegerman.

14  Q.    And once you went to that car, what happened?

15  A.    I found a bottle of codeine cough syrup in the

16  vehicle, and I know there was something else.  I just

17  can't remember what else was recovered from the

18  vehicle.

19         MR. MAZMANIAN:  Court's brief indulgence,

20     Your Honor.

21         (Pause.)

22  BY MR. MAZMANIAN:

23  Q.    The items that were recovered from the vehicle

24  they were placed on a property receipt?

25  A.    Yes.

082620-CHAMBERS_FINAL

039:01 Q.   And if you saw your investigation report, would

02 that refresh your recollection as to what was

03 recovered?

04 A.   Yes.

05        MR. MAZMANIAN:  Your Honor, may I approach?

06        THE COURT:  Yes.

07        MR. MAZMANIAN:  I'm approaching with the

08     75-49 that defense has.

09 BY MR. MAZMANIAN:

10 Q.   I am going to direct your attention to the last

11 line.  I want you to read it, and you can hand it back

12 to me.

13 A.   From the Nissan --

14 Q.   Not out loud.  In your head.

15      Does that refresh your recollection?

16 A.   Yes.

17 Q.   What was recovered?

18 A.   It was one amber pill bottle -- one amber bottle

19 containing approximately 10 ounces of codeine cough

20 syrup.

21 Q.   And then, Officer Bogan, was the defendant placed

22 under arrest and transported?

23 A.   He was already under arrest.  Officer Deveaux did

24 the 229, which is the biographical information, and the

25 defendant was transported to Northeast Police Division

082620-CHAMBERS_FINAL

040:01   for processing.

02   Q.    Did you positively identify the defendant once the

03   search warrant was served?

04   A.    Yes.

05   Q.    And it was the same person you had seen on the

06   other days that you had conducted the observations?

07   A.    Yes.

08        MR. MAZMANIAN:   Judge, I have no further

09     questions for this witness.

10        THE COURT:   You may cross-examine the

11     witness, Mr. Chambers.

12        MR. CHAMBERS:   All right.

13                  CROSS-EXAMINATION

14   BY MR. CHAMBERS:

15   Q.    Officer Bogan, how you doing?

16   A.    Good, sir.  How are you?

17   Q.    I'm all right.

18        Just to elaborate on what you were saying, April

19   16, 2019, you said you made a phone call to the phone

20   number 215-609-7495, correct?

21   A.    Yes.

22   Q.    Do you have any paperwork in reference to that

23   phone number to prove that that number was dialed or

24   any other number?

25   A.    No, I do not.

082620-CHAMBERS_FINAL

041:01 Q.    No, you do not.

02           So in reference to the phone number, the only

03   thing that we have to go on is the arrest report that

04   was written after the arrest?

05   A.    Yes.

06   Q.    After every transaction you said you put it on a

07   property receipt and put it in a lab that day, took it

08   to the lab that day?

09   A.    It was dropped in a drug safe at our headquarters,

10   and I believe it's transported down the next day.   I

11   don't know the whole process of the dropping the drugs

12   in the safe.

13   Q.    But you filled out the property receipt?

14   A.    Yes.

15   Q.    Can you explain why the property receipt says it

16   was confined in the 16th District?

17           THE COURT:  Can you say what you're referring

18       to, property receipt number, what date?

19           MR. CHAMBERS:  Referring to Property Receipt

20       3393659, which is dated 4/16/2019.

21   BY MR. CHAMBERS:

22   Q.    It says that this was a transaction that was

23   confined in the 16th District.

24   A.    I don't –– can I see it?

25   Q.    But this was the 15th District, correct?

082620-CHAMBERS_FINAL

042:01        THE COURT:  You can show him.

02           Are you going to mark this as part of your

03      exhibits?

04           MR. CHAMBERS:  Yes.

05           THE COURT:  Okay.  So that's D-1.

06           MR. MAZMANIAN:  I am approaching to hand D-1

07      to Officer Bogan.

08           MR. GOODMAN:  I'll put it up.

09           THE COURT:  All right.  While you get it up,

10      the officer will look at it the old-fashioned way.

11           You may ask a question.

12   BY MR. CHAMBERS:

13   Q.   What is the district control number for that

14   transaction?

15   A.    It's right up here in the right-hand corner,

16   19-15-35886.

17   Q.   So what would be the 33886 that's crossed out?

18   A.   I guess when Officer Deveaux was typing this she

19   typed in the wrong numbers.

20   Q.   Is there any indication on this property receipt

21   that any of this evidence was taken from me, the

22   defendant?

23   A.   No.

24   Q.   Why?

25   A.   Because it was an ongoing investigation.

082620-CHAMBERS_FINAL

043:01   Q.   **But you did ID me on that day you said, correct?**

02   A.   Yes.

03   Q.   **Do you have any documentation to back up that**

04   **story?**

05   A.   What?  That it was you that sold the drugs to the

06   CI that day?

07   Q.   **Yes.**

08   A.   Just from what myself and Officer Deveaux saw.

09   Q.   **So, once again, it's only the report after the**

10   **arrest?**

11   A.   Actually, at the end of the purchase, I go in and

12   start typing.  So it's actually maybe an hour after the

13   purchase.

14         THE COURT:  Are you making an ongoing report?

15   Is that what --

16         THE WITNESS:  Yes, Your Honor.

17         THE COURT:  Each day you summarize what you

18   did?

19         THE WITNESS:  Yes.

20   BY MR. CHAMBERS:

21   Q.   **According to your police directives, should there**

22   **not be a 75-48A for every transaction?**

23   A.   No.

24   Q.   **No?**

25   A.   No.

082620-CHAMBERS_FINAL

044:01          MR. CHAMBERS:  All right.  May I read from

02      the directives?

03          MR. MAZMANIAN:  I object to the relevance at

04      this time.

05          MR. CHAMBERS:  It's relevant.

06          THE COURT:  Well, let me -- what are you

07      referring to, Mr. Chambers?

08          MR. CHAMBERS:  Philadelphia Police Directive

09      1211, Appendage B, in reference to 75-48s, which

10      reads in Section F in the section, "however, if an

11      arrest is made as a result of an investigation, an

12      officer will be required to complete a 75-48 for

13      an arrest, a 75-48A for the underlying

14      vehicle/pedestrian investigation.  Two sets of DC

15      numbers will be obtained, one set for the arrest,

16      one for the vehicle/pedestrian investigation.  In

17      order to track the pedestrian or vehicle

18      investigation involving the arrest, the 75-48 and

19      75-48A must cross reference by DC numbers."

20 BY MR. CHAMBERS:

21 Q.   So I ask you when was the DC number that we are

22 going by, which is 19-15-35886, when was that number

23 acquired?

24 A.   It was acquired right after the purchase of the

25 confidential informant.

082620-CHAMBERS_FINAL

045:01  Q.   On the 16th?

02  A.   Yes.

03  Q.   So you used the same DC number throughout the

04  whole investigation?

05  A.   Yes.

06  Q.   But that's not what the directives instruct you to

07  do, is it?

08  A.   This is an ongoing investigation.  It stays with

09  the same DC number.

10        THE COURT:  I think the directive, if I heard

11     you correctly, Mr. Chambers, says when you make an

12     arrest.  No arrest was made until several days

13     later.

14        MR. CHAMBERS:  The arrest has a separate DC

15     number.  Every criminal act when it's being

16     investigated has a 75-48A, which is supposed to

17     get its own DC number.

18        THE COURT:  I'll take a look at the directive

19     and see what you say, but go ahead.  And just so

20     you know, directives do not control the law.  The

21     law is controlled otherwise.  But go ahead.  Keep

22     going.

23        MR. CHAMBERS:  I understand that.

24  BY MR. CHAMBERS:

25  Q.   So according to the evidence, there is no

082620-CHAMBERS_FINAL

046:01 indication of identification being made on the 16th?

02   A.   That's correct.

03   Q.   Even in your report you state that the vehicle was

04   being operated by a black male?

05   A.   That's correct.

06   Q.   With no identification?

07   A.   We didn't know your name on the 16th.

08   Q.   But you physically said you saw me on the 16th?

09   A.   I see a lot of people.  I don't know their names.

10   Q.   Because you had no prior run-in with me to know

11   that that was me driving the vehicle, correct?

12   A.   I know it was you driving the vehicle.  I did not

13   know your name.

14   Q.   But you ran the plates?

15   A.   Yes, I did.

16   Q.   So why is there no indication of that name being

17   incorporated into the report?

18   A.   I believe it is.

19   Q.   No.  It's only on the reference to the

20   registration of the vehicle, like who owns the vehicle,

21   where it's registered to as far as the address.

22   A.   Well, there is a record of it then.

23   Q.   My name is not incorporated into the target or the

24   black male target or the black male target wearing all

25   black with his hood up as you identified the suspect?

082620-CHAMBERS_FINAL

047:01  A.    I did not know if you were Mark Chamberlain or

02  not.

03  Q.    But you see me on more than one occasion?

04        MR. MAZMANIAN:   Judge, I will object to asked

05        and answered at this point.

06        THE COURT:  He can ask this question, and

07        then we'll move on.

08  BY MR. CHAMBERS:

09  Q.    The question is:  When they did the DMV check, is

10  it not accurate to say that a name, a picture, as well

11  as an address would show up on the computer?

12  A.    When Officer Galaska ran it, we just had the name.

13  We did not have a picture.  We had the name and address

14  of the vehicle where it was registered.

15  Q.    So it wasn't a DMV check?

16  A.    It was a DMV check, yes.

17  Q.    DMV stands for Bureau of Motor Vehicles?

18  A.    Yes.

19  Q.    You also don't have any verification that a DMV

20  check was done that day.  Do you have anything to

21  verify?

22  A.    I do not.

23  Q.    With the information that you received from the

24  DMV check, could you have not done a license check with

25  that name?

082620-CHAMBERS_FINAL

048:01  A.    I don't know if I did or not.

02  Q.    **So, once again, you have no proof of**

03  **identification?**

04          MR. MAZMANIAN:  Objection.

05          THE COURT:  He didn't do it.  That's the

06      answer.  He had other information.  Proceed

07      forward, please.

08  BY MR. CHAMBERS:

09  Q.    **Next transaction, April 18, 2019, you prepared the**

10  **property receipt for that?**

11  A.    It was prepared, yes.

12  Q.    **Did you prepare it?**

13  A.    I probably did not.

14          THE COURT:  Which property receipt number,

15      Mr. Chambers?

16          MR. CHAMBERS:  3393664.

17          THE COURT:  You didn't prepare that?

18          THE WITNESS:  More than likely I didn't.  My

19      partner probably did.

20          MR. MAZMANIAN:  If it's being marked, I can

21      bring it up to the officer, Judge.

22          THE COURT:  Are you going to mark that?

23          MR. CHAMBERS:  Yes, it's Exhibit 2.

24          THE COURT:  That will be Defense Exhibit 2,

25      if you can show it to the officer.

082620-CHAMBERS_FINAL

049:01 BY MR. CHAMBERS:

02 Q.   If I'm not mistaken, the signatures are exactly

03 the same as far as the preparation of Property Receipt

04 3393664 as it is 3393659, and you said that you

05 prepared the first one but you did not prepare the

06 second one?

07 A.   No.  Officer Deveaux typed both property receipts.

08 Q.   She did both property receipts?

09 A.   She did both property receipts.

10 Q.   So you're taking back that you did it the first

11 time?

12 A.   As I stated, I said she made a mistake, and that's

13 why she crossed out that DC number.

14 Q.   No.  I asked did you prepare --

15        MR. MAZMANIAN:  Objection.

16        THE COURT:  Let's not argue with the witness.

17    You can ask a question.

18 BY MR. CHAMBERS:

19 Q.   So this is the date in question where you said

20 that you followed the suspect to 2139 Anchor Street,

21 correct?

22 A.   Yes.

23 Q.   There is no indication of that either?

24 A.   No.  It's a confidential investigation.

25 Q.   That's the part that doesn't make sense.

082620-CHAMBERS_FINAL

050:01          MR. MAZMANIAN:  Objection.

02  BY MR. CHAMBERS:

03  Q.    Confidential investigation to who?  Me?

04  A.    I don't understand the question.

05  Q.    Am I the confidential investigation?

06  A.    This was a confidential investigation, and the

07  reason it's marked like that is so people who are

08  outside the Narcotics Bureau, when they get this

09  document, they don't know who we are looking at.

10  Q.    But is it not accurate for the person who it was

11  taken from or the owner of the property to be placed on

12  a property receipt?

13          THE COURT:  I think what the officer is

14      saying, Mr. Chambers, just to be able to move it

15      along, is that when they do a confidential

16      investigation they don't do that.  Because it's an

17      ongoing confidential investigation they don't want

18      anybody else who might see the property receipt to

19      know who the target is or where the property was

20      taken from.

21          MR. CHAMBERS:  I understand what you're

22      saying, but the sensibility in that for only

23      officers to see wouldn't make sense.

24          THE COURT:  Well, that can be your argument,

25      and I will hear your argument.  I am just trying

082620-CHAMBERS_FINAL

051:01    to --

02  BY MR. CHAMBERS:

03  Q.    Again, there is no indication of identification?

04  A.    That's correct.

05  Q.    There is also no district control number; there is

06  no request for a lab; there is no indication of

07  anything in relevance to this case?

08  A.    That's correct.  I don't see the DC number or the

09  lab requested.

10  Q.    So you don't have a separate DC number for that

11  control either, correct?

12  A.    That's correct.

13  Q.    To get a district control number can you explain

14  how that works?

15        MR. MAZMANIAN:  Objection, Your Honor.

16        THE COURT:  No.  I'm going to allow it,

17        because I think it's important for the record that

18        we clarify it just to explain what DC numbers are

19        and how they're given out and everything so the

20        record will be clear.

21        MR. CHAMBERS:  Right.

22        THE WITNESS:  After we made the purchase from

23        you on the 16th, we contacted police radio and I

24        asked for the northeast radio band to get me a set

25        of numbers for investigation of object for the

082620-CHAMBERS_FINAL

052:01      confines of 15th District.

02  BY MR. CHAMBERS:

03  Q.    So isn't it proper procedure to fill out a 75-48

04  for that district to have a written file for all

05  events, incidences, offenses, arrests, et cetera?

06  A.    Under that DC number, yes.

07  Q.    75-48, to have a written record of it is the

08  policy, correct?

09  A.    Yes.

10  Q.    But you didn't do that?

11  A.    Yes.

12  Q.    You did?

13  A.    I did.

14  Q.    Where is it?

15  A.    Should be in discovery.

16  Q.    It's not.   There is no 75-48, and there is no

17  75-48A.

18  A.    75-48A?  I'm sorry.  We don't do 75-48As.  A 75-48

19  would have been generated, would have been sent over

20  the computer to the 15th District.

21  Q.    And that documentation is where?

22  A.    Should be in the 15th District.

23  Q.    Personally typed version?

24  A.    Yes.

25  Q.    Was written by who?

082620-CHAMBERS_FINAL

053:01  A.   Myself.

02  **Q.   But this is not the proper procedure.   The proper**

03  **procedure would be the paper slip, correct?**

04  A.   What happens is when we generate the DC number,

05  Your Honor, and we send it over the computer to the

06  15th District, the operations room will handwrite the

07  75-48 out.

08            MR. CHAMBERS:  Can I have a copy of the 48?

09  Anybody?

10            MR. MAZMANIAN:  Brief court's indulgence.

11            (Pause.)

12            THE COURT:  Do you have it there?

13            MR. MAZMANIAN:  I think so.  May I approach

14  the officer to see if this is the document he's

15  referring to?

16            THE COURT:  Sure.  Then we'll make copies.

17            MR. MAZMANIAN:  It should have been provided.

18  It was labeled as NCIC paperwork.

19            THE COURT:  Okay.

20            MR. MAZMANIAN:  You're saying it's not like

21  the normal 48 slip?

22            THE WITNESS:  No.

23            MR. MAZMANIAN:  Is this what that would be?

24  Is this what would be submitted to the 15th?

25            THE WITNESS:  This is what I generate through

082620-CHAMBERS_FINAL

054:01    the computer and I send it over to the 15th

02    District and I send it over on --

03        THE COURT:  Before we do that, let's make

04    copies so that Mr. Chambers has it.

05        MR. MAZMANIAN:  I mislabeled that to

06    Mr. Chambers because I never seen it before but it

07    should still be provided.  We'll get you a copy.

08        THE COURT:  Well, let's get copies.  We'll

09    clarify it right now.  The officer can testify.

10  BY MR. CHAMBERS:

11  Q.   So according to policy 1211, section 1, "to

12  establish and maintain a permanent written record of

13  all founded offenses, arrests, complaints, particular

14  incidences, and services requiring police action, a

15  complaint or incident report 75-48 will be prepared at

16  the time that each complaint, offense, or incident is

17  received or observed and will serve as the basic record

18  for such complaint, offense, or incident."  Correct?

19  A.   Yes.

20  Q.   A paper copy?

21  A.   As I explained --

22  Q.   The slip that all officers are required to carry

23  is the form that's supposed to be filled out?

24  A.   As I explained earlier --

25  Q.   I understand what you're saying, but what I'm

082620-CHAMBERS_FINAL

055:01  saying is that this is not policy or procedure.

02  A.    I've been doing it this way for 22 years.

03        COURT CRIER:  Does the witness need a copy,

04  Your Honor?  I was not sure.

05        THE COURT:  Sure.

06        I think to clarify, Mr. Chambers, I know what

07  you're referring to.  When you stop people, they

08  have to do a 48 and 48A.

09        MR. CHAMBERS:  Yes.

10        THE COURT:  When they're doing

11  investigations, it's a slightly different

12  procedure.  It does have to be documented and this

13  was the documentation that should have been sent

14  to you, which you're now given copies of.

15        MR. CHAMBERS:  Well, the thing is this, I

16  have reason to believe this documentation was done

17  way after the fact.

18        THE COURT:  Okay.  Well, that will be an

19  argument that you make, and you can certainly ask

20  any questions relative to those documents.  That's

21  why I ask that it be given to you, and you have

22  the officer here.

23  BY MR. CHAMBERS:

24  Q.    Officer, for clarity, the date on this is April

25  16, 2019, so that would be the only one?

082620-CHAMBERS_FINAL

056:01  A.   This is it.

02  Q.   That's it?

03  A.   This is it.

04  Q.   But the original district control number was

05  placed on the property receipt as one digit off,

06  correct, then someone crossed it out and put that

07  number?

08  A.   Yes.

09        MR. MAZMANIAN:  Just to clarify, what's the

10  last three digits of the property receipt you're

11  talking about, Officer Bogan?

12        THE WITNESS:  I believe he's talking about

13  3393656, I'm sorry, 59.

14        THE COURT:  Are we marking this as D-3,

15  Mr. Chambers?  Do you want this marked as D-3?

16        MR. CHAMBERS:  Yes.

17        THE COURT:  So this is D-3, which is what I'm

18  calling the 48 and the 48A computer generated.

19        THE WITNESS:  Yes.

20        THE COURT:  Go ahead.

21  BY MR. CHAMBERS:

22  Q.   So at the top where it says you have ten minutes

23  to enter this text, why?

24        MR. MAZMANIAN:  Objection.

25        THE COURT:  If the officer knows, go ahead.

082620-CHAMBERS_FINAL

057:01          THE WITNESS:  I have no clue.

02          MR. CHAMBERS:  No clue.

03   BY MR. CHAMBERS:

04   Q.   Officer, I would like to know how is it on this

05   receipt -- I mean, on this 75-48, that you would know

06   on the 16th that there would be one inside transaction

07   and two outside transactions?

08   A.   I think --

09   Q.   One inside?

10   A.   I think what you're asking --

11   Q.   Two outside?

12   A.   -- is that is already on the screen.  If the

13   transaction happened inside, I would have to put one

14   for inside.  If it happened on the outside, which is

15   two, and that's why I put the two because, when you

16   sold the drugs, you were outside on the highway.

17          MR. CHAMBERS:  Objection to me selling

18       anything.

19          THE COURT:  That's overruled, Mr. Chambers.

20       That's the officer's testimony.

21   BY MR. CHAMBERS:

22   Q.   So on the original 75-48, it doesn't give you an

23   option of having a one or two.  If I'm not mistaken,

24   it's just a box that says in or out on the copy of a

25   75-48, right?

082620-CHAMBERS_FINAL

058:01  A.   I don't know.  It always comes up.  Like I said,

02  I've been doing it this way for --

03  Q.   You've never used an accurate form?

04          MR. MAZMANIAN:  Objection.

05          THE COURT:  We need to -- look, Mr. Chambers,

06  I understand what you're trying to ask, but we

07  need not to make apples into oranges.

08          MR. CHAMBERS:  I'm not trying to make apples

09  into oranges.

10          THE COURT:  Well, you are, because --

11          MR. CHAMBERS:  My argument is --

12          THE COURT:  Mr. Chambers --

13          MR. CHAMBERS:  -- he never documented

14  anything that he said that happened.

15          THE COURT:  You can make those arguments with

16  the motion, and I will hear anything you want to

17  say.  But, for the record purposes, he's

18  discussing a computer-generated 48 versus a

19  hand-generated 48 that you keep referring to, and

20  I just want to make sure the record is clear.

21  You're free to argue anything you want in terms of

22  how it was done or whether it was done properly or

23  anything else.

24  BY MR. CHAMBERS:

25  Q.   So in reference to probable cause, would you agree

082620-CHAMBERS_FINAL

059:01  that the only thing that you had to acquire probable

02  cause was the transaction of the 18th?

03         MR. MAZMANIAN:  Objection.  Probable cause is

04  a legal determination.

05         THE COURT:  I will sustain it, but just to

06  move it along, what you're asking is is that the

07  only thing you had to go get a search warrant

08  approved by an arraignment court magistrate

09  because it's the arraignment --

10         MR. CHAMBERS:  In order for the magistrate to

11  determine probable cause.

12         THE COURT:  Correct.

13         MR. CHAMBERS:  Right.

14         THE COURT:  You can answer.

15         THE WITNESS:  Well, the 16th transaction in

16  the vehicle was actually at Anchor and Hegerman

17  and then the second transaction where you walked

18  up to the CI and was followed back to the house

19  you used keys to enter the property.

20         THE COURT:  And, Mr. Chambers, in terms of

21  the warrant itself, the only thing I can consider

22  on the warrant is what's on the warrant that was

23  presented to the arraignment court magistrate, not

24  what could have been presented or other

25  information, because that's the only information

082620-CHAMBERS_FINAL

060:01 that the arraignment court magistrate had when

02 deciding whether there was sufficient probable

03 cause to sign it.

04 MR. CHAMBERS: I understand. He keeps –– he

05 continues to reference that the vehicle was parked

06 on Anchor and Hegerman, but in your affidavit it

07 says it was parked on Anchor and Tulip, which is

08 about two blocks away from the house.

09 THE WITNESS: Right. It was a typo on my

10 part. It was Hegerman.

11 BY MR. CHAMBERS:

12 Q. That typo was also presented to the magistrate?

13 A. Yes.

14 Q. So, again, the only determination of probable

15 cause was the transaction from the 18th when someone

16 allegedly was followed back to the residence?

17 A. When you were followed back to the residence, yes.

18 Q. And nowhere in the report or in the affidavit does

19 it say that I was that person?

20 MR. MAZMANIAN: Objection, asked and

21 answered.

22 THE COURT: He can answer.

23 THE WITNESS: I didn't know your name or else

24 I would have put it in there.

25 BY MR. CHAMBERS:

082620-CHAMBERS_FINAL

061:01  Q.   This was days later.  You got this affidavit

02  signed, allegedly, on the 22nd; so still on the 22nd

03  you didn't know my name?

04  A.   I don't understand allegedly.

05  Q.   Allegedly.

06  A.   Did I falsify the document?

07  Q.   Yes, you did.  And I say that due to the trash

08  marks that are on the document.

09       THE COURT:  Okay.  We're going to do it this

10  way because this a motion.  You're asking me, from

11  what I understand in the beginning, to suppress

12  the search warrant that there was not

13  sufficient --

14       MR. CHAMBERS:  No.

15       THE COURT:  -- probable cause.

16       MR. CHAMBERS:  No.

17       THE COURT:  Then what are you asking?

18       MR. CHAMBERS:  It was never a search warrant.

19  It was never an affidavit.

20       THE COURT:  So you're claiming that the

21  search warrant that was given to you was made up?

22       MR. CHAMBERS:  Search warrant that was given

23  to me has seals on it, and the one he has here in

24  the discovery doesn't.  So that's a different copy

25  of the search warrant altogether.

082620-CHAMBERS_FINAL

062:01          THE COURT:  Okay.  What I suggest in order to

02      be able to ask the questions to deal with the

03      motion you're raising is to go directly to the

04      questions.  You see, when it comes to the search

05      warrant, either there is not enough evidence in

06      the body in the probable cause, or, if you're

07      saying I didn't sign it, the person didn't sign

08      it, or if you're claiming something about a seal,

09      let's go right to the issue.

10          MR. CHAMBERS:  I'm going through the motions

11      of probable cause because that is still part of

12      the motion.  There was no probable cause.

13          THE COURT:  It isn't -- probable cause deals

14      with what's in the body of the search warrant.

15          MR. CHAMBERS:  That's what we're talking

16      about.

17          THE COURT:  No.  No.  You're starting to

18      raise that there was never a search warrant.

19          MR. CHAMBERS:  That's another issue.

20          THE COURT:  Well, okay.  Let's stick to one

21      issue at a time, Mr. Chambers, so that we can go

22      through this in an orderly way.

23          MR. CHAMBERS:  I was trying to.  I was trying

24      to.

25          THE COURT:  If you're saying there is not

082620-CHAMBERS_FINAL

063:01   enough evidence in the body of the probable cause,

02   then the only thing that I can do is hear your

03   argument and review it.  I can't allow the

04   prosecutor to add anything or take anything away.

05       MR. CHAMBERS:  Your Honor, that's not the end

06   of the argument though.  So I'm going to go

07   through, back through the affidavit, and then once

08   that's established I am going to go through the

09   affidavit itself as far as signatures and other

10   things of that nature.

11       THE COURT:  I don't know that --

12       MR. CHAMBERS:  It's not just about probable

13   cause.  It's about the fraudulence of the

14   affidavit and search warrant altogether.

15       THE COURT:  Are you challenging what is

16   written there in the affidavit of probable cause

17   is insufficient to allow the police to go into the

18   house?

19       MR. CHAMBERS:  In part.

20       THE COURT:  Well, I don't know what "in part"

21   means.  Either you are or --

22       MR. CHAMBERS:  In part means the first part

23   of it is, yes, because no matter what I still have

24   to argue whether or not there was probable cause.

25       THE COURT:  Okay.  So if you're arguing that,

082620-CHAMBERS_FINAL

064:01    then all you need to do is say, I don't believe

02    that there is sufficient probable cause in that

03    warrant, and then when we're done with all --

04        MR. CHAMBERS:  We're going through that right

05    now.

06        THE COURT:  No.  No, you're not going through

07    it.  When we're done with all of the testimony

08    about all the issues you want to raise, you'll

09    make that argument to me.  I will then look at the

10    body of the warrant.  I will read it, and I will

11    determine whether or not the magistrate in his

12    shoes believed that there was sufficient probable

13    cause.  That's the only thing I can do on a search

14    warrant on that issue.

15        MR. CHAMBERS:  Your Honor, throughout the

16    entirety of my argument since I've been coming in

17    your courtroom through motions, I have been

18    claiming that this warrant and the affidavit has

19    been fraudulent.  No one has set up a time period

20    to go over that type of stuff, and we're here

21    today to establish whether or not there was

22    probable cause.  But within my motion, I do argue

23    whether or not it was accurate, authentic, or if

24    it was fraudulent.

25        THE COURT:  Okay.  You can argue that it was

082620-CHAMBERS_FINAL

065:01    fraudulent.  I'm not precluding your argument on

02    that.  I'm just trying to explain to you that the

03    information in the body of the affidavit --

04            MR. CHAMBERS:  I got that.

05            THE COURT:  -- is information I look at.

06    You're saying --

07            MR. CHAMBERS:  You can continue.  I got it.

08            THE COURT:  -- that information was

09    fraudulent, okay, or it's not enough.  Whatever

10    you want to argue when we get to argument that's

11    fine, and I'll read the affidavit.  Now you're

12    further raising the issue that, in fact, the

13    police officer made up whatever he put into the

14    search warrant, didn't sign it, didn't do certain

15    things, and, therefore, it should be also

16    suppressed, am I correct about that?

17            MR. CHAMBERS:  Yes.  There is many issues why

18    it should be suppressed.

19            THE COURT:  Well, it can't be about many

20    issues.  We go issue by issue by issue.  This

21    isn't like --

22            MR. CHAMBERS:  Which is more than one issue.

23    There is many.

24            THE COURT:  Okay.  First issue is the

25    affidavit of probable cause and the sufficiency of

082620-CHAMBERS_FINAL

066:01    it.  That's in the body of the warrant.  Second

02    issue is whether or not the warrant is fraudulent

03    and whether you're claiming that the officer

04    didn't sign it or didn't do something properly,

05    right?

06        MR. CHAMBERS:  How about this; where is the

07    75-51?  I don't have a 75-51, which is an

08    affidavit.  Does anybody have one?

09        MR. MAZMANIAN:  Judge, I don't know what a

10    75-51 is.

11        MR. CHAMBERS:  On the face of the search

12    warrant it says we're going to look at the

13    affidavit of probable cause, which is attached to

14    the warrant which is not attached to the warrant.

15    It says the 75-51.  The terminology of 75-51 is --

16        THE COURT:  Hold it.  Hold it.  Mr. Chambers,

17    you've got to stop so we can get this done

18    properly, because I want to hear everything you

19    have to say and get it down.  Your question is to

20    the officer did you fill out a 75-51 or whatever

21    document you're asking about.  That's how we do

22    motions, not a speech.

23  BY MR. CHAMBERS:

24  Q.    Affidavit of probable cause.

25  A.    I'm sorry?

082620-CHAMBERS_FINAL

067:01 Q.    75-51, is there one?

02 A.    I'm sure if you scroll down next you'll see the

03 story.  That would be the 75-51.

04 Q.    Okay.  Let's scroll down.

05 A.    There it is.

06 Q.    That right there.  All right.  Zoom in on the top.

07    This is a 49, this investigation report, which is

08 a cut and pasted version of your arrest report so much

09 so you can see that the names -- not the names, the

10 payroll numbers or badge numbers are blacked out, which

11 is exactly the same as your arrest report, 75-49?

12 A.    Correct.

13 Q.    There is also no indication of any information on

14 the top of this document to link it to this case.

15 There's no district control number.  There is no name

16 of the officer, complainant.  In fact, where it says

17 race, you can see it was blacked out.  It actually says

18 white male.  I can clearly see the W.  Zoom in further

19 and we can see it's not a B.  Also, where it says

20 stolen property, currency and bonds, it has nothing to

21 do with a drug case.

22    So, again, I'm asking you, where is the 75-51,

23 because this isn't it?

24 A.    That is the affidavit of probable cause that I

25 attached to the search warrant.

082620-CHAMBERS_FINAL

068:01 Q.   It doesn't even say affidavit of probable cause.

02 A.   It is attached to the search warrant with a search

03 warrant number.

04 Q.   Was it attached to the version of the search

05 warrant that you gave my fiance?

06 A.   Your fiance got a copy of the search warrant of

07 the face.

08 Q.   A carbon copy?

09 A.   Yes.

10 Q.   It wasn't attached to an affidavit?

11 A.   No.

12 Q.   But isn't it procedure to leave a copy of the

13 affidavit and warrant at the property along with the

14 items seized?

15 A.   I never left a copy of the affidavit at a house.

16 Q.   Again, you never followed proper procedure.

17       THE COURT:  Wait a second.  Wait a second.

18 Let him answer.  Are you -- you're asking to leave

19 a copy of what property is seized?

20       MR. CHAMBERS:  Yes.  According to

21 Pennsylvania --

22       THE COURT:  Okay.  Just a second.

23 Go ahead.

24 THE WITNESS:  I did not.

25       THE COURT:  The answer is did not.

082620-CHAMBERS_FINAL

069:01 BY MR. CHAMBERS:

02  Q.   So is this an accurate version of the description

03  of the person you was looking for, a white male who

04  stole stolen currency and bonds?

05          MR. MAZMANIAN:  Can you please zoom out,

06      Mr. Goodman, so you can see the left side of the

07      screen?

08          THE WITNESS:  I have no idea what that ––

09 BY MR. CHAMBERS:

10  Q.   I mean, this is the report that you gave to the

11  magistrate is what I'm asking?

12  A.   That is the report I gave to the magistrate as you

13  can see by the search warrant number, 212248.

14  Q.   At this time you had a district control number,

15  correct?

16  A.   Yes.

17  Q.   Why is it not on this form?

18  A.   It's on the face of the search warrant.

19  Q.   On the face of the search warrant?  This is a

20  totally different form, though?

21  A.   It's all attached to the same search warrant.

22  Q.   It was never attached, not to the copy that you

23  left at the house.  So how would we know?

24  A.   I've never left the story at the house.

25  Q.   Okay.  Never left the story at the house.  Moving

082620-CHAMBERS_FINAL

070:01  on.

02      THE COURT:  Can we just clarify, when you say

03  leave at the house, what you leave at the house is

04  the items you take, right?

05      THE WITNESS:  Right.  What I leave --

06      THE COURT:  I'm not sure what he's talking

07  about because you don't leave the affidavit.

08      MR. CHAMBERS:  What is supposed to be left at

09  the house is a copy of the search warrant, a copy

10  of the affidavit, and a copy of the inventory.

11      THE COURT:  Go ahead.

12      THE WITNESS:  When we did the search warrant,

13  Your Honor, what was taken was placed on the

14  property receipt -- on the search warrant.  The

15  drugs, the money, the handgun, the shotgun, the

16  paraphernalia, that is all placed in on the actual

17  front page of the search warrant.  We leave the

18  owner/occupant copy with his fiance.

19      THE COURT:  When you say owner/occupant copy,

20  you mean the front page of the search warrant of

21  what was seized?

22      THE WITNESS:  I believe it's, like, the

23  fourth page -- you know what, I have a search

24  warrant in my bag, if you --

25      THE COURT:  Well, take a look but it's

082620-CHAMBERS_FINAL

071:01    whatever the --

02        THE WITNESS:  I will let you know.

03        THE COURT:  We will clarify.  I am trying to

04        understand what was left and how it was left

05        because he raised that question.

06        MR. CHAMBERS:  All that I'm trying to

07        establish is that the search warrant was not

08        attached to any affidavit, and there is no

09        accurate itemized characteristic to be specific

10        what was taken from the house.

11        THE WITNESS:  It is this page of a search

12        warrant.

13        THE COURT:  What page?

14        THE WITNESS:  It is the fourth page, Your

15        Honor.  That is the page that we left with the --

16        THE COURT:  That's a copy, right?

17        THE WITNESS:  That is actually part of the --

18        THE COURT:  No.  But it's the first page but

19        it's the fourth copy, am I correct?  Isn't that a

20        copy?

21        MR. MAZMANIAN:  That's a carbon copy.

22        THE COURT:  That's a carbon copy.  That's

23        what I mean.

24        THE WITNESS:  I'm sorry.  Yes.

25        THE COURT:  It's the front page.  That's what

082620-CHAMBERS_FINAL

072:01   I couldn't understand.

02          THE WITNESS:  Right.

03          THE COURT:  That's why I kept asking the

04   question.  It's the front page of the search

05   warrant.  It's the fourth copy that goes and is

06   left with the people at the house where property

07   is taken.  Okay.

08          THE WITNESS:  Correct.

09          THE COURT:  Which lists what property was

10   taken.

11          THE WITNESS:  Yes, sir.

12          THE COURT:  Got it.

13          Go ahead.  You may ask the next question.

14   BY MR. CHAMBERS:

15   Q.    The question is just that did you or did you not

16   follow the procedure?

17   A.    I did not leave a copy of the affidavit at the

18   house.

19   Q.    So there is no way for anyone to know if there was

20   an affidavit prior to now?

21          THE COURT:  Mr. Chambers, I am going to ask

22   you to move on, please, because now you're getting

23   into argument.  The officer followed the procedure

24   of leaving a copy of what was taken.  The

25   affidavit that you're referring to goes with all

082620-CHAMBERS_FINAL

073:01      the paperwork, is turned over as part of the
02          discovery, not left at a house.
03  BY MR. CHAMBERS:
04  Q.    Like I was saying, back to the purposes of
05  probable cause.  The only thing that we have with the
06  transaction is the 18th, correct?
07  A.    That's correct.
08  Q.    Which leaves no evidence in the report or any
09  other documentation that I was the suspect that you
10  seen enter into that house?
11  A.    That we knew it was you?  We knew it was you.  We
12  just didn't know your name.
13  Q.    That's kind of like --
14          THE COURT:  Okay.  You got -- look, you're
15  making argument now.  These are actually maybe
16  trial arguments you're making.  I'm just dealing
17  with whether the evidence comes in.
18          MR. CHAMBERS:  Because it goes into the next
19  section as far as what the search warrant where
20  you still didn't put a name on it.
21          THE COURT:  The warrant speaks for itself.  I
22  keep trying to tell you that.
23          MR. CHAMBERS:  You're right.  It does, which
24  means that it doesn't have an identification of a
25  suspect.

082620-CHAMBERS_FINAL

074:01        THE COURT:  Those are -- that's for argument,

02     for argument.  The warrant is the warrant.

03            MR. CHAMBERS:  But we are arguing.

04            THE COURT:  No.  No, we're not.

05            MR. CHAMBERS:  Identification and --

06            THE COURT:  We're not arguing.

07            MR. CHAMBERS:  -- probable cause, correct?

08     This is what Ms. Mazmanian first directed his

09     questioning on, identification and probable cause.

10            THE COURT:  Mr. Mazmanian directed his

11     questions to the officer as to information --

12            MR. CHAMBERS:  Identification.

13            THE COURT:  Excuse me.  I don't interrupt

14     you.  When the officer is doing the investigation,

15     whatever the officer did in the warrant is in the

16     warrant and that's it.  You can argue anything you

17     want, what isn't, what should be, what --

18            MR. CHAMBERS:  Your Honor --

19            THE COURT:  Anything else?

20            MR. CHAMBERS:  Your Honor, the first part of

21     Mr. Mazmanian's direct was about identification.

22            THE COURT:  Yes.

23            MR. CHAMBERS:  Okay.  So all the way leading

24     even into the day that he got a search warrant

25     there is still proof that he had no

082620-CHAMBERS_FINAL

075:01     identification.

02             THE COURT:  That's your argument when we're

03     all done with the testimony.  That's all I'm

04     trying to explain to you.

05             MR. CHAMBERS:  But I'm asking him a question.

06             THE COURT:  He's been answering his

07     identification.

08  BY MR. CHAMBERS:

09  Q.    So on the face of the warrant, you still did no

10  identification of a suspect?

11  A.    I did not know your name, that's correct.

12  Q.    You did not know my name?

13  A.    That's correct.

14  Q.    And you did not docket anywhere in any report or

15  any other document even after the fact of the search

16  that you physically IDed me that day?

17  A.    IDed you on the 16th or --

18  Q.    On any --

19  A.    The sale on the 16th, the sale on the 18th, or the

20  sale on the 22nd?

21  Q.    On any day do you have any documentation to prove

22  that?

23  A.    Just my testimony.

24  Q.    Just your testimony, which was written after the

25  event?

082620-CHAMBERS_FINAL

076:01 A.   The only thing that was written after the event

02 was the circumstances of the 22nd when I had your name.

03 Q.   And you still didn't put that in the report?

04 That's still not in the arrest report even after you

05 said you had --

06        THE COURT:  When you say it's not in the

07    arrest report, can you refer specifically to what

08    you mean by the arrest report?  There is a lot of

09    different documents.

10        MR. CHAMBERS:  All right.

11 BY MR. CHAMBERS:

12 Q.   The 75-49 is another redacted version of the

13 original arrest report, which was given to me by the

14 District Attorney's Office for forfeiture claim.  This

15 would be the original.

16        THE COURT:  Mr. Mazmanian, does he have the

17    original?

18        MR. MAZMANIAN:  He has the 75-49 along with

19    the PARS.  Those are the full write-ups and the

20    affidavit that are all full write-ups.

21        MR. CHAMBERS:  The PARS, right.  The PARS,

22    what was in the PARS?  This is the first document.

23    It says it's a copy.  It's a copy of the original.

24    The one that claims to be the original is the

25    arrest report.  I have the redacted.  I have the

082620-CHAMBERS_FINAL

077:01    arrest report.  The arrest report claims to be the

02        original.  The problem being is the arrest report

03        says it's an original but it can't be a copy which

04        is the redacted because the redacted says Chambers

05        and the original says Chamberlain.  Chamberlain

06        would be my accurate name.  This is my true name.

07        This is the name that you got when you did the DMV

08        check, Mark Chamberlain, 1235 South 58th Street.

09             THE COURT:  Okay.  You can't make speeches.

10        You can only ask questions if you're representing

11        yourself.

12             MR. CHAMBERS:  I'm going to ask a question.

13             THE COURT:  No, you're not.  You're going on

14        and on.  Ask a question.

15             MR. CHAMBERS:  You stopped me.  I was

16        explaining why.

17             THE COURT:  You don't explain it.  You just

18        ask the question that you want to ask, then you

19        can argue whatever --

20   BY MR. CHAMBERS:

21   Q.   In the redacted arrest report, in the original

22   arrest report, in the 75-49, did you state that you

23   physically seen me anywhere?  Did you finally finalize

24   the identification after the arrest?

25   A.   I have to see the reports to see if I have

082620-CHAMBERS_FINAL

078:01  anything in there documented.

02          MR. CHAMBERS:  I would like to give him the

03  report.

04          THE COURT:  Sure.

05          MR. MAZMANIAN:  Judge, I have the PARS and

06  the 49.  Neither are redacted.  So he's kind of

07  referring to three different documents.  These are

08  the only two.

09          MR. CHAMBERS:  There is three different

10  documents that was given to me, like, three

11  different versions of the search warrant.

12          THE COURT:  There is nothing about three

13  different versions.  One has to do with

14  forfeiture.  I would appreciate if you did not

15  make statements where you don't have the full

16  information because it makes the record --

17          MR. CHAMBERS:  I have the full information.

18          THE COURT:  No, you don't, sir, because there

19  is a forfeiture proceeding --

20          MR. CHAMBERS:  You're saying I don't but I

21  do.

22          THE COURT:  I didn't stop you and you're not

23  going to stop me or you're not going to be able to

24  represent yourself.  Mr. Goodman would make an

25  argument; he would hear me; and then I would hear

082620-CHAMBERS_FINAL

079:01　　　him.  That's the way we do things here.  Now,

02　　　there is a forfeiture proceeding, and there is a

03　　　criminal proceeding.  This document is for the

04　　　criminal proceeding which has everything.  The

05　　　forfeiture proceeding, if I'm correct, may not

06　　　have all of that information because that's not a

07　　　criminal proceeding.  It's a civil proceeding.

08　　　　　　MR. CHAMBERS:  They're exactly the same.

09　　　　　　THE COURT:  Okay.

10　　　　　　COURT CRIER:  Your Honor, is something being

11　　　marked?

12　　　　　　THE COURT:  Is this D-4 or D-5?

13　　　　　　COURT CRIER:  D-4.

14　　　　　　MR. MAZMANIAN:  Just for clarity, D-4 will be

15　　　the PARS because I have to hand up two documents,

16　　　Judge.

17　　　　　　THE COURT:  Go ahead.

18　　　　　　MR. MAZMANIAN:  D-5 is the 49.

19　　　　　　THE COURT:  Okay.  Go ahead.  You may ask the

20　　　question again now that he has the documents.

21　BY MR. CHAMBERS:

22　Q.　So there are the different documents, 75-49,

23　arrest report, redacted arrest report; is there

24　anywhere to prove that you ever physically identified

25　me as the suspect?

082620-CHAMBERS_FINAL

080:01 A.   On page three of the 49 it has the property

02 receipt for the two clear packets purchased from

03 Chamberlain.

04 Q.   Which was written after?

05 A.   Well, I knew your name then.

06 Q.   But this is in reference to the first?

07 A.   The first purchase.

08 Q.   The first purchase?

09 A.   The first time we bought from you.

10 Q.   Now, which document are you saying?

11 A.   The 75-49.

12 Q.   75-49?

13          MR. MAZMANIAN:   D-5.

14 BY MR. CHAMBERS:

15 Q.   Page what?

16 A.   Page three.

17          MR. GOODMAN:   What is this called?

18          MR. MAZMANIAN:   D-5.

19 BY MR. CHAMBERS:

20 Q.   So this was an add-on after the arrest report?

21 A.   This is after you're arrested.  I know your name

22 and I can put those drugs on you at that time.

23 Q.   Okay.  Now, here's the problem; that's not in the

24 arrest report?

25 A.   In the PARS?

082620-CHAMBERS_FINAL

081:01  Q.    In the PARS or in --

02  A.    You sure about that?  On page three of the PARS,

03  two clear Ziploc packets purchased from Chamberlain on

04  4/16 and 19.

05  Q.    And this was after when?

06  A.    This is after you are arrested at the house.

07  Q.    No, the document.

08  A.    This is done that day.

09  Q.    The PARS report?

10  A.    After you're arrested it's done then.

11  Q.    The 79 or the PARS?

12  A.    The PARS.

13  Q.    Was done that day?

14  A.    It was done on the day of the 22nd.

15  Q.    Or was it done on May 10th?

16  A.    What?  The PARS?

17  Q.    The PARS says it was done on May 10th, which is

18  approximately maybe two weeks after looking at this

19  one.

20  A.    Arrest information on the PARS is 4/22.  I don't

21  know where you're getting May 10th.

22          MR. CHAMBERS:  So can we move these both into

23      exhibits?

24          MR. MAZMANIAN:  He has both of them, 49 and

25      PARS, and Mr. Goodman has them.

082620-CHAMBERS_FINAL

082:01          MR. CHAMBERS:  Your Honor, the reason for
02    this is the one that I was given on May 10th --
03          THE COURT:  I don't know what you were given
04    on May 10th.  All we're dealing with is D-4 and 5,
05    which was for the arrest and it was part of the
06    full discovery that you were given for the
07    criminal case.
08          MR. CHAMBERS:  Right.
09          MR. MAZMANIAN:  This will be marked as the
10    next exhibit in sequence.
11          COURT CRIER:  D-6.
12          THE COURT:  What is that, Mr. Goodman?
13          MR. GOODMAN:  This is the PARS that was
14    provided to Mr. Chamberlain in the forfeiture.
15          THE COURT:  That's the forfeiture PARS?
16          MR. GOODMAN:  Yes, Your Honor.
17          MR. CHAMBERS:  Just for the record, I was not
18    given a 75-49 for discovery until January the 21st
19    of 2020.  So that is the first document --
20          THE COURT:  Mr. Chamberlain, you've got to do
21    me a favor; I want you to ask all the questions
22    that are relevant.  But when you were given this
23    discovery in January versus being given it in
24    October or whenever doesn't matter.  We are now in
25    August.  You've had this discovery and the

082620-CHAMBERS_FINAL

083:01    question goes to specifics, not when you were
02    given stuff or anything else.
03        MR. CHAMBERS:  I know you saying it's not
04    time for argument, but there is argument behind
05    it.  This is the reason why it's relevant being as
06    though this says copy.  This is the first copy.
07    It says it right there on the bottom.
08        THE COURT:  Mr. Chamberlain, you can ask this
09    officer if he knows is this a copy, is this the
10    original, what is this part of?  Is this part
11    of --
12 BY MR. CHAMBERS:
13 Q.    Is it true or is it not true that this redacted
14 arrest report, the original arrest report that was done
15 on the 22nd, and the 75-49 are all the same, one pasted
16 and cut from the other?
17 A.    There are some modifications between the PARS and
18 75-49.
19 Q.    Other than the fact that you added the individuals
20 that was in the house, there is not much difference?
21 A.    And your statement to Sergeant Love and Officer
22 Galaska.
23 Q.    And a statement that is to be claimed that I made.
24 Okay.  So I'm just trying to figure out how is this a
25 copy of the arrest report when there are two different

082620-CHAMBERS_FINAL

084:01  documents in whole altogether?  Is this not something

02  that doesn't raise an eyebrow?

03          MR. MAZMANIAN:  Objection.

04          THE COURT:  Okay.  That's sustained.  Ask

05      your next question.

06  BY MR. CHAMBERS:

07  Q.    Basically, in reference to documentation, when was

08  the redacted version written?

09          MR. MAZMANIAN:  May I ask a clarifying

10      question?

11          THE COURT:  What are you referring to,

12      Mr. Chambers, so it's clear which?

13          MR. CHAMBERS:  The first part that I received

14      with the --

15          THE COURT:  No.  No.  Did you mark it?

16          MR. GOODMAN:  It's up on the board.

17          MR. CHAMBERS:  D-6.

18          MR. GOODMAN:  For the record, Your Honor, I

19      will print out a copy.  I have it saved as part of

20      my system now so I can print out a copy for court

21      and court reporter.

22  BY MR. CHAMBERS:

23  Q.    When was it written is the question?

24  A.    When do I write the PARS report?

25  Q.    This one.

082620-CHAMBERS_FINAL

085:01        THE COURT:  No.  No.  I think the question

02   goes to this redacted version used for the

03   forfeiture proceedings.  Are you involved in doing

04   that at all?

05        THE WITNESS:  I submit my discovery to the

06   District Attorney's Office, and, if they redact

07   it, it wasn't redacted by myself.

08        THE COURT:  That's the answer.

09   BY MR. CHAMBERS:

10   Q.  The District Attorney's Office is redacting the

11   report -- the District Attorney's Office made a

12   duplicate that is actually not the original I'm asking?

13        THE COURT:  Sir, no.  No.  He doesn't know.

14   All he's saying, Mr. Chambers, is --

15        MR. CHAMBERS:  But he has to clarify.

16        THE COURT:  No.  No.  No.  It's not about

17   clarifying.  I do my report on the day of the

18   arrest and I submit it.  That's it.  And then he's

19   done, right?

20        You're not involved in anything else after

21   that?

22        THE WITNESS:  The last thing I do is the 49,

23   and that may be two, three weeks later.

24        THE COURT:  And that's based on the PARS

25   report?

082620-CHAMBERS_FINAL

086:01          THE WITNESS:  Exactly.  Yes, Your Honor.

02          THE COURT:  All right.

03          MR. GOODMAN:  May it please the court, the

04     PARS, what is the exhibit number for that?

05          MR. MAZMANIAN:  D-4.

06          MR. GOODMAN:  D-4?

07          THE COURT:  Yes.

08   BY MR. CHAMBERS:

09   Q.   All I'm asking is what's the difference between

10   the redacted version of the PARS arrest report and the

11   original?

12          MR. MAZMANIAN:  Objection, asked and

13     answered, Judge.  He doesn't know.  He didn't

14     redact anything.

15          THE COURT:  I think that's what he just said,

16     but I'll give him a chance to answer it again.

17          THE WITNESS:  I redacted nothing.

18          THE COURT:  Next question.

19   BY MR. CHAMBERS:

20   Q.   So it doesn't exist?

21          MR. MAZMANIAN:  Objection.

22          THE COURT:  Okay.  I think it's been asked

23     and answered.  The officer said he did his

24     original reports after the arrest and subsequently

25     the 49 and that's all he ever did.  Next question.

082620-CHAMBERS_FINAL

087:01  BY MR. CHAMBERS:

02  Q.   Why does each one of the PARS report have

03  different names?  The one that's a copy that is

04  supposed to be copy of the original has a different

05  name than the original?

06           THE COURT:  When you say "different names,"

07      could you clarify please, Mr. Chambers?

08  BY MR. CHAMBERS:

09  Q.   On the copy of the redacted at the top where it

10  says defendant, it says Mark Chambers.  On the alleged

11  original at the top for defendant it says Mark

12  Chamberlain.

13           THE COURT:  The question is why, if he knows.

14           THE WITNESS:  I don't know why they're

15      different on the PARS.  I don't know.

16  BY MR. CHAMBERS:

17  Q.   So the issue would be, again, this is not a

18  question but authenticity for the record.

19           THE COURT:  Keep the issues for closing for

20      your closing argument.  You may keep moving with

21      the questions so we can get through the testimony,

22      please.

23  BY MR. CHAMBERS:

24  Q.   During the day of the 22nd serving the search

25  warrant, you and Deveaux set up in the back of the

082620-CHAMBERS_FINAL

088:01   house?

02   A.   Myself and Officer Deveaux, yes.

03   Q.   Galaska and other officers set up in the front of

04   the house, correct?

05   A.   Yes.

06   Q.   How did they radio to you to ask for breach?  What

07   was his word?

08   A.   I don't authorize a breach.  That comes from a

09   supervisor.

10   Q.   So that would be Lieutenant Muldoon?

11   A.   That would be, I believe, Love, Sergeant Love, or

12   Lieutenant Muldoon.

13   Q.   Sergeant Love.  After the breach when you came

14   into the residence, the defendant was already arrested,

15   correct?

16   A.   You were in the kitchen, yes.

17   Q.   Being searched?

18   A.   Yes.

19   Q.   Prior to that within the discovery and in the

20   evidence there is nothing to determine why; meaning

21   during the search you have authority to detain but you

22   don't have authority to search or arrest without

23   certain significant factors?

24          MR. MAZMANIAN:  Objection.

25          THE COURT:  That's for argument not ---

082620-CHAMBERS_FINAL

089:01  BY MR. CHAMBERS:

02  Q.   What I'm asking is was it anything that was

03  determined at that time to automatically arrest the

04  defendant or search him through documentation?

05          MR. MAZMANIAN:  Objection.

06          THE COURT:  Sustained.

07  BY MR. CHAMBERS:

08  Q.   So there is nothing to indicate upon the record

09  that the defendant was a suspect or a reason to arrest

10  the suspect, or the defendant, or search him?

11          MR. MAZMANIAN:  Objection.

12          THE COURT:  Okay.  I am going to overrule

13      that.  I think the officer has but he can answer

14      it one final time.

15          Your arrest report contains the investigation

16      information?

17          THE WITNESS:  Yes.  He was the subject of the

18      investigation after three positive purchases and

19      the search warrant on his house.  So you were

20      going to be arrested for the transactions that

21      happened on the 16th, the 18th, and the 22nd.

22          MR. CHAMBERS:  Your Honor, I understand that.

23      The problem is that wasn't written into the report

24      until after.

25          THE COURT:  You can make that argument.  The

082620-CHAMBERS_FINAL

090:01    report speaks for itself.

02        MR. CHAMBERS:  I'm just asking the question.

03        THE COURT:  The report is written after the

04    arrest is made, am I correct about that?

05        THE WITNESS:  The arrest report is after the

06    arrest.

07        THE COURT:  And isn't the first thing in the

08    arrest report, if this is the procedure, the PARS

09    report, which describes what the basic facts of

10    investigation and arrest is?

11        THE WITNESS:  It's basically a copy and paste

12    from the affidavit and what's added into the PARS

13    is the facts of April 22nd.

14        THE COURT:  Which is the date of the search

15    and the arrest?

16        THE WITNESS:  Correct, and the purchase.

17        THE COURT:  And all of that is sent to the

18    DA's office to determine what, if any, charges are

19    to be lodged against the person who is in custody?

20        THE WITNESS:  That's correct.

21        THE COURT:  Go ahead.  Next question.

22    BY MR. CHAMBERS:

23    Q.    The question wasn't answered.  Prior to the

24    arrest, prior to the search, was there any

25    documentation given to the officers to let them know

082620-CHAMBERS_FINAL

091:01   who the suspect was or who was to be arrested or

02   searched?  That's the question.

03   A.   Yes.  On the 22nd when you came back to the house

04   after you sold to the CI, I gave the direction and

05   followed you to the 2100 block of East Cheltenham and

06   then you walked southbound and then Officer Galaska

07   then also observed you.  So Officer Galaska knew who

08   the target of the investigation was.

09   Q.   You're still not answering the question.  The

10   question was the documentation proof in evidence that

11   this was --

12           THE COURT:  Don't use the word "proof,"

13       please, because that's sort of a legal term.  You

14       can ask was there documentation --

15   BY MR. CHAMBERS:

16   Q.   Was there documentation?

17           THE COURT:  -- and the officer can answer.

18           THE WITNESS:  To what?

19   BY MR. CHAMBERS:

20   Q.   To prove or to establish that these officers had a

21   direct target to search or arrest?

22   A.   Yes, after you made the last sale.

23   Q.   No documentation?

24   A.   It was all verbal.

25   Q.   No.  So yes or no documentation?

082620-CHAMBERS_FINAL

092:01 A.   There is no documentation except what's in the

02 paperwork.

03 Q.   All we have, again, is your word?

04 A.   Actually, I think it's in the 49 that I followed

05 you and then Officer Galaska observed you enter the

06 property so there is documentation.

07 Q.   This is after the arrest?

08          THE COURT:  Okay.  I think I know what you're

09      asking.  While they're doing the investigation

10      they're not writing out pieces of paper and memos

11      to people or giving them written information.

12      They're communicating orally with backup people.

13      When it's all over, they write a report.  Next

14      question.

15 BY MR. CHAMBERS:

16 Q.   Okay.  You said that you don't do 75-48As, but by

17 policy officers are required to complete a vehicle and

18 pedestrian investigation report 75-48A on all

19 individuals detained in the immediate vicinity of the

20 search of the residence location that is being

21 conducted based upon a valid search warrant.

22          MR. MAZMANIAN:  Objection.

23          THE COURT:  Sustained.

24          MR. CHAMBERS:  On what grounds?

25          THE COURT:  I don't have to list my grounds,

082620-CHAMBERS_FINAL

093:01   sir.  I make the rulings.  You can move on to the

02   next question.

03        MR. CHAMBERS:  It's relevant because of the

04   fact he's not documenting as he's required to do

05   in order for procedures like this to show --

06        THE COURT:  We've been through what the 75-48

07   is for when you're making pedestrian stops.  It's

08   not for going into a house and doing a search

09   warrant.

10        Am I correct, Officer?

11        THE WITNESS:  Your Honor, we are supposed to

12   document people inside the property, and I did

13   document it in the 49 who was in the property.

14        THE COURT:  So it's now in the 49 as he was

15   supposed to once they went in there, which you

16   have and which you should know, and, instead,

17   you're trying to mix, again, apples and oranges.

18        MR. CHAMBERS:  I'm really not because --

19        THE COURT:  Aren't you concerned about the

20   documentation?

21        MR. CHAMBERS:  Yes, this is part of the

22   documentation.  He's supposed to put on a 75-48A

23   why they decided to stop, search, and arrest an

24   individual during a search.  There is no

25   documentation and identification and all we have

082620-CHAMBERS_FINAL

094:01    is what he's saying after the fact.

02    THE COURT:  And your question is?

03    MR. CHAMBERS:  The question is why is it

04    not -- why is not the policy or procedures or

05    commands or directives being followed in order for

06    you to properly do an investigation?

07    MR. MAZMANIAN:  Objection.

08    THE COURT:  Go ahead.  You can answer that.

09    THE WITNESS:  They were not the target of my

10    investigation.  They were not searched.  So I

11    think that --

12    MR. CHAMBERS:  We're not talking about them.

13    THE COURT:  We're not going to -- that's

14    enough.

15    MR. CHAMBERS:  I'm talking about myself.

16    THE COURT:  Then ask the question about

17    yourself.  There are people in the house that were

18    stopped.

19    MR. CHAMBERS:  The question is about myself.

20    THE COURT:  Answer it.

21    THE WITNESS:  Why we didn't do a 75-48 on

22    you?  Because you were actually being arrested.

23    So I have never done a 75-48 on somebody that I

24    have arrested.  You're now known as Mark

25    Chamberlain and all your paperwork is Mark

082620-CHAMBERS_FINAL

095:01      Chamberlain so every piece of document --

02  BY MR. CHAMBERS:

03  Q.    It's not.  I'm arrested under Mark Chambers.

04        MR. MAZMANIAN:  Your Honor, at this point I

05  will move to bifurcate.  It's 2:38.

06        THE COURT:  We can bifurcate it and we can

07  pick it up but I am going to say something so when

08  we do resume with the testimony that you can ask a

09  question, but, after you ask the question, it's

10  not asking it three and five and ten more times.

11  The officer's answer was that.  You may disagree

12  and you may believe that he's in violation of

13  directives and you have every right to argue that

14  in your final argument on the motion or

15  potentially at trial, if I believe it's relevant.

16        All right.  We will bifurcate.  Let's get a

17  date soon so we can finish the motions.

18        MR. MAZMANIAN:  Your Honor, can I grab

19  Officer Galaska -- he is another witness -- so we

20  have a good date for him and Officer Bogan.

21        MR. GOODMAN:  Your Honor, I will --

22        (Court reporter indicates difficulty in

23  hearing.)

24        THE COURT:  He's asking for the notes, the

25  notes of testimony for today's hearing.  I'll

082620-CHAMBERS_FINAL

096:01        speak to the court reporter.

02                Officer, let's figure out the date first.

03                COURT CRIER:  9/14.

04                MR. MAZMANIAN:  That's fine for me

05        personally.  You guys?

06                THE WITNESS:  That's good.

07                THE COURT:  I don't think we have anything

08        else that day.  We have one status hearing.  That

09        would be the only thing we schedule that day so we

10        can finish this up.

11                MR. GOODMAN:  I have one preliminary hearing

12        that day.  That's obviously earlier.

13                THE COURT:  That's fine.  You can do that.

14        You can come here, and I'll clear the day.

15                Go ahead.  I have you as Chambers.  That's

16        what the court has.  I understand it's

17        Chamberlain.  Go ahead.

18                MR. CHAMBERS:  I am objecting to any further

19        continuances and delay not only due to lack of

20        evidence but due to the fraudulent documentation

21        that has still not yet to be established as well

22        as the promulgation of falsehood and fraud upon

23        the court.  Furthermore, the District Attorney's

24        Office is disqualified from even trying this case

25        due to the conflict of interest of Jason Morgan

082620-CHAMBERS_FINAL

097:01 who is the person who signed my criminal complaint
02 to be the person who has affirmed knowledge of
03 these incidents and he is also the person that's
04 in charge of discovery, court proceedings, and
05 contact with the police officers, investigating
06 officers.  So due to that, I am asking for a
07 change of venue.
08     THE COURT:  Okay.  That will be a motion
09 we'll deal with in the future.  Your jury trial is
10 scheduled for 10/26 so we have plenty of time to
11 deal with all the motions in September and take
12 care of everything then.
13     All right.  The reason that we're continuing
14 the hearing today, for the record, and I want to
15 put this on the record, is that the police have
16 been called in because there is potential unrest
17 in different parts of the city as a result of the
18 shooting that occurred in Kenosha, Wisconsin
19 earlier this week, and, therefore, the police are
20 on duty in various parts of city.  That's why we
21 could not complete it today.  All right.  That
22 does it.
23     (Proceedings concluded.)
24
25

082620-CHAMBERS_FINAL

098:01                        CERTIFICATION

02

03          I hereby certify that the proceedings and

04    evidence are contained fully and accurately in the

05    stenographic notes taken by me on the hearing of

06    the above cause on August 26, 2020, and that this

07    copy is a transcription of the same.

08

09

10

11                          ELISABETTA GUERRIERO, RPR
                            Official Court Reporter

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    IN THE COURT OF COMMON PLEAS OF PHILADELPHIA

2        FIRST JUDICIAL DISTRICT OF PENNSYLVANIA

3            CRIMINAL TRIAL DIVISION

4                    - - -

5   COMMONWEALTH              :
                              :
6         v.                 :
                              :
7   MARK CHAMBERS             :   CP-51-CR-0004488-2019

8

9                    - - -

                 Courtroom 1105
10      Justice Juanita Kidd Stout Center
            Philadelphia, Pennsylvania
11                    - - -

12             September 14, 2020

13                    - - -

14             Motions Hearing

15

16  BEFORE:  THE HONORABLE CHARLES EHRLICH, J.

17

18

19  APPEARANCES:

20          GREGORY MAZMANIAN, ESQ.
            Assistant District Attorney
21          for the Commonwealth

22          LEON GOODMAN, ESQ.
            Back-up Counsel for Defendant
23

24          MARK CHAMBERS, pro se

25

<u>WITNESS INDEX</u>

– – –

<u>COMMONWEALTH'S WITNESSES</u>

| WITNESS | DR | CR | RD | RC |
|---|---|---|---|---|
| Off. Timothy Bogan | -- | 6 | 47 | |
| Off. Jeffrey Galazka | 71 | 80 | 97 | 98 |

<u>DEFENSE WITNESSES</u>

| WITNESS | DR | CR | RD | RC |
|---|---|---|---|---|
| (none presented.) | | | | |

1                    <u>EXHIBIT INDEX</u>

2                       -   -   -

3              <u>COMMONWEALTH'S EVIDENCE</u>

4

5     <u>EXHIBIT</u>                              <u>PAGE</u>

6     C-1                                      15

7     C-2                                      16

8     C-3                                      53

9     C-4                                      56

10    C-5                                      56

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

4

DEFENSE'S EVIDENCE

| EXHIBIT | PAGE |
|---|---|
| D-7 | 23 |
| D-8 | 104 |
| D-9 | 34 |
| D-10 | 35 |
| D-12 | 83 |

1          THE CRIER:  Your Honor, this is
2     Case Number 3, Mark Chambers.
3          THE COURT:  All right.  Are we
4     ready to proceed?
5              We're starting with the
6     cross-examination on the motion.  Officer
7     Bogan was on the stand.  We started the
8     motion, just for the record, on August 26th,
9     2020.  Officer Bogan testified on direct and
10    is still on cross here today on September 14th
11    to complete the motion.
12             Let's have Officer Bogan come
13    back, put him on the witness stand, and we may
14    resume cross-examination.
15         MR. MAZMANIAN:  Thank you, Your
16    Honor.  Officer Bogan is in the hallway.
17         THE COURT:  All right.
18         MR. MAZMANIAN:  Your Honor, for
19    the record, we do have the notes of testimony.
20    Mr. Griffin just sent them to me.  Would you
21    like me to forward them to Your Honor?
22         THE COURT:  Yes, please.  That
23    would be helpful, and let's proceed forward.
24             Let's swear him in, please.
25         THE CRIER:  Officer, please

1    state your full name, give your badge number,
2    and unit of assignment for the record.
3              THE WITNESS:  Officer Timothy
4    Bogan, B-O-G-A-N, Badge Number 3358, assigned
5    to Narcotics.
6                        -  -  -
7              ...TIMOTHY BOGAN, having been
8    duly sworn, was examined and testified as
9    follows:
10                       -  -  -
11             THE CRIER:  Thank you.  Have a
12   seat, sir.
13             THE COURT:  Good morning,
14   Officer Bogan.
15             THE WITNESS:  Good morning, Your
16   Honor.
17             THE COURT:  We're still on the
18   motion on cross.
19             Mr. Chambers, you can proceed.
20                       -  -  -
21             CROSS-EXAMINATION
22                       -  -  -
23   BY MR. CHAMBERS:
24   Q.    Before we stopped the last time, I believe we
25   were talking about the affidavit of probable cause,

1    and you asked me was if I was accusing you of
2    fabricating a document.
3         Is it any possibility that you brought the
4    original copy of the affidavit and search warrant
5    with you today?
6                        MR. MAZMANIAN:  Objection, Your
7         Honor.
8                        THE COURT:  Sustained.
9    BY MR. CHAMBERS:
10   Q.    Do you have a copy of the original affidavit
11   and search warrant?
12                       MR. MAZMANIAN:  Objection, Your
13        Honor.
14                       THE COURT:  Well, he can answer
15        that, if has it.
16                       THE WITNESS:  I believe I do.
17        It's not on me.  I'm sure the original copy is
18        at the DA's office, as well as downstairs in
19        the of Magistrate's office.
20   BY MR. CHAMBERS:
21   Q.    In the beginning of the affidavit of probable
22   cause, it states that you received information from
23   Mangone and Winscow from the Intelligence Unit.
24                       THE COURT:  You're going to have
25        to speak up, sir.

1                           MR. CHAMBERS:  I'm sorry.  Is

2          this on?

3    BY MR. CHAMBERS:

4    Q.    That's Mangone, M-A-N-G-O-N-E, and Winscow of

5    the Intelligence Unit, about a black male named Ron

6    selling drugs in the area of Torresdale and Anchor

7    using the telephone number --

8                           THE COURT:  You can move back

9          from the mic just a little bit?

10                          MR. CHAMBERS:  Using the

11         telephone number 215-609-7495.

12   BY MR. CHAMBERS:

13   Q.    What is the first name of Officer Mangone?

14   A.    Patrick.

15   Q.    Patrick Mangone?

16   A.    I believe so.

17   Q.    Is this not Special Agent Patrick Mangone?

18                          THE COURT:  If the officer

19         knows.

20                          THE WITNESS:  I mean, he does

21         have a relative that was on the Police

22         Department who I believe was with the Attorney

23         General's Office.

24   BY MR. CHAMBERS:

25   Q.    Is he Intelligence or is he the Attorney

1  General officer?

2  A.     The one I received the information from is

3  from Criminal Intelligence.  He's a police officer.

4  Q.     He's a police officer.

5  Did Patrick Mangone give you any information in

6  reference to when he received this information?

7  A.     I don't remember if he did or not, but as soon

8  as he gave it to me, I went out the 16th and tried

9  the phone number.

10  Q.     Do we have a source of this information?

11                    MR. MAZMANIAN:  Objection.

12                    THE COURT:  All right.  I'm

13          going to sustain it.  The motion is on the

14          probable cause in the affidavit.

15                    MR. CHAMBERS:  That's what we're

16          talking about.

17                    THE COURT:  When he got it or

18          other material is not relevant to whether

19          there's sufficient bases in the actual

20          affidavit -- which is the only thing that I

21          can consider -- to suppress.

22                    MR. CHAMBERS:  Actually, the

23          only information that is allowed to be used is

24          the information in the affidavit, and the

25          affidavit does not give a timeframe or a

```
1        source of information, which is one of the
2        implications.
3                      THE COURT:  Okay.  Mr. Chambers,
4        you can argue that.
5                      MR. CHAMBERS:  So I'm ask just
6        asking him --
7                      THE COURT:  No, you can't ask
8        him.  You can argue that it's insufficient
9        because -- anything that you feel is wrong in
10       the affidavit, you're going to be free to
11       argue to me that that's why I should suppress
12       the affidavit, or what you feel was not in the
13       affidavit that should be there, okay?
14                     MR. CHAMBERS:  Okay.
15                     THE COURT:  Let's go.
16   BY MR. CHAMBERS:
17   Q.   So the information about Ron selling the
18   drugs, is there any confirmation on who Ron was?
19                     MR. MAZMANIAN:  Objection, Your
20       Honor.
21                     THE COURT:  Okay.  Again, I'm
22       going to sustain it.  You have said that this
23       affidavit is not enough for a magistrate to
24       sign to be able to go into a property.  The
25       affidavit speaking for itself.  I keep trying
```

1    to tell you that.

2              You can argue -- and I said this

3    a minute ago -- that they should have put this

4    in the affidavit, or they should have put that

5    in the affidavit, or any other information

6    that you think should have been --

7              MR. CHAMBERS:  My motion --

8              THE COURT:  Mr. Chambers, let me

9    finish.  That it should be in there to make

10   the warrant or the affidavit proper.  But

11   asking this officer about other information is

12   not relevant to the motion.

13             Next.

14             MR. CHAMBERS:  My motion is not

15   only suppressing the physical evidence, it's

16   also suppressing an arrest.

17             THE COURT:  You cannot suppress

18   an arrest.

19             MR. CHAMBERS:  I can suppress an

20   arrest if there's no probable cause to make an

21   arrest.

22             THE COURT:  Well, you can argue

23   that there's insufficient probable cause, but

24   you --

25             MR. CHAMBERS:  This is all

1          related.
2                         THE COURT:  But you cannot
3          suppress an arrest.
4                         Go ahead.  Keep going.
5     BY MR. CHAMBERS:
6     Q.    So on the second transaction -- I'm sorry, the
7     third transaction -- the 22nd, after this transaction
8     is when the warrant was executed, correct?
9     A.    That's correct.
10    Q.    What was obtained during the search?
11    A.    What was confiscated?
12    Q.    Yes.
13                        MR. MAZMANIAN:  Judge, I'm just
14         going to object on it being asked and
15         answered.  It is a new day, but we have gone
16         over it at length at this point.
17                        THE COURT:  I will let him
18         answer the question, although, it's all on the
19         face of the search warrant.
20                        MR. CHAMBERS:  Your Honor, I
21         would like to also say, Your Honor, throughout
22         the entirety of our meetings and me being
23         allowed to address the situation and records
24         in reference to this case, I have indicated
25         several times that the evidence and

2          part of the motion and arguing these points.

3                    So me asking these questions is

4          going to making the point of the fraudulent

5          documentation.

6                    THE COURT:  So if I'm correct,

7          what you're claiming is that the evidence

8          that's on the face of the search warrant that

9          was collected, drugs, weapons, revolver,

10         shotgun, paraphernalia and cash, was, in fact,

11         never collected from the location of 2139

12         Anchor Street; is that right?

13                   MR. CHAMBERS:  Correct.  As the

14         criminal complaint indicates, it was collected

15         from 2139 East Sanger Street, six days prior

16         to them coming to my residence.

17                   THE COURT:  Okay.  We can't deal

18         with three things at once.  Let's deal with

19         the warrant first that you're trying to

20         suppress, and then we can go on from there.

21                   The officer can answer.  Go

22         ahead.

23                   THE WITNESS:  Confiscated from

24         you in the kitchen from your wallet was one

           packet of heroin, two Suboxone strips, seven

1       clear packets of crack cocaine, one cell

2       phone, one .38 revolver with six rounds, $420

3       plus the buy money which was used on that

4       day, which was $40.

5               From the basement from the

6       rafters was one sawed-off shotgun.  From the

7       washing machine/dryer was one clear bag

8       containing pills, one scale, new and unused

9       clear packets.  It was also mail confiscated

10      I believe from the living room in your name

11      with that address, I believe.

12  BY MR. CHAMBERS:

13  Q.      You did take pictures of the mail, correct?

14  A.      It's in discovery.

15  Q.      But you took no pictures of any of the

16  evidence that was confiscated during the exact same

17  time that you confiscated the mail?

18              MR. MAZMANIAN:  Objection, Your

19      Honor.  The officer has already that no

20      pictures of the evidence were taken.

21              MR. CHAMBERS:  He didn't answer

22      the question.

23              THE COURT:  Okay.  That's

24      because there was an objection.  If he has

25      testified that there were no pictures taken,

```
 1          that's the answer.
 2                         MR. CHAMBERS:  He didn't answer.
 3          He objected before he could answer.
 4                         THE COURT:  Previously, he had
 5          said that no pictures were taken.  But let's
 6          go ahead.
 7                         Officer Bogan, were any pictures
 8          taken?
 9                         THE WITNESS:  No, sir.
10                         THE COURT:  Next.
11     BY MR. CHAMBERS:
12     Q.    During the direct, in reference to the search
13     warrant, there was an exhibit put in with Assistant
14     District Attorney Kate Lewis' signature on the front.
15     This would reflect that exhibit, correct?
16     A.    I can't see everything on that page.
17                         THE COURT:  Wait a second.  Has
18          this been marked?
19                         I believe this was marked as
20          C-2.
21                         MR. MAZMANIAN:  It's C-1, Your
22          Honor.  I have a copy, I can bring it up.
23                         THE COURT:  Okay.  Let the
24          officer see what is being asked.
25                         MR. MAZMANIAN:  Do you want a
```

1      copy of it in front of you, Officer Bogan, or

2      is that okay?

3              THE WITNESS:  Sure.  Can I have

4      a copy in front me?

5              MR. MAZMANIAN:  Yes, I have one.

6              May I approach, Your Honor?

7              THE COURT:  Yes, please.

8              MR. MAZMANIAN:  For the record,

9      I'm not including the affidavit, just the

10     front page that's currently being talked

11     about.

12              THE COURT:  Which is C-1, right?

13              MR. MAZMANIAN:  Which is C-1,

14     Your Honor.  It has been already been

15     previously marked and moved into evidence.

16              THE COURT:  Go ahead.  You can

17     ask again.

18  BY MR. CHAMBERS:

19  Q.     Kate Lewis signed this exhibit, it says

20  Exhibit C-1, on the face on the warrant, correct?

21  A.     That's correct.

22  Q.     Can you explain who whitened her name out on

23  the document C-2?

24              THE COURT:  And what is C-2 for

25     the record?

1                        MR. MAZMANIAN:  For the record,

2           Your Honor, C-2 is --

3                        MR. CHAMBERS:  C-2 is the

4           warrant that the judge allegedly signed.

5  BY MR. CHAMBER:

6  Q.      Her name is no longer on the warrant.  Did you

7  white it out?

8  A.      Originally her name is not on the warrant

9  because that's the actual copy of the search warrant.

10  This is a copy of the approved affidavit that she

11  emailed me back and had it printed out.

12          So that is why it Kate Lewis is not scribe

13  across the front of the search warrant.

14  Q.      So after she approved it, you removed it?

15  A.      No.

16  Q.      Well, it's clearly signs of it being "whited"

17  out by a black marker.

18                        MR. MAZMANIAN:  Objection.  Not

19           a question.

20                        MR. CHAMBERS:  It's leading to a

21           question.

22                        THE COURT:  You have to ask a

23           question.

24  BY MR. CHAMBERS:

25  Q.      The question is, where is the approval of Kate

1   Lewis on the warrant that was signed by the

2   magistrate?

3   A.      What I actually do is when the ADA sends this

4   back to me via email or fax, I put a copy of what the

5   DA sent me back in the discovery.

6         I then would write on the side of the warrant

7   ADA Kate Lewis -- "approved by ADA Kate Lewis,"

8   exactly the time that she approved it on the side of

9   the warrant.  And if I'm right, it may be up there on

10  the upper left.

11  Q.      So you wrote the information on the warrant?

12  A.      On the original I wrote it, on the side of the

13  warrant.

14  Q.      The original would be the first document that

15  she signed.  That's the warrant that you should have

16  gotten signed by the magistrate, correct?

17  A.      The DA's office -- when I sent the warrant

18  down to the District Attorney's Charging Unit, I sent

19  them down a photocopy of the face, as well as the

20  probable cause.  They emailed it back or faxed it

21  back, and that is what I put in the discovery.

22  Q.      So this is a clear indication of you forging

23  Kate Lewis's signature on the warrant?

24                      MR. MAZMANIAN:  Objection.

25                      THE COURT:  All right, I'|||

1    going to sustain that.

2                    Let me just ask Officer Bogan,

3    I'm just curious, the procedure when you're

4    getting a search warrant, if I'm correct, is

5    that you put it together, and you send it to

6    the District Attorney's Charging Unit?

7                    THE WITNESS:  Yes, sir.

8                    THE COURT:  And you send it to

9    the Charging Unit to make sure that they

10   approve it and that there's sufficient

11   probable cause?

12                   THE WITNESS:  That's correct.

13                   THE COURT:  All right.  And

14   that's all done via fax?

15                   THE WITNESS:  It's either fax or

16   email.

17                   THE COURT:  When you get it

18   back, you then have to go down to the Criminal

19   Justice Center to get a magistrate to approve

20   it?

21                   THE WITNESS:  When I get it back

22   and if it's approved like it is here, what I

23   will do is I will write on the side of the

24   warrant "approved by ADA Kate Lewis on 4/21 at

25   12:32 p.m.," and then I would take it to the

1    magistrate and then they would review it, and

2    authorize the search.

3                    THE COURT:  Okay.  I guess my

4    question is, when you take it to the

5    magistrate, you take a clean copy?

6                    THE WITNESS:  Yes.

7                    THE COURT:  Meaning that the

8    information about Kate Lewis or other things

9    is not on there?

10                   THE WITNESS:  Except on the side

11   of the search warrant, Your Honor.  My

12   supervisor actually approves it on the side of

13   the warrant --

14                   THE COURT:  Right.

15                   THE WITNESS:  -- and then I

16   would write whichever DA approves the warrant,

17   and that is why I put a copy of what I get

18   back from the DA's office in the discovery.

19                   THE COURT:  Okay.  Very good.

20   You may proceed.

21   BY MR. CHAMBERS:

22   Q.    This is normal procedure?

23   A.    It's the way I have been doing it for twenty

24   plus years.

25                   MR. GOODMAN:  One moment, Your

1        Honor.

2   BY MR. CHAMBERS:

3   Q.      Do you have a multi-colored copy like you

4   pulled out the last time to show the signature of the

5   DA on the front of the face and then where you wrote

6   it?

7   A.      I don't have a search warrant on me today.

8   Q.      No.  I mean the original one that you used for

9   this?

10  A.      I don't understand your question.

11  Q.      The carbon copies.  The colored carbon copies

12  that were used to duplicate this?

13  A.      Okay.

14  Q.      Do you have them?

15  A.      No, I don't have them.

16  Q.      Do you know who has them?

17  A.      I believe the magistrate's office gets one,

18  and the rest are dispersed among other agencies and

19  other officers.

20              MR. CHAMBERS:  Excuse me for one

21      minute.

22              THE COURT:  While we're waiting,

23      I just want to state something which maybe I

24      didn't make clear in beginning to Mr.

25      Chambers.  When you represent yourself, you

1          represent yourself.  Mr. Goodman is back-up

2          counsel.  You cannot be conferring with him --

3          and, Mr. Goodman, I appreciate that you got

4          all of the discovery for Mr. Chambers and you

5          have given him all of the tools he needs, but

6          I'm also asking you -- I'm not going to allow

7          hybrid representation in this case.

8                    I wanted the defendant to have

9          somebody like you who is very experienced as

10         back-up counsel, and to make sure he had all

11         of the materials he needs to proceed on his

12         own.  But since he wants to represent himself,

13         he has to represent himself.

14                    Thank you.

15                    MR. CHAMBERS:  The documentation

16         that he gave me, I gave to him.  It was just

17         given back to me.

18                    THE COURT:  Okay.  Mr. Chambers,

19         did you hear what I said?

20                    MR. CHAMBERS.  I did.  I was

21         just clarifying.

22                    THE COURT:  You cannot confer

23         with him.  If you're representing yourself,

24         then you represent yourself.  If you want Mr.

25         Goodman to take over at any time, that's fine

1    with me.

2                        MR. CHAMBERS:  There is some

3    documentation that I gave him that I was just

4    receiving back.  He wasn't giving me anything

5    extra that I don't already have.

6                        THE COURT:  Very well.

7                        MR. CHAMBERS:  Exhibit D-7.

8                        MR. GOODMAN:  As an officer of

9    the Court, I believe we're at Exhibit-6 at

10   this point?

11                       MR. MAZMANIAN:  That's correct.

12   That's what I have written down.  D-7 would be

13   the next one.

14                       THE COURT:  D-7.  Okay, very

15   good.  Is that being marked?

16                       MR. CHAMBERS:  D-7, yes.  This

17   is the bottom half copy of the blue carbon

18   copy that was left at the residence.

19                       THE COURT:  Okay.

20                       MR. CHAMBERS:  I have the top

21   half, too, but you know it's a longer page.

22   This is the first half of it, and then it was

23   folded in half to make a photocopy of it.

24   This is just the bottom half of it.

25                       So my question is --

1          THE COURT:  Well, hold it.

2     Before we get to that, do we have a copy for

3     the witness?

4          MR. MAZMANIAN:  Your Honor, it

5     looks like C-2 with the seal on it.  I can

6     give Officer Bogan C-2, which would be the

7     copy of the completed warrant.

8          THE COURT:  Okay, very good.

9          MR. MAZMANIAN:  May I approach,

10    Your Honor?

11         THE COURT:  Please, just so that

12    everybody has the same thing.  Yes.

13         MR. CHAMBERS:  So is a copy of

14    this warrant being given to Bogan?

15         MR. MAZMANIAN:  I did provide

16    Officer Bogan with a copy of C-2, the

17    completed search warrant that has been marked

18    and moved into evidence.

19         MR. CHAMBERS:  With the seals on

20    it?

21    BY MR. CHAMBERS:

22    Q.   The copy that was just given to you, does it

23    have these seals on it?

24    A.   I can't tell if there's a seal on this or not.

25         MR. CHAMBERS:  Can it be shown?

1    Can we see it?

2                 THE COURT:  Well, Mr. Mazmanian,

3    do you want to approach?

4                 Do you know if there's seals on

5    what you just gave him?

6                 MR. MAZMANIAN:  I can speak as

7    an officer of the Court, Your Honor, that you

8    can kind of tell that there's a seal on bottom

9    left-hand corner.  But because these are

10   photocopies of the warrant, it's not like the

11   press seal is very obvious.

12                MR. CHAMBERS:  Can we bring it

13   up?

14                MR. MAZMANIAN:  Specially

15   because it's not a carbon copy, as this would

16   be a copy of.  But, yes, do you see where Mr.

17   Goodman is focusing in next to "22nd"?

18                If you compare the two, that's

19   where the seal is, but on the copy that I have

20   it is very faint.  And that's what Officer

21   Bogan has in front of of him.

22                MR. CHAMBERS:  Well, I have an

23   objection to that.  That's a clear indication

24   that it's not the same.  There's no

25   similarity.

1          THE COURT:  Okay.  I'll tell you

2      what, let Officer Bogan get off of the witness

3      stand, and if he needs to take a closer look

4      at this he can do that, and answer to whatever

5      question that you're going to ask.

6          Let's go.

7  BY MR. CHAMBERS:

8  Q.    The question is, can you explain why the

9  carbon copy that was left at the residence has seals

10  on it, and the copy that was just given to you, which

11  is a copy that was given to me in the discovery, does

12  not?

13      You have a complete copy of it, correct?

14  A.    The reason why that has a seal on it is

15  because that's made off of the original warrant and

16  this is a photocopy, which obviously, didn't pick up

17  on the seal.

18  Q.    Well, if that's your story, I will move on.

19  Commonwealth's Exhibit-1 and Exhibit-2.

20          MR. MAZMANIAN:  For the record,

21      Officer Bogan does have Commonwealth's Exhibit

22      -1 and Exhibit-2 in front of him.

23          THE COURT:  Very well.

24  BY MR. CHAMBERS:

25  Q.    If you look at the area where it says, "Owner:

1   Sean Paul, gold voter's check shows James Rose."

2       "Target:  black male wearing all black,

3   medium dark complexion, medium build."

4       You can see at the "medium build," the

5   alignment is off on it, and it's below the line going

6   into the area of "violation."  If we compare that to

7   Exhibit-7, which is a copy of the carbon copy, this

8   alignment is not the same.  The "build" is above the

9   line.

10                      MR. MAZMANIAN:  Objection,

11      argumentative.  It's not a question for the

12      witness.

13                      MR. CHAMBERS:  So the question

14      is --

15                      THE COURT:  Okay.  Mr. Chambers,

16      I want you to just ask questions.  I will hear

17      whatever argument that you want to make, but

18      in a motion it's about questions and answers.

19                      Let's go.

20                      MR. CHAMBERS:  So in order for

21      me to ask the question, I have to make sure

22      that the Court understands what it is that I'm

23      asking the question about.

24                      THE COURT:  No.  Just ask the

25      question.

1    BY MR. CHAMBERS:

2    Q.      The question is, can you explain why the

3    alignment is different on this form --

4                           THE COURT:   You have to move

5         back a little bit from the microphone.

6    BY MR. CHAMBERS:

7    Q.      -- from the carbon copy, compared to what is

8    being used as the original copy?

9            If you can see, "medium build" is below the

10   line into the area of "violation," and on the carbon

11   copy it is above the line, clearly showing that it is

12   a separate and different copy.

13           So I'm just asking if you have an explanation

14   on how it could possibly be two different

15   alignment issues on the same copy with the same

16   warrant?

17   A.      I don't know.  I'm looking at the two

18   documents in front of me, they look almost identical.

19   Q.      Of course, that's what you would say.  But

20   again, if you look at "medium build" --

21                           MR. MAZMANIAN:  Objection.

22                           THE COURT:  Sustained.

23                           Ask the question.  It's not

24        about argument.

25                           MR. CHAMBERS:  It's not about

```
 1                        And then the officer answers
 2           whatever his answer is, and then you can make
 3           argument to me.  I know what you're trying to
 4           bring out, and I'm going to let you do it, but
 5           you have to do it the right way.
 6                        Let's go.
 7                        MR. MAZMANIAN:  Your Honor, for
 8           the record, these are not comparisons of C-1
 9           and C-2 that Officer Bogan has in front of
10           him.  This up on the screen is actually a
11           comparison of C-1 and D-7.  They are two
12           completely different things.
13                        THE COURT:  All right.  Let's
14           go.
15                        MR. CHAMBERS:  All right.
16      BY MR. CHAMBERS:
17      Q.      After the transaction on April 22nd, 2019,
18      Property Receipt 3393678 would indicate the property.
19      This property also has an evidence control data form,
20      Lab Number 1906643.  It also has a district control
21      number and a property receipt that doesn't belong to
22      this case.  They are crossed out.  Are you the person
23      that crossed them out?
24      A.      I would have to see the document.
25      Q.      Exhibit-8, Defense.
```

1          THE COURT:  Can you see that
2  from where you're at?
3          THE WITNESS:  No, Your Honor.
4          THE COURT:  All right.  Can we
5  have a copy that we can just mark D-8 and show
6  it to the witness?
7          MR. MAZMANIAN:  I think I have
8  it, Your Honor.  One second.
9          THE COURT:  All right.
10          MR. MAZMANIAN:  I know it's in
11  the file.
12          THE COURT:  Okay.
13          MR. CHAMBERS:  Your Honor, I do
14  apologize about the exhibits, but I tried to
15  address a lot of these issues prior to this
16  hearing.
17          MR. MAZMANIAN:  Judge, may I
18  approach?
19          MR. CHAMBERS:  And we were not
20  given an opportunity to go over these
21  documents.
22          THE COURT:  I don't know what
23  you mean by "going over the documents," but if
24  there are issues about not having documents
25  then you bring it to my attention.

```
1                        Do you have everything?
2                        MR. CHAMBERS:  We have the
3      documents.
4                        THE COURT:  All right then.
5                        MR. CHAMBERS:  I'm just saying
6      at several different hearings I have made
7      argument about the documents.
8                        THE COURT:  Okay.
9                        MR. CHAMBERS:  So I'm just
10     saying I'm going over them now because this is
11     the first time I have been allowed to do so.
12                       THE COURT:  Is this D-8 that
13     you're marking?
14                       MR. GOODMAN:  Yes, Your Honor.
15                       THE COURT:  All right.
16     The officer has a copy of it?
17                       MR. MAZMANIAN:  Yes, Your Honor.
18                       THE COURT:  Do you have that?
19                       THE WITNESS:  I have it, Your
20     Honor.
21                       MR. GOODMAN:  Can we have a
22     second?
23                       THE COURT:  Sure.  I will take a
24     look at it while the officer is being
25     questioned so that I know what you're asking
```

1    about.

2                        MR. GOODMAN:  For the record,

3    Your Honor, it's on the screen.

4                        THE COURT:  This is D-8.  Go

5    ahead, Mr. Chambers.

6                        MR. CHAMBERS:  Do you want me to

7    repeat the question?

8                        THE COURT:  Yes, please.

9    BY MR. CHAMBERS:

10   Q.    The indication is that someone crossed out

11   these numbers and added the information that belongs

12   to my case to it.

13         So I'm asking you, did you cross out the

14   information and add my information to this document?

15   A.    No.

16   Q.    Exhibit-9, Property Receipt 3393768, which is

17   the property receipt number that's crossed out on

18   this document.

19                        THE COURT:  Do we have a copy of

20         that?

21                        Again, I think as you're going

22         through it, it will be helpful for the

23         officer, and also I need a copy for the Court.

24                        MR. MAZMANIAN:  Can I have that

25   property receipt number again?

1          MR. CHAMBERS:  It's 3393768.

2          MR. MAZMANIAN:  Okay, -3768.  I

3    think I do.

4          MR. GOODMAN:  May I please the

5    Court?  All of the exhibits that I have, I

6    will print out from this, and I can email it

7    to His Honor as well as the court reporter.

8          THE COURT:  All right.

9          MR. MAZMANIAN:  May I approach,

10   Your Honor?

11          I do have a copy of this.

12          THE COURT:  Okay.  Yes, please.

13   BY MR. CHAMBERS:

14   Q.    This exhibit shows the defendant by the name

15   of Rashawn Carter.  Do you have any knowledge of Ron,

16   which is the information you received from Mangold

17   and Winscott?

18          Do you have any information to know whether

19   or not if Ron is Rashawn?

20   A.    This is the first time I'm seeing this.

21   Q.    Were you involved in an arrest of Rashawn?

22   A.    No, I was not.

23          THE COURT:  Can I just ask, D-9,

24   was that prepared by you, officer?

25          THE WITNESS:  No, Your Honor, it

1     argument.

2                    THE COURT:  You have your view,

3     Mr. Chambers, and I respect that, and that's

4     why I'm going to hear all of your argument.

5     But as to this officer, you don't need to have

6     3 minutes building up to a question.  Just ask

7     your question.  In this case --

8                    MR. CHAMBERS:  Question asked

9     and answered.

10                   THE COURT:  -- it would have

11    been very simple to say --

12                   MR. CHAMBERS:  Question asked

13    and answered.

14                   THE COURT:  Mr. Chambers, when

15    I'm talking, you don't talk.  I'm not talking

16    while you're talking.

17                   All you would have had to ask,

18    Mr. Chambers, to give you an example is, it

19    appears that this "medium build" is slightly

20    below the line; is that correct?

21                   Yes.

22                   MR. CHAMBERS:  That's correct.

23                   THE COURT:  Then on the other

24    one, it looks like it's above the line; is

25    that correct?

1        was not.

2                        THE COURT:  All right.  Very

3        well.

4   BY MR. CHAMBERS:

5   Q.      There is also a memorandum, Exhibit-10, that

6   indicates Police Officer Devereux is the one who

7   prepared the property receipt.  And this memo was

8   used to correct an item on my property receipt; and

9   the item that was added to my property receipt is the

10  item that is on Rashawn Carter's property receipt,

11  which is a blue glassine packet containing alleged

12  heroin.

13          You indicated before that Tyra Devereux is

14  the one who prepared the property receipts, correct?

15                      MR. GOODMAN:  May I please the

16      Court?  Here is the print out.

17                      THE CRIER:  Thank you.  What

18      number is it?

19                      MR. GOODMAN:  D-10, I'm sorry.

20                      THE CRIER:  Thank you.

21          The witness is being shown D-10.

22  BY MR. CHAMBERS:

23  Q.      The question is, did you authorize Devereux to

24  do this memorandum and to add that item to the

25  property receipt?

1        MR. MAZMANIAN:  Your Honor, I'm

2   going to object.  Do you have this in front of

3   you?

4        THE COURT:  I don't.

5        MR. MAZMANIAN:  Okay.  Well,

6   either way, he just asked if he authorized

7   Officer Devereux -- this isn't her document.

8   The signature is on the bottom is not her's.

9   It lists an analyst and forensic manager.

10        THE COURT:  Can I see the

11   document?

12        MR. CHAMBERS:  It says --

13        THE COURT:  Just a second, Mr.

14   Chambers.  Can I see the document?

15        THE COURT:  Where is Officer

16   Devereux's name on what I'm looking at, which

17   is C-10, "Correction to property receipt

18   memo."

19        MR. CHAMBERS:  It's right below

20   "Subject:  Correction to property," it says

21   the property receipt, the DC number, lab

22   number.  It says on "April 22nd, 2019," in

23   that area right there, if you would read from

24   there.

25        THE COURT:  All right.  "The

1   property receipt was prepared by Police
2   Officer Devereux," is that what you're
3   referring to?
4                    MR. CHAMBERS:  Yes.
5                    THE COURT:  Badge number --
6                    MR. CHAMBERS:  Police Officer
7   Bogan, Badge Number 3358, is the arresting
8   officer and receiving officer on the above
9   case.
10                   THE COURT:  All right.  Okay.
11  Go ahead.
12                   You can answer the question,
13  please.
14                   THE WITNESS:  Your Honor, I have
15  never seen these.
16                   THE COURT:  All right.  He has
17  never seen these.
18                   THE WITNESS:  This is from
19  another squad and from West Philadelphia.  How
20  the numbers got changed to me, I can only
21  guess.
22                   THE COURT:  I don't want any
23  guesses.  But you have never seen this
24  document and you have nothing to do with it;
25  is that the answer?

1      THE WITNESS:  That's correct,

2  sir.

3      THE COURT:  Next question,

4  please.

5 BY MR. CHAMBERS:

6 Q. You Said the property receipt is in West

7 Philadelphia.  Is the 16th District, which you have

8 in -3393659 in West Philadelphia as well?

9 A. Yes, it is.

10 Q. Are you aware of any investigation of Tyra

11 Devereux?

12      MR. MAZMANIAN:  Objection, not

13  relevant.

14      THE COURT:  Sustained.

15      MR. CHAMBERS:  It would be

16  relevant to the fact that during this

17  investigation -- can I make this Exhibit-11?

18      THE COURT:  Well, just tell me

19  how it's relevant before you mark anything

20  else.

21      MR. CHAMBERS:  It's relevant

22  because a decision was made by Internal

23  Affairs in September of 2018 that states based

24  on this above fact, that Tyra Devereux lied to

25  Internal Affairs about her brother being a

1    drug dealer.  She also lied about --
2                     MR. MAZMANIAN:  Objection.
3                     MR. CHAMBERS:  -- she also lied
4    on the police officer questionnaire form.
5                     THE COURT:  All right.  First of
6    all, this officer doesn't know anything about
7    this form, number one, and he has been asked
8    that.  Number two, I'm going to rule it's
9    irrelevant.
10                     Next question, please.
11   Sustained.
12                     MR. CHAMBERS:  Well, I would
13   still like to put it in as an exhibit.
14                     THE COURT:  Well, if I view that
15   it is irrelevant and sustained the objection,
16   it's not going to be an exhibit at this point
17   until you can show me that it's relevant.  And
18   so far I haven't seen it.
19                     Next question.
20                     MR. CHAMBERS:  You didn't allow
21   me to finish.  Can I finish stating the
22   relevancy?
23                     THE COURT:  Go ahead.
24                     MR. CHAMBERS:  Internal Affairs
25   made the decision that it would not be in the

1    best interest of the Department to allow
2    Police Officer Devereux to remain assigned to
3    Narcotics Bureau.  So the relevancy is, during
4    this time was she or was she not a narcotics
5    officer?
6                    Because on the memorandum,
7    Exhibit-10 I believe, it says that she is 25th
8    District BCRT, which is not NFU.
9                    THE COURT:  Just ask Officer
10   Bogan does he know Officer Devereux or does he
11   have any connection or worked with Officer
12   Devereux?
13                   He can only testify to what he
14   knows.  Each witness can only testify to what
15   he knows.  I know you have your theories, Mr.
16   Chambers, but what you don't understand is
17   Officer Bogan can only testify, like any
18   witness, as to what he did and what paperwork
19   he may have put together as part of the work
20   he did as a police officer.
21                   So, Officer Bogan, do you know
22   Officer Devereux?
23                   THE WITNESS:  Yes.
24                   THE COURT:  Okay.  And how do
25   you know Officer Devereux?

1              THE WITNESS:  I have known

2    Officer Devereux for at least 20 years, and I

3    have been partnered up with her twice during

4    those 20 years.

5              THE COURT:  All right.  And how

6    about when this case was going on in 2019,

7    were you working with officer Devereux?

8              THE WITNESS:  Yes, I was.

9              THE COURT:  On this particular

10   investigation?

11             THE WITNESS:  Yes, I was.

12             THE COURT:  All right.  Go

13   ahead.  Let's go.

14   BY MR. CHAMBERS:

15   Q.    So, the question is, was she still a Narcotics

16   Field Unit officer in 2019?

17   A.    Yes.

18   Q.    Okay.  Thank you.

19             MR. CHAMBERS:  So, can I add my

20   exhibit?

21             THE COURT:  I want to hear what

22   the question is that's going to go with the

23   exhibit.  So let's go.

24             Just ask the next question.

25             MR. CHAMBERS:  The question is,

1        can I add it as an exhibit?

2                THE COURT:  No.  Not until I

3        hear what your question is.  Exhibits have to

4        be relevant.

5                MR. CHAMBERS:  I asked him the

6        question.  He said she was apart of the

7        Narcotics Field Unit at this time.

8                THE COURT:  But that didn't --

9                MR. CHAMBERS:  So I'm using this

10       as an exhibit showing that there's a

11       credibility issue with Devereux, and that she

12       may have not been a Narcotics Field Unit

13       officer at this time.

14              THE COURT:  But that has nothing

15       do with with Officer Bogan.

16              MR. CHAMBERS:  But it has

17       something to do what the case.

18              THE COURT:  I'm not sure what it

19       has to do with the case, but as to this

20       witness it has nothing do to with.  Sustained.

21             MR. CHAMBERS:  Tyra Devereux is

22       the person that he allowed to fill out the

23       property receipt, which he also co-signed.

24       Furthermore, he testified that Tyra Devereux

25       also filled in the blanks on the search

1    warrant.  So there's a credibility issue,

2    specially due to the fact that I'm challenging

3    the authenticity of the affidavit of probable

4    cause as well as the search warrant, which is

5    an indication that her signature and her

6    handwriting is all over it.

7              THE COURT:  Okay.  Did Tyra

8    Devereux fill out the property receipts form

9    working with you on the case?

10             THE WITNESS:  Yes.  She filled

11   out some of them.  There are other officers

12   that typed up property receipts as well.

13             THE COURT:  Okay.  And did she

14   fill it out with you, or did you review what

15   she filled out?

16             THE WITNESS:  Yes.

17             THE COURT:  Which one was

18   reviewed or both?

19             THE WITNESS:  Both.  When we do

20   a job, Your Honor, we go inside and myself and

21   Devereux break everything down.  We break the

22   drugs down, the money down, and if there's any

23   weapons.  At that point Officer Devereux is

24   kind of like my right hand.  And people will

25   go to Officer Devereux and say "what needs to

1    be typed," and then Officer Devereux will

2    parse it out to who comes in to type it.

3                    Like, I'll type up the PARS

4    report.  And like while I'm typing up the PARS

5    report, people will come to me and I'll glance

6    over the property receipt and sign it.

7                    THE COURT:  Okay.  And when you

8    say "PARS Report," that's the main

9    investigative report that's going to be used

10   in the arrest processing; is that correct?

11                   THE WITNESS:  Yes, sir.

12                   THE COURT:  All right.  Go

13   ahead, Mr. Chambers.

14                   MR. CHAMBERS:  Exhibit-13.

15                   MR. MAZMANIAN:  Your Honor, I'm

16   renewing my objection to this.

17                   THE COURT:  Your objection is

18   noted.  I will allow him to ask the question.

19   I don't know if it's going to be appropriate,

20   but I will allow the question to be asked.

21                   MR. CHAMBERS:  The question was

22   already asked and answered.

23                   THE COURT:  Why don't you repeat

24   it again?

25                   MR. CHAMBERS:  There's two of

1    them.   The first one is --
2                        THE COURT:   One question at a
3    time.   Let's go.
4    BY MR. CHAMBERS:
5    Q.   The first one is, do you or did you know
6    during the time that you allowed her to be a part of
7    this investigation that her credibility was an issue?
8                        MR. MAZMANIAN:   Objection.
9                        THE COURT:   Well, I think he can
10   answer that.
11                       Did you know anything about
12   this?
13                       THE WITNESS:   I knew that
14   something came down from the District
15   Attorney's Office about how Officer Devereux
16   was not credible to testify according to the
17   current administration.
18                       THE COURT:   Go ahead.   Next
19   question.
20                       MR. CHAMBERS:   The second one he
21   answered when I asked him was she still apart
22   of the Narcotics Field Unit at that time, and
23   he stated that she was.
24                       THE WITNESS:   Yes.
25                       THE COURT:   All right.   Next.

1    BY MR. CHAMBERS:

2    Q.    Can you explain why she would say that or why

3    Forensics would say that she is 25th District VCRT?

4    Is this also narcotics?

5                       MR. MAZMANIAN:  Objection.  He

6         testified he didn't prepare this document.

7                       THE COURT:  Okay.  If he didn't

8         prepare it, he can't answer it.

9                       Sustained.

10                      MR. CHAMBERS:  Can I asked him

11        what VCRT stands for?

12                      THE COURT:  If he knows.

13                      Go ahead.

14                      THE WITNESS:  Violent Crime

15        Reduction Team.

16                      MR. CHAMBERS:  Say it again.

17                      THE WITNESS:  Violent Crime

18        Reduction Team, VCRT.

19                      MR. CHAMBERS:  Okay.  I'm going

20        to close argument for this.  No more question

21        for this witness.

22                      THE COURT:  No more questions.

23        All right.

24                      Redirect, Mr. Mazmanian.

25                            - - -

<pre>
 1                    REDIRECT EXAMINATION
 2                         - - -
 3   BY MR. MAZMANIAN:
 4   Q.      Officer Bogan, we will start off with the PARS
 5   report.  We heard testimony previously about the
 6   differences in names.  Can you explain to His Honor
 7   how names appear on a PARS report, and why a name
 8   might be different than the person's actual legal
 9   name?
10   A.      What happens is the first time you're ever
11   arrested, whatever name you give to the Police
12   Department, that name goes down as your master name
13   even though -- if I was ever arrested and I changed
14   my name to Timothy Agon, that would be my name
15   throughout the entire time that I'm alive according
16   to the Philadelphia Police Department, even though my
17   birth certificate says Timothy Bogan.  And any time I
18   would be arrested and finger printed, my name would
19   come up Timothy Agon.  So the first time you ever
20   give to the Police Department, that's considered your
21   master name.
22                    THE COURT:  Go ahead.
23                    MR. MAZMANIAN:  Thank you.
24   BY MR. MAZMANIAN:
25   Q.      Now, Officer Bogan, you have C-2 in front of
</pre>

```
1    you, correct?
2    A.     Yes.
3    Q.     Officer Bogan, can you just look at the
4    affidavit, which is attached to C-2, as moved into
5    evidence.  Is that your entire affidavit?
6    A.     Yes.
7    Q.     Is that what was presented to the magistrate
8    downstairs?
9    A.     Yes.
10   Q.     Is that your signature at the end?
11   A.     That's correct.
12   Q.     And when you got that, was that sealed?  Were
13   there seals affixed to that?
14   A.     On the originals, yes.
15                     MR. MAZMANIAN:  Your Honor, I
16        have no further questions.
17                     THE COURT:  Any recross based on
18        that?
19                     MR. CHAMBERS:  No questions.
20                     THE COURT:  All right.  Officer
21        Bogan, you may step down.  Thank you.
22                     THE WITNESS:  Thank you, Your
23        Honor.
24                     THE COURT:  Can this witness be
25        excused at this point?
```

```
 1                    MR. MAZMANIAN:  Yes.  I have no
 2       further need for this witness, but his squad
 3       is here, so I think he will still be present.
 4                    THE COURT:  All right.  Do you
 5       want to call your next witness?
 6                    MR. MAZMANIAN:  Yes, Your Honor.
 7       First, may I approach and get the exhibits?
 8                    THE COURT:  Yes, sure.
 9                    MR. MAZMANIAN:  The Commonwealth
10       calls Officer Jeffrey Galazka.
11                    THE COURT:  All right.
12                    THE CRIER:  Your Honor, he is
13       not out there.
14                    MR. MAZMANIAN:  Your Honor.  I
15       don't know where he went.  He just may be in
16       the rest room.
17                    THE COURT:  Okay.
18                    MR. MAZMANIAN:  Because he has
19       been here, and I've spoken to him already.  So
20       I know he's around.
21                    THE COURT:  Okay.  Do you want
22       to wait a minute for him?  We can just wait a
23       couple of minutes until he comes back.  No
24       problem.
25                    MR. MAZMANIAN:  Yes.  If you
```

1    don't mind.

2                    THE COURT:  Let's place this
3    motion on hold and go on to the next motion to
4    quash and proceed forward until the officer
5    comes back.

6                    MR. MAZMANIAN:  Thank you, Your
7    Honor.

8                    As to the motion to quash in
9    this instance, there was a challenge on the
10   criminal come complaint.  I object to that
11   challenge, Your Honor, based on the fact that
12   a criminal complaint only does control in
13   Municipal Court.  At this point we're on the
14   bills of information.  So, I object to the
15   motion to quash based on the complaint.

16                    Your Honor, we do have a motion
17   to quash based on the sufficiency of the
18   bills.  I am marking for this different motion
19   C-1, the bills of information, which I will
20   pass up to Your Honor.  For the record, the
21   dates were amended.  I did include a Post-It
22   note on the top corner.  The dates were
23   amended at the last listing, I believe on
24   8/26.  That Post-It note just indicates the
25   correct dates which apply to all of the

1  charges.

2          THE COURT:  Okay.  Just hold on

3  a second.  The dates have been amended or --

4          MR. MAZMANIAN:  They were

5  amended at the last listing.

6          THE COURT:  They were amended on

7  8/26?

8          MR. MAZMANIAN:  Yes, on the

9  record.

10          THE COURT:  As to the dates?

11          MR. MAZMANIAN:  As to the dates.

12  Nothing else is different.  The bills are all

13  -- what's written there is what's typed out

14  and is what controls for that.

15          THE COURT:  Okay.  So, where it

16  says -- if I can just say, on Count 1 it says

17  "on various dates between 4/16 and 4/22,"

18  that's what it says now, right?

19          MR. MAZMANIAN:  That's what it

20  would say now, yes.

21          THE COURT:  That's what it says

22  here.

23          MR. MAZMANIAN:  Oh, it must have

24  been updated.

25          THE COURT:  On Count 1, and then

# Commonwealth of Pennsylvania
CITY AND COUNTY OF PHILADELPHIA    } ss:

APPLICATION FOR
## SEARCH WARRANT
AND AFFIDAVIT

| P/O Bogan | 3358 | NFU | WARRANT CONTROL NO. |
|---|---|---|---|
| (Name and Address) | (Badge No.) | (District/Unit) | 212248 |

ISSUED TO DIST/UNIT
Narcotics

DATE OF APPLICATION
4-21-19

being duly sworn (or affirmed) before me according to law, deposes and says that there is probable cause to believe that certain property is evidence of or the fruit of a crime or is contraband or is unlawfully possessed or is otherwise subject to seizure, and is located at particular premises or in the possession of particular person as described below.

IDENTIFY ITEMS TO BE SEARCHED FOR AND SEIZED (Be as specific as possible):
RACK COCAINE, PARA, USC, WEAPONS, PROCEEDS FROM THE ILLEGAL SALES OF NARCOTICS RECORDS OF THE ILLEGAL SALES OF NARCOTICS, ANY SUBSTANCE UNDER THE PA. CONTROLLE. SUBSTANCE ACT OF 1972.........

SPECIFIC DESCRIPTION OF PREMISES AND/OR PERSONS TO BE SEARCHED (Street and No., Apt. No., Vehicle, Safe Deposit Box, etc.):
2139 Anchor ST. 2 story row in the city and county of Phila.

NAME OF OWNER, OCCUPANT OR POSSESSOR OF SAID PREMISES TO BE SEARCHED (if proper name is unknown, give alias and/or description):
Reg Owner: Jean Paul Gulle Voter's check showed a James Rose. Target B/M wearing all black med to dark compl. med build

VIOLATION OF (Describe conduct or specify statute):

YEAR/DIST./COMPLAINT NO.
19-15--35886

VIOLATION OF THE A. CONTROLLED SUBSTANCE ACT OF 1972    19-NFU-0381

PROBABLE CAUSE BELIEF IS BASED ON THE FOLLOWING FACTS AND CIRCUMSTANCES (See special instructions below):

### REFER TO PROBABLE CAUSE SECTION OF THIS WARRANT ***

ATTACH ADDITIONAL PAPER (75-51) IF NECESSARY          ☒ CHECK HERE IF ADDITIONAL PAPER IS USED.
### PLEASE SEE REVERSE SIDE OF THIS PAGE FOR INSTRUCTIONS

| SIGNATURE OF AFFIANT | BADGE NO. | DIST/UNIT | Sworn to (or affirmed) and subscribed before me this 22ᴰᴰ |
|---|---|---|---|
| /O Bogan | 3358 | NFU | day of APRIL 20 19 |

COURT LOCATION
CR-1391 filled &                Date Commission Expires 2021
K. Dali (Signature of Issuing Authority) (SEAL)

| RESULT OF SEARCH | DATE AND TIME OF SEARCH 4.22.19   4:30 ☐A.M. ☒P.M. | ARREST ☒Yes ☐No | JUDGE'S DISPOSITION ☐ Disc. ☐ Held for Court ☐ Further Hearing ☐ Fined or Committed |
|---|---|---|---|

PROPERTY SEIZED
☒Yes ☐No   (If "Yes" list inventory below)
Drugs, Weapons (REVOLVER, SHOT GUN) PARA, USC

IF ADDITIONAL SPACE REQUIRED, USE REVERSE SIDE — INVENTORY MUST APPEAR ON ALL COPIES OF THE WARRANT

I certify, subject to the penalties and provisions of 18 Pa. C.S. §4904(b) that this is a true and correct listing of all items seized.
Signature of Person Seizing Property    3286a

OTHER OFFICERS PARTICIPATING IN SEARCH
1731, 7328, 8554 8212, 1802, 7481
4053, 9416, 4855 686, 959

SIGNATURE OF WITNESS TO INVENTORY (Name and Address)
SGT W.8554         , SGT PATRICK LOVE   NARCOTICS FIELD UNIT 48.

TO LAW ENFORCEMENT OFFICER: WHEREAS, facts have been sworn to or affirmed before me by written affidavit(s) attached hereto from which I have found probable cause, I do authorize you to search the above described premises or person, and to seize, secure, inventory, and make return according to the Pennsylvania Rules of Criminal Procedure, the above described items.

☒ This Warrant should be served as soon as practicable but in no event later than 2:44 ☐A.M. ☐P.M. APRIL 24th 19
and shall be served only during daytime hours of 6 A.M. to 10 P.M.
Issued under my hand this 22ᴰᴰ day of APRIL
19 , at 9:44 A M o'clock. (Issue time must be stated)
K. Dali
(SEAL)
(Signature of Issuing Authority)
Court location   CR2
Date Commission Expires   2021

☐ This warrant should be served as soon as practicable but in no event later than _____ ☐A.M. ☐P.M. _____, 20 ___.
and may be served anytime during day or night.
issued under my hand this _____ day of _____
20 ___, at _____ .M o'clock. (Issue time must be stated)
_____ (SEAL)
(Signature of Issuing Authority)
Title of Issuing Authority   A.C.M.

The issuing authority should specify a date not later than two (2) days after issuance. Pa. R. Crim. P. 2003(d). If issuing authority finds reasonable cause for issuing a nighttime warrant on the basis of additional reasonable cause set forth in the accompanying affidavit and wishes to issue a nighttime search warrant, only this section shall be completed. Pa. R. Crim. P. 2006(b).

**INVESTIGATION REPORT**

PHILADELPHIA POLICE DEPARTMENT

| YEAR 0 | ᵛDISTRICT OF OCCURANCE | | ᵛDC NUMBER | REPORT TYPE INITIAL (49) | Sheet of | | ᵛDISTRICT | | ᵛSECTOR |
|---|---|---|---|---|---|---|---|---|---|
| PREVIOUS CLASSIFICATION | | CODE | INVESTIGATING OFFICER | | BADGE | PAYROLL | DIST / UNIT PREPARING | CODE | REPORT DATE |
| CLASSIFICATION | | ᵛCODE | ᵛPLACE OF OCCURRENCE | | | | J.A.D. INVESTIGATIONS ☐ Male ☐ Female | Juvenile Offenders ☐ Adult Offenders | |
| COMPLAINANT (USE FIRM NAME) | | | | | ᵛAGE | ᵛRACE ~~███~~ | | ᵛSEX ~~███~~ | |
| COMPLAINANT ADDRESS | | | | | | | COMPLAINANT PHONE ###-###-#### | | |
| ᵛTYPE OF PREMISES | DATE REPORTED | TIME REPORTED | REPORTED BY | | | ADDRESS | | | |
| ᵛDATE OF OCCURRENCE | ᵛDAY CODE | ᵛTIME | ᵛFOUNDED ☐ Yes ☐ No | ᵛSTATUS 1. ☐ Active 2. ☐ Inactive - not cleared | | 3. ☐ Arrest - cleared 4. ☐ Exceptionally cleared | | UNIT 0 | |
| STOLEN PROPERTY 1. Currency, Bonds, etc. | | | | | ᵛPROPERTY VALUE $ | | ᵛRECOVERED VALUE $ | INSURED ☐ Yes ☐ No | OCCURRENCE ☐ Inside ☐ Outside |

<u>**CONTINUATION OF PROBABLE CAUSE FOR SEARCH & SEIZURE WARRANT #212248**</u>

<u>**CERTIFIATION OF COMPLIANCE**</u>

<u>**I CERTIFY THAT THIS FILING COMPLIES WITH THE PROVISIONS OF THE PUBLIC ACCESS POLICY OF THE UNIFIED JUDICIAL SYSTEM OF PENNSYLVANIA: CASE RECORDS OF THE APPELLATE AND TRIAL COURTS THAT REQUIRE FILING CONFIDENTIAL INFORMATION AND DOCUMENTS DIFFRENTLY THAT NON – CONFIDENTIAL INFORMATION AND DOCUMENT.**</u>

On Monday 4-15-19 P/O's Mangold #4477 and Winscom #7625 of Criminal Intelligence Unit passed along the following information of a B/M named Ron selling drugs using a cell phone number of 215-609-7495 around the area of Anchor and Torresdale ave (recent Homicide at this location on 4-11-19), also possibly related to the homicide sat 4800 Benner ST as well on this same date.

On 4-16-19 the following officers went to the area of Anchor and Torresdale ave. P/O's Galazka (204032),Brown (~~█████~~),Sumter(~~██████~~),Eleazer(~~███████~~) Sgt. Love (~~███████~~), Lt. Muldoon (~~███████~~)

On this date between the hours of 1p and 4p P/O Bogan (~~███████~~) and DeVeaux (~~███████~~) met with C/I #1417. P/O Bogan searched the C/I for any Illegal contraband and USC with negative results.

P/O Bogan dialed the following number 215-605-7495, the phone rang and was answered by a male's voice and turned over to the C/I. There was a one sided conversation and the location of 5400 Torresdale Ave was picked out, and the phone call was ended.

P/o Bogan then deployed his back up officers into the area, P/O Bogan gave the C/I $40.00prbm, and the C/I exited the officers vehicle.

While the C/I waited and Nissan Quest arrived on location with P.A tag#KYZ-0624 operated by a B/M, this vehicle stopped and the C/I entered the vehicle for apprx. 1 minute then exited and back up officers followed this Nissan Quest.

The C/I got back into P/O Bogan and DeVeaux's vehicle and turned over 2 clear z/l pkts cont. crack/cocaine.

P/o Bogan searched the C/I for any additional contraband with negative results.

| SIGNATURE | SIGNATURE | SIGNATURE |
|---|---|---|

**INVESTIGATION REPORT**                                      PHILADELPHIA POLICE DEPARTMENT

| YEAR | DISTRICT | DC NUMBER | CONTROL NUMBER | PAGE 2 |
|------|----------|-----------|----------------|--------|

While back up officers followed the Nissan Quest( Galazka, Eleazer, Sumter, Brown, Love, Muldoon), this vehicle parked in the area of Anchor and Tulip St. and parked this vehicle on the corner while back up officers attempted to conduct a surveillance on this vehicle and when they circled the block the vehicle was unoccupied.

P/O Galazka conducted a BMV and the vehicle was registered to a Mark Chamberlain at 1235 S 58th St.

P/O Bogan conducted a Nik test G on a sample and the results were positive for Cocaine base and placed on PR#3393659
On Wednesday 4-17-19 At approx.. 5:30a P/O Bogan and DeVeaux went to the area of 1200 S 58th St to look for the Nissan Quest. The vehicle was not on location.

On Thursday 4-18-19 P/o Bogan and DeVeaux met with the C/I #1417. P/O Bogan checked the C/I for any Illegal contraband and USC with negative results.

P/O Bogan and DeVeaux did go to the area of Anchor and Tulip to see if the Nissan Quest was parked with negative results.

Between the hours of 11a and 3p P/O Bogan dialed the number of 215 609-7495 and once again the phone rang and was answered by a male's voice, and then turned over to the C/I. There was a one sided conversation and the phone call was ended.

At this time the following officers were in the area P/o Galazka, Eleazer, and Lt. Muldoon.

P/O Bogan gave the C/I $40.00prbm and took the C/I to 5400 Torresdale ave. along with P/O DeVeaux on foot.

After appx. 5 minutes a B/M wearing all black with his hood up came walking onto the 2100 Blk of Sanger St.(walking W/B from Tulip St.)
This male made a hand motion to the C/I with his right hand, and the C/I approached this male, and handed him the $40.00prbm, and this male handed the C/I a item in a hand to hand exchange.

This male walked N/B thru the driveway then E/B on 2100 Carver ST with DeVeaux on foot following this male.

The C/I got into P/O Bogan's vehicle and turned over 2 loose chunks of crack/cocaine. At this time P/O Bogan was in constant communication with P/O DeVeaux, and was providing the direction out to his back up officers.

P/o Bogan went E/B on the 2100 Blk of Anchor ST and observed the target walking W/B then this male crossed over and with keys opened the front door of a property (2139)and entered the location.

P/O Bogan then picked up P/O DeVeaux. P/O Bogan checked the C/I for any additional contraband with negative results.

P/O Galazka and Eleazer and based on the description of the property they obtained the address of 2139 E Anchor ST.

P/O Bogan and DeVeaux went by the location of 2100 E Sanger St and observed the Nissan Quest parked in front of 2139 E Anchor ST.

P/O Bogan conducted a NIK test G and the results were positive for cocaine and placed on PR#3393664

| SIGNATURE | SIGNATURE | SIGNATURE |
|-----------|-----------|-----------|

INVESTIGATION REPORT

PHILADELPHIA POLICE DEPARTMENT

| YEAR | DISTRICT | DC NUMBER | CONTROL NUMBER | PAGE 3 |
|------|----------|-----------|----------------|--------|

A real estate check showed Jean Paul Gulle owned the property and a James Rose was registered to vote.

C/I #1417 has been used in past investigations which have resulted in the arrest and seziuers DC# upon request.

P/O Bogan has been a POLICE OFFICER for over 29 years, P/O Bogan was assigned to the Narcotics Division in May of 1999 then transferred out in July of 2011 then transferred back into the Narcotics Division in July of 2012 and has been involved in numerous investigations where the persons selling Narcotics will drive around and make deliveries to potential buyers to make it harder on Law Enforcement to track and follow them back to their residence where they may store additional narcotics, weapons, and proceeds from their Illegal sales of Narcotics. P/O Bogan's experience with the drug delivery service is that the persons selling the Narcotics give out their cell phone number to potential customer's, these persons would then drive around and meet their potential buyers, to eliminate the constant flow of persons knocking on their front door, and not being obvious to Law enforcement or neighbors. These persons will drive around all day making deliveries, also to avoid being followed by Law Enforcement.

Based on the above circumstances your affiant believes that illegal narcotics are being stored and distributed from inside the Residence of 2139 E Anchor St . Respectfully Request a Day Time search and seizure warrant for this Property.

P/O _____ NFU
SIGNATURE OF AFFIANT BADGE/UNIT

SWORN TO (OR AFFIRMED) BEFORE ME THIS
22 ND DAY OF APR 2019
_____
SIGNATURE OF ISSUING AUTHORITY

| SIGNATURE | SIGNATURE | SIGNATURE |
|-----------|-----------|-----------|

1239 S. 58 St.

# BIOGRAPHICAL INFORMATION REPORT

☒ ARREST      ☐ INVESTIGATION      ☐ OTHER

(CHECK BLOCKS WHERE DOCUMENTATION EXISTS)

PHILADELPHIA POLICE DEPARTMENT

| DATE 4-22-19 | TIME 4:30 PM | LOCATION OF INITIAL CONTACT 2139 Anchor St. | DISTRICT 15 | D.C. NO. 35886 |

| NAME Chamberlain | LAST | FIRST Meek | MIDDLE | D.O.B. 9-2-82 86 | SEX M | RACE B |

| HEIGHT 5'9 | WEIGHT 180 | HAIR COLOR blk | EYE COLOR br | COMPLEXION med | BUILD med | GLASSES (YES/NO) no | FACIAL HAIR yes |

| NICKNAME | | ALIASES | | | | MARITAL STATUS |

| RESIDENCE STREET NUMBER-NAME 2139 Anchor St. | | CITY/STATE (OTHER THAN PHILA) Phila PA. | | DIST. 15 |

| TYPE OF RESIDENCE | RESIDES WITH | | DRIVER NUMBER | STATE |

| SOCIAL SECURITY NUMBER | OCCUPATION | | EMPLOYER/ADDRESS | |

| PLACE OF BIRTH/CITY, STATE Phila Pa | GROUP AFFILIATION | ETHNIC BACKGROUND |

| SCARS, TATTOOS, DEFORMITIES tattoos on neck & both arms | CLOTHING DESCRIPTION grey sweatpants blk nike hoodie white sneakers | JEWELRY WORK |

## VEHICLE INFORMATION

| YEAR | MAKE | MODEL | COLOR | STATE | TAG | VIN |
|------|------|-------|-------|-------|-----|-----|
|      |      |       |       |       |     |     |
|      |      |       |       |       |     |     |

| OWNER-LAST NAME, FIRST | ADDRESS | CITY | STATE |
|------------------------|---------|------|-------|
|                        |         |      |       |
|                        |         |      |       |

| MODUS OPERANDI (METHODS, TRAITS, ETC.) | AREAS FREQUENTED |
|----------------------------------------|------------------|
|                                        |                  |
|                                        |                  |
|                                        |                  |

DEFENCE EXHIBIT DM12

229 (Rev. 3/92)

AREAS MARKED WITH ☛ MUST BE FILLED IN.
CHECK RELIABILITY BOXES WHEN APPROPRIATE

## RELATIVES

| | LAST | MAIDEN | FIRST | ADDRESS | CITY/STATE |
|---|---|---|---|---|---|
| SPOUSE | | | | | |
| MOTHER | LAST | MAIDEN | FIRST | ADDRESS | CITY/STATE |
| FATHER | LAST | | FIRST | ADDRESS | CITY/STATE |
| BROTHER SISTER | | | | | |
| BROTHER SISTER | | | | | |
| BROTHER SISTER | | | | | |

## ASSOCIATES

| LAST NAME | FIRST NAME | ADDRESS | CITY/STATE | PPN |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |

## EDUCATION

| SCHOOL | ADDRESS | CITY/STATE | YEARS |
|---|---|---|---|
| MLK | Stenton & Haines St | Phila Pa | 2 |

## CRIMINAL RECORD INFORMATION

| PPN | FBI NUMBER | PA NUMBER | OTHER NUMBER (STATE, IMMIGRATION) |
|---|---|---|---|
| PAROLE NUMBER | PAROLE OFFICER | | TELEPHONE NUMBER(S) |
| PROBATION NUMBER | PROBATION OFFICER | | TELEPHONE NUMBER (S) |

CHIEF CRIMINAL ACTIVITY  Narcotics

| INITIATING OFFICER LAST NAME | BADGE | RANK | DISTRICT/UNIT/PLATOON |
|---|---|---|---|
| DeVaup | 3210 | P/O | NFU-4B |
| ASSIGNED INVESTIGATION | BADGE | RANK | DISTRICT/UNIT PLATOON |

## ADDITIONAL REMARKS

Made in Brazill impbRall
SB 414058 SB

Ser
SJ8203
38 Brown
Highmat

75-229 (Reverse) (Rev. 3/92)



**LAWRENCE S. KRASNER**
**DISTRICT ATTORNEY**

# DISTRICT ATTORNEY'S OFFICE
THREE SOUTH PENN SQUARE
PHILADELPHIA, PENNSYLVANIA 19107-3499
215-686-8000

Philadelphia Police Department ("PPD") Misconduct Disclosures are provided in the form we received them from PPD.  PPD redacted the documents pursuant to the *PPD Office of Professional Responsibility Redaction Schedule for Police Misconduct Disclosure Requests*, available from the PPD.   Because these documents are a redacted version of the original documents, the defense may obtain, through compulsory process (i.e. a subpoena served on the PPD), additional and unredacted documents relating to qualifying misconduct.  Further, additional documents relating to complaints against police, if any such complaints have been made, may also be found with the PPD.



DEFENSE
EXHIBIT
DM11



# PHILADELPHIA POLICE DEPARTMENT

## MISCONDUCT DISCLOSURE

# REQUEST

| Rank: | Name: | Badge: | Current Assignment: |
|---|---|---|---|
| **P/OFF** | **DEVEAUX TYRA** | **3212** | **NARC FIELD UNIT** |

Date Requested:          9/15/2018

Requested By:          Philadelphia D.A. Office, Patricia Cummings

Pertinent Case Number:          CP51CR00035862017

Request Filled By:          Office of Professional Responsibility, Lt. Brad Lukach

Request Filled Date:          9/28/2018

Request Filled Method:          EMAIL ATTACHMENT

Please review the following attachments:

IAD Investigative Conlclusion
PBI Findings Sheet

01-1134

Internal Affairs Division

## CONCLUSION

The allegation that P/O Deveaux#3212, PR#███████was associating with a known drug dealer is SUSTAINED. P/O Deveaux violated the Philadelphia Police Department Disciplinary Code Article 1, Section 1.25, which states: Knowingly associates, fraternizes, or conducts business transactions at any time, or in any manner whatsoever, with known criminals or persons engaged in unlawful activity. The investigation revealed that P/O Deveaux had ample information from P/O ██████to determine that ██████████ was involved in criminal activity.

In addition, the investigation SUSTAINED the fact that P/O Deveaux failed to list her brother, ████████, on her Personal Data Questionnaire. In not doing so she violated Section 1.15 of the Disciplinary Code, which reads: Knowingly and willfully making a false entry in any departmental report or record.

P/O Deveaux also violated Sections 1.11 and 1.12 of the Disciplinary Code when she denied, in two separate IAD interviews, knowing that ██████████ had been arrested. It is not believable that P/O Deveaux, a trained investigator, did not know that her half brother had a criminal record. Especially in light of the information P/O Deveaux had received from P/O ██████that ███████ had seen ██████████in the Criminal Justice Center on several occasions.

Based on the above facts, it does not appear to be in the best interest of the Department for P/O Deveaux to remain assigned to the Narcotics Bureau.

A copy of this report will be sent to the Police Board of Inquiry for action and then review by the Commanding Officer, Narcotic Field Unit-South.

**INSPECTOR**
**INTERNAL AFFAIRS DIVISION**

3



# PHILADELPHIA POLICE DEPARTMENT

# MISCONDUCT DISCLOSURE

## PBI FINDINGS

| Hearing Date: | PBI#: | IAD#: |
|---|---|---|
| | | **01-1134** |

| Rank: | Name: | Badge: | Current Assignment: |
|---|---|---|---|
| **Police Officer** | **Deveaux, Tyra** | **3212** | **Narcotics Field Unit** |

| Article/Section: | Charge: | Board Finding: | Penalty: |
|---|---|---|---|
| | *Per PBI no records available at this time.* | | |

| Total Penalty: | |
|---|---|
| | |

| Arbitration/Settlement: | |
|---|---|
| | |



**U.S. Department of Justice**

*United States Attorney*

*Eastern District of Pennsylvania*

---

J. Jeanette Kang
Direct Dial: (215) 861-8204
Facsimile: (215) 861-8618
E-mail Address: jeanette.kang@usdoj.gov

615 Chestnut Street
Suite 1250
Philadelphia, Pennsylvania 19106-4476
(215) 861-8200

**FILED UNDER SEAL**

January 11, 2022

Honorable Mitchell S. Goldberg
Judge, United States District Court
7614 United States Courthouse
601 Market Street
Philadelphia, PA 19106-1744

Re:     *United States v. Mark Chamberlain*
         *Criminal No. 20-cr-362*

Dear Judge Goldberg:

The government writes to disclose information we have learned about Officer Jeffrey Galazka of the Philadelphia Police Department, who testified during the January 6, 2022 suppression hearing in the above-referenced case. After the suppression hearing, the government learned that Officer Galazka has an open Internal Affairs Division ("IAD") complaint that was initiated in January 2020. The complaint relates to an allegation of theft in a domestic dispute between Officer Galazka's former squad partner and the squad partner's estranged spouse. A Corporal with the IAD advised that this complaint remains open because IAD has been unable to interview Officer Galazka's former squad partner due to his ongoing injured-on-duty status.

Given the sensitivity of this disclosure, and the importance of protecting the integrity of nonpublic and open Internal Affairs investigations, the government asks that the Court grant the government's motion to file this letter under seal and the government's motion for a protective order that would limit dissemination of this letter, which have been submitted to the Court.

Respectfully yours,

JENNIFER ARBITTIER WILLIAMS
United States Attorney

*/s/ J. Jeanette Kang*
J. Jeanette Kang
Assistant United States Attorney

cc: Mark Wilson, Esq. (Counsel for Defendant, Mark Chamberlain)

**Mark Wilson**

| | |
|---|---|
| From: | Adina Greenfield |
| Sent: | Wednesday, April 20, 2022 10:12 AM |
| To: | Mark Wilson |
| Subject: | M Chamberlain |

Hi Mark,

Just as a recap of our conversation yesterday. On April 19, 2022, I went to CJC and viewed all the search warrants the Office of Judicial Records have for April and May of 2019. I didn't see any search warrants with the Sanger or Anchor street addresses, Marl Gaillard. The Deputy Director of the Office informed me they scan the search warrants as they are received. Mr. Gaillard stated some days they receive a lot of search warrants and other days they receive none. It is all dependent upon when the police districts send a copy to their office.  Mr. Gaillard is looking into whether his office received a copy of the search warrant in this case (Search warrant #212248) as I didn't see it in their system. Please let me know if you need anything else.

Adina Greenfield Trial Unit Investigator
Federal Community Defender –EDPA
601 Walnut Street
Suite 540 West –The Curtis Center
Philadelphia, Pa. 19106
215-928-1100 Phone
267-273-5046 Mobile
215-928-1112 Fax

Defens

I, THE AFFIANT, BEING DULY SWORN ACCORDING TO LAW, DEPOSE AND SAY THAT THE FACTS SET FORTH IN THE
AFFIDAVIT ARE TRUE AND CORRECT TO THE BEST OF MY KNOWLEDGE, INFORMATION AND BELIEF AND THAT PROBABLE
CAUSE TO ARREST EXIST

Affiant: SGT MARTIN GEERON MARTIN 654 East Detectives Division

Sworn to or affirmed and subscribed before me this 10 day of January , 2019

_____ 654                    _____
Affiant Signature                      Issuing Authority Signature

Page 4 of 4 Pages                      Printed: 01/10/2019 07:57 PM

DANIEL KING

---

BADGE NO. 3358        DISTRICT   NFU

GR-1921 WARD ST

4-22-19   4:30 PM

DRUGS, Weapons (REVOLVER, SHOT GUN)
PARA, USC

5286

8554, SGT PATRICK LOVE

Sworn to (or affirmed) and subscribed before me this 22 PD
day of APRIL  , 20 22
                              K. Diello
2021                          (SEAL)
                         (Signature of Issuing Authority)
Date Commission Expires

ARREST  ☒ Yes  ☐ No

JUDGE'S DISPOSITION
☐ Disc.  ☐ Hold for Court  ☐ Further Hearing  ☐ Fined or Committed

OTHERS SERVING/PARTICIPATING IN SEARCH
8212, 1802, 7481
1731, 7328, 8554
Badge No.  4053, 9416, 4855  686, 959
NARCOTICS FIELD UNIT
48

This warrant should be served as soon as practicable but in no event

☐ This warrant should be served as soon as practicable but in no event
later than _____  ☐ A.M. ☐ P.M. _____, 20 _____,
and may be served anytime during day or night.

Issued under my hand this _____ day of _____
20 _____, at _____ M. o'clock. (Issue time must be stated)
                                    (SEAL)
(Signature of Issuing Authority)

2021
Date Commission Expires

A.C.M.
Title of Issuing Authority

Commonwealth of Pennsylvania

AFFIDAVIT OF PROBABLE CAUSE

MC Transcript     Page 1 of 2

**PARS**

**Commonwealth VS.**
**DANIEL KING**  ← My HOMIE /
Address:
0 HOMELESS ST
Philadelphia PA 00000-
PID:1115954     SID: 39353528     DOB: 03/10/1996

Dckt/MC#     BAP Interview
MC51-CR-0025449-2018
COMPLAINT FILED BY:
Name: CITIZENS BANK
Date: 10/04/2018
OTN#: U1397141

DC#
18-35-051176
Codefendants: 0

Complainants:  1

| State Chrg | O Court | Description | Gr | Ct | State Chrg | O Court | Description | Gr | Ct |
|---|---|---|---|---|---|---|---|---|---|
| CC3701 | 20006 | ROBBERY | F1 | 01 | CC0907 | 43001 | PIC | M1 | 01 |
| CC2706 | 3755D | TERRORISTIC THREATS | M1 | 01 | CC3921 | 50002 | THEFT-UNLWF TAKING | M1 | 01 |
| CC3925 | 58001 | THEFT-RSP | M1 | 01 | | | | | |

Arrest Date: 10/03/2018   BY: MATTHEW CAREY MATTHEW
Next Action Date: 10/18/2018   Time: 08:00
Arraignment Disposition: Bail
Conditions of Release:

Amount: $50,000.00
Detainer Issued
Stay-Away Order Issued
Notes: See Supplemental Page For Complete Text

Badge#: 283812   Group Id:
Next Action Location: 803: 1301 Filbert Street, Stout Center
Appeal Information
Bail Appeal Judge:
Appeal By:

Arrest Type: WA

Special Needs:
AC Magistrate: KEVIN          DEVLIN     ← SIGNATURE

OFFICIAL → RW

Attorney for Def: Public Defender
Court Clerk: MARGARET SOLOMON
ADA/DA Rep: NICO CERIALE
Arraignment Site: PD
Arraignment Date: 10/04/2018   Time: 09:54

Preliminary Hearing or Trial Continuances

| First Action | Continued To | Reason for Continuance | Code | ☐ B.W. Issued ☐ B.O.S.O. | Judge |
|---|---|---|---|---|---|
| Further Action | Continued To | Reason for Continuance | Code | ☐ B.W. Issued ☐ B.O.S.O. | Judge |
| Further Action | Continued To | Reason for Continuance | Code | ☐ B.W. Issued ☐ B.O.S.O. | Judge |

Preliminary Hearing Disposition

| Date | Place | Attorney for Defendant (Name and Address) | | |
|---|---|---|---|---|
| Court Clerk | Court Reporter | Atty No. | | ADA |

After (waiving) hearing, above defendant is held for Court as follows:

Arraignment Date and Room

It is ordered that the charge(s) against the defendant are to be presented
to the District Attorney for the preparation of information.

Date:          Judge:

Trial Disposition Date

| Date | Place | Attorney for Defendant (Name and Address) | | Atty No. |
|---|---|---|---|---|
| Court Clerk | Court Reporter | Plea | Verdict | Atty for Prosecution |

Sentence:

I hereby certify that the above is a true and correct
return and transcript. Witness my hand and Seal.     Judge:

Date:

(Seal)

Use reverse side for additional notes

| PROPERTY RECEIPT | FROM WHOM TAKEN | | | AGE | SEX | N$^o$ 3393678 | |
|---|---|---|---|---|---|---|---|

| PROPERTY RECEIPT | FROM WHOM TAKEN MARK CHAMBERLAIN |
|---|---|

☐ LOST AND FOUND

☐ FOR INVESTIGATION

☐ PERSONAL PROPERTY FOR SAFEKEEPING

☒ EVIDENCE

FROM WHOM TAKEN: MARK CHAMBERLAIN
AGE: 36   SEX: B/M   N$^o$ 3393678
ADDRESS: 2139 ANCHOR STREET
DATE: 4/22/19   TIME: 4:30PM   DISTRICT: NFU   UNIT: 4B
OWNER (If Known): SAME AS ABOVE
LAB USER FEE REQUESTED: ☒ YES  ☐ NO
DC NO. 19-15-35886
ADDRESS: SAME AS ABOVE
SEIZURE NO.
DEFENDANT'S NAME: SAME AS ABOVE
BULK OF PROPERTY STORED AT: POLICE CHEM LAB

ITEMS OF PROPERTY AND CIRCUMSTANCES UNDER WHICH IT WAS RECEIVED INCLUDING THE EXACT LOCATION TAKEN FROM

EVIDENCE: ITEM#1-LOOSE CHUNKS OF ALLEGED CRACK COCAINE. ITEM#2-ONE(1) PKT
OF ALLEGED HEROIN, TWENTY-SIX(26) PKTS OF SUBOXONE AND SEVEN(7) PKTS OF
ALLEGED CRACK COCAINE INSIDE OF A KNOTTED SANDWICH BAGGIE.  ITEM#3-OEN(1)
BOTTLE OF SYRUP WITH A MISSING LABEL AND ONE CLEAR CONTAINER WITH A BLUE CAP
CONTAINING FOUR OXY'S(TWO BLUE AND TWO ORANGE PILLS).
CIRCUMSTANCES: THE ABOVE LISTED ITEM#1 WAS PURCHASED BY A C/I USING PRE
RECORDED N BUY MONEY ON THE ABOVE LISTED DATE. THE ABOVELISTED ITEM#2 WAS
CONFISCATED FROM THE DEFT., ON AND AT THE ABOVE LISTED DATE AND TIME OF HIS
ARREST. THE ABOVELISTED ITEM#3 WAS  O CONFISCATED WHILE EXECUTING SW#212248
ON AND AT THE ABOVE LSITED DATE AND TIME.
FIELD TEST: A NIK TEST "G" WAS CONDUCTED ON THE ABOVE LISTED ITEM#1 BY P/O
BOGAN #3358 WITH POSITIVE RESULTS FOR THE PRESENCE OF CRACK COCAIENE.
CHARGES: N1336F, N1316M  UCR:1807
CASE#: 19-NFU-381
CO-DEFENDANTS: REFER TO 75-49
ADDITIONAL PR#: REFER TO 75-49

| If the person from whom the above amount of money and/or property was taken does not sign below, state reason why: | RECEIVED BY POLICE DEPARTMENT |
|---|---|
| | Arresting or Receiving Officer: (If personal property for safekeeping, DeskSupervisor is the Receiving Officer) |
| PERSON FROM WHOM TAKEN (Signature) | |
| WITNESS (Signature) P/R _____  BADGE NO. (Type) .3212 | SIGNATURE P/O BOGAN   BADGE NO. (Type) 3358 |

TRANSFERRED TO EVIDENCE CUSTODIAN/COLLECTOR

I hereby acknowledge receipt of the above listed items.

| (Date) | (Time) | (Evidence Custodian/Collection) |
|---|---|---|

RELEASE FROM CUSTODY OF POLICE DEPARTMENT

This will acknowledge the receipt from the Police Department of the City of Philadelphia of the amount of money and/or property listed above, and will constitute the release of the City of Philadelphia and its agencies from any and all future responsibility therefor.

| | RECEIVED BY (Owner or Agent) | | |
|---|---|---|---|
| ☐ Returned to Owner or Agent | OWNER OR AGENT (Signature) | | |
| ☐ Confiscated by Court | | | |
| ☐ Destroyed by Order of Court | | | |
| Petition No. _____ | WITNESS (Signature) | BADGE NO. | DATE |
| ☐ Escheat to State | | | |
| Escheat List No. _____ | RECEIVED BY (Other than Owner of Agent) | | |
| ☐ To Department of Collections | SIGNATURE AND TITLE | | |
| ☐ Other Disposition (Explain): | | | |
| | WITNESS | | DATE |

Defendants 000011

POLICE DEPARTMENT

75-3 (Rev. 3/17)

Philadelphia Police Department
Office of Forensic Science
CHEMISTRY UNIT

**CHEM Evidence Control Data Sheet**

Document ID: 3526
Revision # 4 - 7/21/16
Page 1 of 1

| **EVIDENCE CONTROL DATA**<br>(CHEMISTRY – FORM A) | **CITY OF PHILADELPHIA**<br>**POLICE DEPARTMENT**<br>**OFFICE OF FORENSIC SCIENCE** | DATE / TIME STAMP |
|---|---|---|

LABORATORY NUMBER
19-00643

RECEIVED BY
*Keith Jones*

CONDITION OF SEAL
(*AT EVIDENCE INTAKE*)

☑ SEAL INTACT
☐ RECEIVED UNSEALED: EVIDENCE CONSISTENT WITH PR
☐ RECEIVED UNSEALED: PR CORRECTED TO MATCH EVIDENCE

| SUBMITTED BY (*PLEASE PRINT*)<br>Sean P. O'Malley | BADGE<br>6991 | PAYROLL NUMBER<br>223939 |
|---|---|---|

D.C. NUMBER
19 - ~~12~~ 35886
~~029316~~

PROPERTY RECEIPT NUMBER
~~3393768~~ 3393678

SUBMITTED BY (*SIGNATURE*)

**SECTION 1: SEAL INTEGRITY VERIFICATION**

| DATE | INITIALS | CONDITION OF SEAL | REMARKS |
|---|---|---|---|
| 05\|06\|2019 | *JL* | Intact | |
| | | | |
| | | | |
| | | | |

**SECTION 2: EVIDENCE INVENTORY**

| DATE | INITIALS | REMARKS | |
|---|---|---|---|
| 05\|06\|2019 | *JL* /3 /17 | EVIDENCE CONSISTENT WITH PROPERTY RECEIPT | ☐ |
| | | PROPERTY RECEIPT CORRECTED TO MATCH EVIDENCE | ☑ |
| | | EVIDENCE CONSISTENT WITH PROPERTY RECEIPT | ☐ |
| | | PROPERTY RECEIPT CORRECTED TO MATCH EVIDENCE | ☐ |
| | | EVIDENCE CONSISTENT WITH PROPERTY RECEIPT | ☐ |
| | | PROPERTY RECEIPT CORRECTED TO MATCH EVIDENCE | ☐ |
| | | EVIDENCE CONSISTENT WITH PROPERTY RECEIPT | ☐ |
| | | PROPERTY RECEIPT CORRECTED TO MATCH EVIDENCE | ☐ |

**SECTION 3: TO BE USED WHEN BEAST LIMS IS NOT USED**

| DATE | TIME | INITIALS | REMARKS |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

DEFENSE
EXHIBIT
DM8

**ISSUING AUTHORITY: Director, Office of Forensic Science**
Document is uncontrolled if printed

PROPERTY RECEIPT

| | | | | | | DISTRICT | UNIT |
|---|---|---|---|---|---|---|---|
| ☐ LOST AND FOUND | ADDRESS 5200 Kershaw street | | DATE 04-19-19 | 12:50 TIME P M | NB | 7401 |
| ☐ FOR INVESTIGATION | OWNER (If Known) Rashon Carter | | LAB USER FEE REQUESTED ☒ YES ☐ NO | DC NO. 19-19-029316 | | |
| ☐ PERSONAL PROPERTY FOR SAFEKEEPING | ADDRESS 6210 Hazel avenue | | | SEIZURE NO. | | |
| ☐ EVIDENCE | DEFENDANT'S NAME Rashon Carter | | BULK OF PROPERTY STORED AT Police Chem lab | | | |

ITEMS OF PROPERTY AND CIRCUMSTANCES UNDER WHICH IT WAS RECEIVED INCLUDING THE EXACT LOCATION TAKEN FROM

1. EVIDENCE: Item #1, (4) Blue Glassine packets containing alleged Heroin, Item #2, (1) clear sandwich baggie contain alleged marijuana, (2) clear containers (1) yellow container of alleged marijuana, (2) blue glassine packe alleged heroin.

2. CIRCUMSTANCES: The above evidence Item #1, was purchased by C/I #01080, above Item #2, was recovered from the abo defendant at 5200 Kershaw street.

3. FIELD TEST RESULTS: A NIK Test "E" was performed on a sample of the above alleged Marijuana with positive results the presence of marijuana.

4. NARCOTICS CASE #: 19-NFU-355

5. CHARGES: N1316M,N1330F,(1805)

6. ADDITIONAL PROPERTY RECEIPTS: Refer to 75-49

7. CO-DEFENDANTS: Refer to 75-49

---

| If the person from whom the above amount of money and/or property was taken does not sign below, state reason why: | RECEIVED BY POLICE DEPARTMENT |
|---|---|
| | Arresting or Receiving Officer: (If personal property for safe keeping, DeskSupervisor is the Receiving Officer) |

PERSON FROM WHOM TAKEN (Signature)

Refuse to sign

| WITNESS (Signature) ___ 417 | BADGE NO. (Type) | SIGNATURE | BADGE NO. (Type) |
|---|---|---|---|
| SGT. Lonnell  241412 | 427 | P/O Lotech O   217285 | 6760 |

TRANSFERRED TO EVIDENCE CUSTODIAN/COLLECTOR

I hereby acknowledge receipt of the above listed items.

| (Date) | (Time) | (Evidence Custodian/Collection) |
|---|---|---|

RELEASE FROM CUSTODY OF POLICE DEPARTMENT

This will acknowledge the receipt from the Police Department of the City of Philadelphia of the amount of money and/or property listed above, and will constitute the release of the City of Philadelphia and its agencies from any and all future responsibility therefor.

| | RECEIVED BY (Owner or Agent) | | |
|---|---|---|---|
| ☐ Returned to Owner or Agent | OWNER OR AGENT (Signature) | | |
| ☐ Confiscated by Court | | | |
| ☐ Destroyed by Order of Court   Petition No. | WITNESS (Signature) | BADGE NO. | DATE |
| ☐ Escheat to State   Escheat List No. | RECEIVED BY (Other than Owner of Agent) | | |
| ☐ To Department of Collections | SIGNATURE AND TITLE | | |
| ☐ Other Disposition (Explain): | WITNESS | | |

DEFENSE EXHIBIT DM9

75-3 (Rev. 3-17)

DISTRICT CONTROL COPY

Docket Number: MC-51-CR-0010379-2019

# CRIMINAL DOCKET

Court Case



Commonwealth of Pennsylvania

v.

Rashon Carter

Page 5 of 10

## DISPOSITION SENTENCING/PENALTIES

| Disposition | Disposition Date | Final Disposition | |
|---|---|---|---|
| Case Event | Offense Disposition | Grade | Section |
| Sequence/Description | Sentence Date | | Credit For Time Served |
| Sentencing Judge | Incarceration/Diversionary Period | | Start Date |
| Sentence/Diversion Program Type | | | |
| Sentence Conditions | | | |
| | | F | 18 § 903 §§ C |
| 2 / Conspiracy | Proceed to Court | F3 | 18 § 7512 §§ A |
| 3 / Criminal Use Of Communication Facility | Proceed to Court | M | 35 § 780-113 §§ A16 |
| 4 / Int Poss Contr Subst By Per Not Reg | Proceed to Court | M | 35 § 780-113 §§ A31 |
| 5 / Poss Of Marijuana | Proceed to Court | | |

| Dismissed - LOP | 10/09/2019 | Final Disposition | |
|---|---|---|---|
| Preliminary Hearing | Dismissed - LOP | F | 35 § 780-113 §§ A30 |
| 1 / Manufacture, Delivery, or Possession With Intent to Manufacture or Deliver | Dismissed - LOP | F | 18 § 903 §§ C |
| 2 / Conspiracy | Dismissed - LOP | F3 | 18 § 7512 §§ A |
| 3 / Criminal Use Of Communication Facility | Dismissed - LOP | M | 35 § 780-113 §§ A16 |
| 4 / Int Poss Contr Subst By Per Not Reg | Dismissed - LOP | M | 35 § 780-113 §§ A31 |
| 5 / Poss Of Marijuana | | | |

## COMMONWEALTH INFORMATION · ATTORNEY INFORMATION

| COMMONWEALTH INFORMATION | ATTORNEY INFORMATION |
|---|---|
| **Name:** Philadelphia County District Attorney's Office | **Name:** Gina A. Amoriello |
| Prosecutor | Court Appointed |
| **Supreme Court No:** | **Supreme Court No:** 082163 |
| **Phone Number(s):** | **Rep. Status:** Active |
| 215-686-8000 (Phone) | **Phone Number(s):** |
| **Address:** | 215-389-3090 (Phone) |
| 3 South Penn Square | 215-389-3090 (Office) |
| Philadelphia, PA 19107 | **Address:** |
| | 1515 Market St Ste 1200 |
| | Philadelphia, PA 19102 |
| | Representing: Carter, Rashon |

## ENTRIES

| Sequence Number | CP Filed Date | Document Date | Filed By |
|---|---|---|---|
| 1 | 04/20/2019 | | Municipal Court - Philadelphia County |
| PARS Transfer | | | |
| 2 | 04/20/2019 | | Stack, Patrick |
| Bail Set - Carter, Rashon | | | |

CPCMS 9082

Printed: 05/03/2022

Recent entries made in the court filing offices may not be immediately reflected on these docket sheets. Neither the courts of the Unified Judicial System of the Commonwealth of Pennsylvania nor the Administrative Office of Pennsylvania Courts assume any liability for inaccurate or delayed data, errors or omissions on these reports. Docket Sheet information should not be used in place of a criminal history background check which can only be provided by the Pennsylvania State Police. Moreover an employer who does not comply with the provisions of the Criminal History Record Information Act may be subject to civil liability as set forth in 18 Pa.C.S. Section 9183.

**Capone, Joseph**

| | |
|---|---|
| From: | Unger, Roseanne |
| Sent: | Wednesday, March 9, 2022 11:34 AM |
| To: | Dugan, Patrick; Capone, Joseph |
| Cc: | Scurry, Carole |
| Subject: | FW: US v Chamberlain |
| Attachments: | Arraignment Court .pdf |



Judge,

Please see the below request for the ACM schedule for April 22, 2019. Below is Carole's copy of the April schedule for that time period which reflect changes. I'll defer to Joe to share just 4/22/2019 or the entire page with Legal. Thank you.

Roseanne

### PHILADELPHIA MUNICIPAL COURT
### Arraignment Court Magistrate Schedule
### January 1, 2019 through December 31, 2019
*Continuing Education Training ~ April 29, 2019 – May 2, 2019*

| DAY | DATE | BERNARD | BEDFORD | O'BRIEN | STACK | RICE | DEVLIN |
|---|---|---|---|---|---|---|---|
| TUES | APR 2 | OFF | OFF | SB | 3:30 | 11:30 | 7:30 |
| WED | APR 3 | 11:30 | 7:30 | 3:30 | OFF | OFF | SB |
| THUR | APR 4 | 11:30 | 7:30 | 3:30 | OFF | OFF | SB |
| FRI | APR 5 | 11:30 | 7:30 | 3:30 | OFF | OFF | SB |
| SAT | APR 6 | 11:30 | 7:30 | 3:30 – Annual | OFF | OFF | SB - 3:30 |
| SUN | APR 7 | 11:30 | 7:30 | 3:30 - Annual | OFF | OFF | SB – 3:30 |
| MON | APR 8 | OFF | SB | OFF | 11:30 | 7:30 | 3:30 |
| TUES | APR 9 | OFF | SB | OFF | 11:30 | 7:30 | 3:30 |
| WED | APR 10 | OFF | SB | OFF | 11:30 | 7:30 | 3:30 |
| THUR | APR 11 | OFF | SB | OFF | 11:30 | 7:30 | 3:30 |
| FRI | APR 12 | OFF | SB – 3:30 | OFF | 11:30 | 7:30 | 3:30 -Annual |
| SAT | APR 13 | Switch w/OB ~~7:30~~ 11:30 | 3:30 | Switch w/Bernard ~~11:30~~ 7:30 | OFF | SB | OFF |
| SUN | APR 14 | Switch w/OB ~~7:30~~ 11:30 | 3:30 | Switch w/Bernard ~~11:30~~ 7:30 | OFF | SB | OFF |

| Day | Date | | | | | | |
|------|--------|------|------|------|------|------|------|
| MON | APR 15 | Switch w/JOB 7:30-11:30 | 3:30 | Switch w/Bernard 11:30 7:30 | OFF | SB | OFF |
| TUES | APR 16 | Switch w/JOB 7:30-11:30 | 3:30 | Switch w/Bernard 11:30 7:30 | OFF | SB | OFF |
| WED | APR 17 | Switch w/JOB 7:30-11:30 | 3:30 | Switch w/Bernard 11:30 7:30 | OFF | SB | OFF |
| THUR | APR 18 | SB | OFF | OFF | Switch w/Devlin 7:30-11:30 | 3:30 | Switch w/Stack 11:30 7:30 |
| FRI | APR 19 | SB | OFF | OFF | Switch w/Devlin 7:30-11:30 | 3:30 | Switch w/Stack 11:30 7:30 |
| SAT | APR 20 | SB | OFF | OFF | Switch w/Devlin 7:30-11:30 | 3:30 | Switch w/Stack 11:30 7:30 |
| SUN | APR 21 | SB | OFF | OFF | Switch w/Devlin 7:30-11:30 | 3:30 | Switch w/Stack 11:30 7:30 |
| MON | APR 22 | SB | OFF | OFF | Switch w/Devlin 7:30-11:30 | 3:30 | Switch w/Stack 11:30 7:30 |
| TUES | APR 23 | Switch w/Bedford 3:30-11:30 | Switch w/Bernard 11:30-3:30 | 7:30 | SB | OFF | OFF |
| WED | APR 24 | Switch w/Bedford 3:30-11:30 | Switch w/Bernard 11:30-3:30 | 7:30 | SB | OFF | OFF |
| THUR | APR 25 | Switch w/Bedford 3:30-11:30 — sick/family | Switch w/Bernard 11:30-3:30 | 7:30 | SB — 11:30 | OFF | OFF |
| FRI | APR 26 | Switch w/Bedford 3:30-11:30 | Switch w/Bernard 11:30-3:30 | 7:30 | SB | OFF | OFF |
| SAT | APR 27 | Switch w/Bedford 3:30-11:30 | Switch w/Bernard 11:30-3:30 | 7:30 — Annual | SB -7:30 | OFF | OFF |



**Commonwealth of Pennsylvania** } ss:
CITY AND COUNTY OF PHILADELPHIA

APPLICATION FOR
**SEARCH WARRANT**
AND AFFIDAVIT

| P/O Bogan | 3358 | NFU |
|---|---|---|
| *(Name and Affiant)* | *(Badge No.)* | *(District/Unit)* |

being duly sworn (or affirmed) before me according to law, deposes and says that there is probable cause to believe that certain property is evidence of or the fruit of a crime or is contraband or is unlawfully possessed or is otherwise subject to seizure, and is located at particular premises or in the possession of particular person as described below.

WARRANT CONTROL NO.
**212248**

ISSUED TO DIST/UNIT
Narcotics

DATE OF APPLICATION
4-21-19

IDENTIFY ITEMS TO BE SEARCHED FOR AND SEIZED (Be as specific as possible):
CRACK COCAINE, PARA, USC, WEAPONS, PROCEEDS FROM THE ILLEGAL SALES OF NARCOTICS RECORDS OF THE ILLEGAL SALES OF NARCOTICS, ANY SUBSTANCE UNDER THE PA. CONTROLLE[] SUBSTANCE ACT OF 1972........

SPECIFIC DESCRIPTION OF PREMISES AND/OR PERSONS TO BE SEARCHED (Street and No., Apt. No., Vehicle, Safe Deposit Box, etc.):
2139 Anchor ST   2 story row in the city and county of Phila.

NAME OF OWNER, OCCUPANT OR POSSESSOR OF SAID PREMISES TO BE SEARCHED (If proper name is unknown, give alias and/or description):
Reg Owner: Jean Paul Gulle Voter's check showed a James Rose. Target B/M wearing all black med to dark compl. med build

VIOLATION OF (Describe conduct or specify statute):
VIOLATION OF THE A. CONTROLLED SUBSTANCE ACT OF 1972

YEAR/DIST/COMPLAINT NO.
19-15--35886

19-NFU-0381

PROBABLE CAUSE BELIEF IS BASED ON THE FOLLOWING FACTS AND CIRCUMSTANCES (See special instructions below):

REFER TO PROBABLE CAUSE SECTION OF THIS WARRANT ***

Approved by: ADA Kate Lewis
4/21/19 @ 12:32 PM

ATTACH ADDITIONAL PAPER (75-51) IF NECESSARY         XX CHECK HERE IF ADDITIONAL PAPER IS USED.
PLEASE SEE REVERSE SIDE OF THIS PAGE FOR INSTRUCTIONS

| SIGNATURE OF AFFIANT | BADGE NO. | DIST/UNIT | |
|---|---|---|---|
| P/O Bogan | 3358 | NFU | Sworn to (or affirmed) and subscribed before me this _____ day of _____ 20 _____ |

COURT LOCATION

_____ (SEAL)
*(Signature of Issuing Authority)*

Date Commission Expires

| RESULT OF SEARCH | DATE AND TIME OF SEARCH | ☐ A.M. ☐ P.M. | ARREST ☐ Yes ☐ No | JUDGE'S DISPOSITION ☐ Disc. ☐ Held for Court ☐ Further Hearing ☐ Fined or Committed |
|---|---|---|---|---|

PROPERTY SEIZED          *(If "Yes" list Inventory below)*

☐ Yes  ☐ No

IF ADDITIONAL SPACE REQUIRED, USE REVERSE SIDE -- INVENTORY MUST APPEAR ON ALL COPIES OF THE WARRANT.

I certify, subject to the penalties and provisions of 18 Pa. C.S. §4904(b) that this is a true and correct listing of all items seized.

OTHER OFFICERS PARTICIPATING IN SEARCH

_____
Signature of Person Seizing Property          Badge No.

SIGNATURE OF WITNESS TO INVENTORY (Name and Address)

Philadelphia Police Department
Office of Forensic Science
CHEMISTRY UNIT

**Correction to Property Receipt Memo**

Document ID: 4113
Revision # 4 - 6/29/16
Page 1 of 1

# MEMORANDUM

POLICE
**CITY OF PHILADELPHIA**
DATE: 05/06/2019

**TO:**  Chief Inspector, ( ) Regional Operations South, ( ) Regional Operations North, ( ) Narcotics Bureau, ( ) Detective Bureau, ( ) Homeland Security Bureau, ( ) Unit Chief, District Attorney's Office

**FROM:**  Forensic Laboratory Manager, Chemistry Unit

**SUBJECT:**  <u>CORRECTION TO PROPERTY RECEIPT</u>

PR   #:   3393678
DC   #:   19-15-35886
LAB  #:   19-6643

1. On   04/22/19   Police Officer   Bogan   Badge #   3358   assigned
   to   15ᵗʰ/ NFU   District / Unit was the arresting / receiving officer on the above case.
   The Property Receipt was prepared by   Police Officer Deveaux   Badge #   3212
   assigned to   25ᵗʰ/ VCRT   District/Unit.

   Be advised that a change was made to the Property Receipt at the Office of Forensic Science
   due to the following:

   (X) count changed                           ( ) evidence description changed
   ( ) drug evidence not received              ( ) non-drug evidence not received
   (X) drug evidence received not listed       ( ) non-drug evidence received not listed
       on Property Receipt                         on Property Receipt
                                               ( ) Directive not followed

   **From:**   ...Item #2- one (1) pkt of alleged heroin, twenty-six (26) pkts of suboxone ...

   ...Item #3- ...and one clear container with a blue cap containing four oxy's (two blue and two
   orange pills) *ra 05/07/2019*

   **To:**   ...Item #2- one (1) pkt  containing a blue glazed pkt of alleged heroin, twenty-seven (27)
   pkts of suboxone ...

   ...Item #3- ...and one clear container with a blue cap containing four oxy's (two blue and two
   orange pills) **and green vegetable residue**

2. Thank you for your attention to this matter.

   _[signature]_
   Analyst - HC

   _[signature]_
   Forensic Laboratory Manager

82-S-1 (Rev. 3/59)        RESPONSE TO THIS MEMORANDUM MAY BE MADE HEREON IN LONGHAND

ISSUING AUTHORITY:  Director, Office of Forensic Science

DEFENSE
EXHIBIT
DM10